UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

VEKUII RUKORO, Paramount Chief of the Ovaherero
People and Representative of the Ovaherero Traditional
Authority; DAVID FREDERICK, Chief and
Chairman of the Nama Traditional Authorities Association,          Civ. No.
THE ASSOCIATION OF THE OVAHERERO GENOCIDE
IN THE USA INC.; and BARNABAS VERAA KATUUO,          **CLASS ACTION**
Individually and as an Officer of The Association of the          **COMPLAINT**
Ovaherero  Genocide in the USA, Inc., on behalf
of themselves and all other Ovaherero and Nama indigenous
peoples,

                                        Plaintiffs,                    Jury Trial Demanded
                    -against-

FEDERAL REPUBLIC OF GERMANY,

                                        Defendant.
_____x


        Plaintiffs, by and through their attorneys, McCallion & Associates LLP, bring this Class

Action Complaint against Defendant Federal Republic of Germany as follows:

                          **SUMMARY OF THE COMPLAINT**


        1.      Plaintiffs bring this action on behalf of all the Ovaherero and Nama peoples for

damages resulting from the horrific genocide and unlawful taking of property in violation of

international law by the German colonial authorities during the 1885 to 1909 period in what was

formerly known as South West Africa, and is now Namibia. Plaintiffs also bring this action to,

among other things, enjoin and restrain the Federal Republic of Germany from continuing to

exclude plaintiffs and other lawful representatives of the Ovaherero and Nama people from

participation in discussions and negotiations regarding the subject matter of this Complaint, in

violation of plaintiffs' rights under international law, including the U.N. Declaration on the Rights of Indigenous People to self-determination for all indigenous peoples and their right to participate and speak for themselves regarding all matters relating to the losses that they have suffered.

2.      From 1885 to 1903, over a quarter of Ovaherero and Nama lands (originally over 50,000 square miles) and countless cattle had been seized without compensation by German colonists with the explicit consent of the German colonial authorities. Since cattle grazing was the primary economic base for their survival, the Ovaherero and Nama communities suffered from these terrible losses.  German colonial authorities also turned a blind eye to the widespread and systematic rape of Ovaherero and Nama women and girls, as well as the indiscriminate use of Ovaherero and Nama peoples as forced laborers without compensation.

3.      After learning that they were going to be forced into concentration camps, and that the remainder of their lands and property were going to be confiscated, the Ovaherero rose up in early 1904, followed by the Nama. The uprising was crushed by German Imperial troops under the command of General Lothar von Trotha, who announced that his goal was to annihilate the Ovaherero people. His orders were effectively carried out, resulting in the deaths of over 100,000 Ovaherero and Nama, with the reminder thrown into concentration camps under atrocious and sub-human conditions, where there was an extraordinarily high death toll, and the survivors who were well enough to stand were forced to work as forced/slave laborer. The surviving women were subjected to systematic rape and other abuses.

4.      After decades of denying that the near destruction and eradication of the Ovaherero peoples by the German Imperial authorities was, in fact, a genocide, and refusing to even consider the issue of reparations or compensation, Defendant The Federal Republic of

Germany ("Germany") recently entered into negotiations with the Republic of Namibia ("Namibia") regarding these issues. However, Germany has refused to include representatives of the Ovaherero and Nama peoples in these discussions, even though they were the primary victims of the atrocities perpetrated by the German colonial authorities. Germany has also refused to explicitly admit that what it did constitutes a genocide under international law, even though it has been quick to pass resolutions and declarations blaming Turkey for the allegedly genocide of the Armenians by the Ottoman Empire during World War I.

5.      The U.S. and Namibian plaintiff representatives of the Ovaherero and Nama communities bring this class action complaint on behalf of all Ovaherero and Nama worldwide, seeking reparations and compensation for the genocide and incalculable damages to persons and property that their peoples suffered at the hands of the German colonial authorities, as well as the continuing violations by Germany of the rights of the Ovaherero and Nama peoples under the U.N. Declaration on the Rights of Indigenous People to directly participate in any discussions or negotiations relating to them.

6.      The U.S. and Namibian plaintiff representatives of the Ovaherero and Nama communities also bring this action, pursuant to 28 U.S.C. § 2201 (The Declaratory Judgment Act) seeking a Declaration of their Rights to be included in any negotiations between Germany and Namibia and that no purported resolution of the claims as set forth herein can be made, nor will they be binding upon the Ovaherero and Nama communities and their members, if Germany and Namibia exclude them from negotiations and unless their competent representatives are signatories to any settlements, treaties or release of claims.

## PARTIES

7.      Plaintiff VEKUII RUKORO, Paramount Chief of the Ovaherero People and representative of the OVAHERERO TRADITIONAL AUTHORITY, as the recognized legal entity representing the overwhelming majority of the Ovaherero people in Namibia and in the Diaspora.

8.      Plaintiff DAVID FREDERICK, a citizen and resident of Namibia, is the Chief and Chairman of the NAMA TRADITIONAL AUTHORITIES ASSOCIATION, the recognized legal entity of the Nama people in Namibia.

9.      Plaintiff THE ASSOCIATION OF THE OVAHERERO GENOCIDE IN THE USA INC. ("the Association") is a New York Not-For-Profit Corporation formed on September 10, 2010, which has had the longstanding purpose of seeking justice and compensation from Germany for the Genocide of the Ovaherero and Nama peoples. Plaintiff BARNABAS VERAA KATUUO, an officer of the Association and a member of the Ovaherero tribe, is a U.S. citizen and resident of Rockland County, New York.

10.     Defendant FEDERAL REPUBLIC OF GERMANY ("Germany")  is a sovereign state and a federal, parliamentary, representative democratic republic. It is the successor to the German Imperial Government, which was responsible for the genocide of the Ovaherero and Nama peoples during the colonial period in South West Africa (now Namibia), as well as the taking and expropriation of Ovaherero and Nama lands, cattle and other property without compensation in violation of international law.

11.     Defendant Germany is a member of the United Nations and a party to the Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide

Convention"), which was adopted by the General Assembly of the United Nations on December 9, 1948, and which became effective on January 12, 1951. Nevertheless, Germany has denied that its mistreatment of the Ovaherero and Nama peoples constitutes a genocide, even though the factual and historical record clearly reflects that Germany's conduct falls squarely within the generally accepted and statutory definition of genocide.

12.     In addition, Germany is a signator to the U.N. Declaration on the Rights of Indigenous Peoples, adopted by the U.N. General Assembly on September 13, 2007 ("Declaration"), which explicitly provides, at Article 11 (2):

> States shall provide redress through effective mechanisms, which may include restitution, developed in conjunction with indigenous peoples, with respect to their cultural, intellectual, religious and spiritual property taken without their free, prior and informed consent or in violation of their laws, traditions and customs.

In addition, Article 18 of the Declaration provides as follows:

> Indigenous peoples have the right to participate in decision-making in matters which would affect their rights, through representatives chosen by themselves in accordance with their own procedures, as well as to maintain and develop their own indigenous decision making institutions.

Nevertheless, despite the incalculable cultural, intellectual, religious and spiritual losses that the Ovaherero and Nama peoples have suffered, Germany has systematically and categorically excluded the lawful representatives of the indigenous Ovaherero and Nama peoples from negotiations between Germany and Namibia relating to their horrific mistreatment during the German colonial period, and has steadfastly refused to even consider making any reparations or compensation to the Ovaherero and Nama peoples for the catastrophic losses that they suffered.

**JURISDICTION AND VENUE**

13.     This Court has subject matter and jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties.

14.     This Court also has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, in that the genocide and unlawful takings claims under international law asserted herein arise under 28 U.S.C. § 1350 (Alien Tort Statute) and, in the case of the plaintiffs who are U.S. residents and citizens, under federal common law, which incorporates international law.

15.     This Court also has subject matter and personal jurisdiction over defendant Germany under the Foreign Sovereign Immunities Act, since this case involves genocide and an unlawful taking and expropriation of property without compensation in violation of international law. 28 U.S.C. § 1605(a)(3). It is undisputed that genocide itself is a violation of international law. See, e.g., *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984) (Edwards, J., concurring); accord, *Abelesz v. OTP Bank*, 692 F.3d 638 at 675-76 (7th Cir. 2012). The Restatement (Third) of the Foreign Relations Law of the United States § 712(1) states that, as here, a country (state) is responsible under international law for injury resulting from a taking by the state of the property of a national of another state that (a) is not for a public purpose, or (b) is discriminatory, or (c) is not accompanied by provision for just compensation.

16.     Congress has also authorized aliens to bring federal common law tort actions in federal courts for violations of the law of nations to avoid the diplomatic problems that may otherwise result from adjudication of these civil claims in state courts. *See, e.g.*, Anne-Marie Burley [Slaughter], *The Alien Tort Statute and the Judiciary Act of 1789: A Badge of Honor*, 83 Am. J. Int'l L. 461, 481-82 (1989); William R. Casto, *The Federal Courts' Protective Jurisdiction Over Torts Committed in Violation of the Law of Nations*, 18 Conn. L. Rev. 467, 468-69 (1985-1986); and 2 Emmerich de Vattel, *Law of Nations*, ch. 6 §§ 71-72 (Joseph Chitty, trans. and ed., T. J. W. Johnson & Co. 1867) (1758) (the law of nations provides a private remedy for foreigners injured by violations of international or domestic law and is an essential

means of reducing friction between nations.).

17.     In addition, the takings of property alleged herein has a sufficient connection to genocide such that they amount to takings "in violation of international law."  28 U.S.C. § 1605(a)(3).  Indeed, the alleged takings did more than effectuate genocide or serve as a means of carrying out genocide.  See *Abelesz*, 692 F.3d at 675-76.  Rather, the expropriations were themselves genocide.  Since the wrongfully taking of Ovaherero and Nama properties was inextricably linked to the mass killings and genocide of these peoples, plaintiffs' property-based claims fall squarely within the FSIA's expropriation exception.  See *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).  Such expropriations, therefore, constitute "tak[ings] in violation of international law."  28 U.S.C. § 1605(a)(3).

18.     The legal definition of genocide thus unquestionably encompasses the mass extermination and systematic expropriation of Ovaharero and Nama lands, cattle and other property alleged in this case.  The Convention on the Prevention of the Crime of Genocide (Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277, adopted by the United Nations in the immediate aftermath of World War II and ratified or acceded to by nearly 150 nations (including the United States), defines genocide as follows:

> [A]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; [or] (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part . . .

19.     This definition of genocide is "generally accepted for purposes of customary [international] law."  Restatement (Third) of the Foreign Relations Law of the United States § 702 cmt. d.  It appears not only in the Genocide Convention itself, but also in numerous other international treaties.  *See, e.g.,* Rome Statute of the International Criminal Court art. 6, July 17,

1998, 2187 U.N.T.S. 90; Statute of the International Tribunal for Rwanda art. 2 (1994); Statute of the International Criminal Tribunal for the Former Yugoslavia art. 4 (1993).  The offense of genocide under U.S. domestic law uses the same definition.  See 18 U.S.C. § 1091(a).

20.     This Court also has personal jurisdiction over the foreign defendant pursuant to Fed. R. Civ. P. 4(k)(2).

21.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims brought under the common law and laws of the State of New York.

22.     Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b)  and (c).  Furthermore, there is no foreign independent or impartial forum in which to bring this action.

## STATEMENT OF FACTS

23.     Imperial Germany first established its colony in Southwest Africa in 1883, and then signed a treaty with the Chief of the Ovaherero tribe, Kamaharero, on October 21, 1885. Interestingly, the treaty was signed on behalf of Imperial Germany by Heinrich Ernst Goring, the Colonial Governor and father of Nazi Luftwaffe commander Hermann Goring. For decades, a main street in the primary German settlement in South West Africa glorified his name – Heinrich Goering Street.

24.     Germany's impetus to expand into Africa in the 1880s was fueled largely by the concept of "Lebensraum" ("living space") espoused by German geographer Friedrich Ratzel, which was based upon the misguided belief in German biological and racial supremacy and insisted that Germany and its "Volk ohne Raum" ("people without space") had an obligation to colonize other lands to create the extra "living space" needed to cure Germany's urban overcrowding. Although Adolph Hitler later expanded this concept with deadly efficiency during the Third Reich, it first took root in the German colonization of South West Africa.

25.     Germany used its superior strength and occupying army to force the Ovaherero and Nama to enter into one-sided agreements, so-called "Protection Agreements," wherein those tribes were forced to cede to the Germans a substantial portion of their rights.

26.     No sooner than the ink was dry on the 1885 treaty documents with the Ovaherero than Germany began repeated violations of its terms, including the rape of Ovaherero women and girls by Germans, a crime that the German authorities largely ignored. Under German colonial rule, natives also were routinely used as slave laborers, and their lands and cattle were frequently confiscated and given to German colonists.

27.     By 1903, over a quarter of Ovaherero and Nama lands (originally over 50,000 square miles) had been seized by German colonists.  In addition, the confiscation of Ovaherero and Nama lands was expedited following the completion of the Otavi Railway Line running from the South West African coast to the inland German settlements.

28.     Throughout South West Africa, German settlers were able to establish lucrative plantations by exploiting the labor of the local indigenous Ovaherero and Nama (who the Germans derogatorily referred to as "Hottentot"). Since the German colonial authorities and the German settlers considered the indigenous peoples to be untermensch ("subhuman"), Ovaherero and Nama tribeswomen were subjected to incessant and often capricious rape, and then their men were killed for attempting to defend them.

29.     German settlers routinely stole the ancestral lands and cattle of the native Ovaherero and Nama, often facilitated by the predatory and confiscatory German bank lending practices enforced at gunpoint by the German colonial authorities.

30.     In early 1904, having learned of a German plan to further take their lands and territory, and to establish "reservations" or "concentration camps," the Ovaherero and Nama

9

finally revolted. Led by Chief Samuel Maharero, and armed primarily with spears, the Ovaherero surrounded the town of Okahandja and cut links to Windhoek, the colonial capital.

31.     Colonial Governor Leutwein, who reported to the Colonial Department of the Prussian Foreign Office, called for urgent assistance, and on June 11, 1904, Lieutenant General Lothar von Trotha, who had been appointed as Supreme Commander of South-West Africa, arrived with an expeditionary force of 14,000 troops.

32.     Trotha, who had earned a reputation as an effective and ruthless officer after effectively crushing a similar revolt against German colonial rule in East Africa, made clear his intentions to crush the resistance and to annihilate the Ovaherero and Nama peoples, leaving the land free for fulfillment of the dream of Lebensraum.  Prior to the Battle of Waterberg on August 11-12, 1904, where his troops defeated the Ovaherero, General Von Trotha issued the following proclamation:

> I believe that the [Ovaherero] nation as such should be annihilated, or, if this was not possible by tactical measures, have to be expelled from the country...This will be possible if the water-holes from Grootfontein to Gobabis are occupied. The constant movement of our troops will enable us to find the small groups of nation who have moved backwards and destroy them gradually.

33.     Trotha further wrote: "It is my intention to destroy the rebellious tribes with streams of blood and money." His men used the German word "Vernichtung," meaning "extermination."

34.     After the battle, the pursuing German forces pushed the surviving Ovaherero further into the desert. As the exhausted and dehydrated Ovaherero fell to the ground, German soldiers acting on orders killed men, women, and children mercilessly, even though almost all of them were unarmed and unable to offer any resistance. They were just trying to get away with

their cattle. Those who managed to make it into the desert were prevented by German troops from returning.

35.     On October 2, 1904, Trotha issued the following warning:

The Herero nation must now leave the country. If it refuses, I shall compel it to do so with the 'long tube' [cannon]. Any Herero found inside the German frontier, with or without a gun or cattle, will be executed. I shall spare neither women nor children. I shall give the order to drive them away and fire on them. Such are my words to the Herero people.

36.     Understandably, Trotha's command became known as a "vernichtungsbefehl", that is an "extermination order." The term quickly became embedded in the German language, and was widely used during the Third Reich with regard to Jews, gypsies, gays, Seventh Day Adventists and any other minority marked for annihilation.

37.     Trotha gave orders that captured Ovaherero males were to be executed, while women and children were to be driven into the desert so that they would die of starvation and thirst. Trotha argued that there was no need to make exceptions for Ovaherero women and children, since these would "infect German troops with their diseases." Trotha further explained that his campaign to annihilate the Ovaherero peoples "is and remains the beginning of a racial struggle".

38.     Thereafter, German soldiers regularly raped young Ovaherero women before killing them or letting them die in the desert.

39.     The same deadly fate also met the Nama tribespeople. Trotha sent them a similar message: "The Nama who chooses not to surrender and lets himself be seen in German territory will be shot until all are exterminated."

40.     The German general staff was aware of the atrocities that were taking place; its official publication, named *Der Kampf*, noted that:

This bold enterprise shows up in the most brilliant light the ruthless energy of the German command in pursuing their beaten enemy. No pains, no sacrifices were spared in eliminating the last remnants of enemy resistance. Like a wounded beast the enemy was tracked down from one water-hole to the next, until finally he became the victim of his own environment. The arid Omaheke [desert] was to complete what the German army had begun: the extermination of the Herero nation.

41.    The rhetoric used by Trotha to justify the extermination of the Ovaherero and Nama peoples eerily presaged the language later used by Hitler to justify the mass extermination of the Jewish people as an "ethnic cleansing" necessary for the resurrection of a New Germany. Trotha saw the annihilation of the Ovaherero and Nama peoples as serving a higher purpose, as part of the establishment of a new world order. He said: "I destroy the African tribes with streams of blood... Only following this cleansing can something new emerge, which will remain."

42.    Governor Leutwein objected to Trotha's "final solution" of the Ovaherero and Nama "problem," but not on humanitarian grounds. Rather he objected to the extermination of these indigenous peoples on economic grounds, writing that:

I do not concur with those fanatics who want to see the Herero destroyed altogether...I would consider such a move a grave mistake from an economic point of view. We need the Herero as cattle breeders...and especially as laborers.

43.    By the end of 1904, the surviving Ovaherero and Nama peoples remaining in South-West Africa, the majority of whom were women and children, were herded into concentration camps, where they were made available to colonists and private companies as slave laborers, or exploited as human guinea pigs in medical experiments.

44.    The most notorious of these camps was at Shark Island on the Atlantic coast, where the German authorities learned many of the lessons that were later employed at Auschwitz and other concentration camps during World War II. All prisoners were first divided into two

categories: those who were fit to work and those who were not. For administrative purposes, pre-printed death certificates uniformly gave the cause of death as "death by exhaustion following privation."

45.     Estimates of the mortality rate from disease, exhaustion and malnutrition at Shark Island and other concentration camps were between 45% and 74%. Despite these harsh conditions, any Ovaherero who could still stand were taken outside the camp every day as forced laborers by the German guards, while the sick and dying were left without medical assistance. Shootings, hangings and beatings of the forced laborers were widely reported by eyewitnesses and in the press. One British eyewitness reported that "cartloads of their bodies were every day carted over to the back beach, buried in a few inches of sand at low tide, and as the tide came in the bodies were out, food for the sharks."

46.     Medical experiments on live prisoners were made by German doctors such as Dr. Bofinger, who injected Ovaherero that were suffering from scurvy with various substances including arsenic and opium. After these "patients" inevitably died, he autopsied the bodies and reported the results. German doctors also experimented with dead body parts from prisoners, including those by Zoologist Leopard Schultzel, who noted that the taking of "body parts from fresh native corpses" was a "welcome addition."

47.     An estimated 300 skulls were sent to Germany for experimentation, in part from concentration camp prisoners. The primary goal of the experimentation was to "prove" the superiority of the "white race" and the "Germanic people."

48.     There are also direct links between the medical experiments on the remains of Ovaherero and Nama victims by Dr. Eugen Fischer, aa German biologist and "race scientist," and later medical procedures used during the Nazi Holocaust. For example, Fischer later became

chancellor of the University of Berlin, where he taught medicine to Nazi physicians. Otmar Freiherr von Verschuer was a student of Fischer, and Verschuer himself had a prominent pupil, the infamous Dr. Josef Mengele, who experimented on victims at the Auschwitz camp. In addition, Franz Ritter von Epp, who helped inaugurate Germany's first concentration camp, Dachau, during World War II, and who founding the Nazi Storm Troopers, took part in the Ovaherero and Nama genocide as well. Von Epp was one of the first German volunteers in the Schutztruppe, which decimated the Ovaherero and Nama people.

49.     The rise of the National Socialist Party in Germany in the 1930s brought with it the Sturmabteilung, the Storm Troopers, decked out in their brown shirts. Many of the early Nazis had served in the Schutztruppe the military units who had operated in South West Africa, and were easily recognized by their distinctive brown shirts. Recalling German colonial grandeur, Nazi Storm Troopers purchased surplus Schutztuppe uniforms, light brown for service in the Kalahari Desert area.

50.     Although the Shark Island Concentration Camp and other death camps were finally closed, the surviving Ovaherero and Nama were distributed as forced or slave laborers to German settlers. All Ovaherero and Nama over the age of seven were forced to wear a metal disc with their labor registration number. The Ovaherero and Nama were also prohibited from owning land or cattle, both of which were considered necessary for survival.

51.     In 1985, the United Nations' Whitaker Report classified the massacres as an attempt to exterminate the Ovaherero and Nama peoples of South-West Africa, and therefore one of the earliest cases of genocide in the 20th century.

52.     In 1998, German President Roman Herzog visited Namibia and met Ovaherero leaders. Chief Munjuku Nguvauva demanded a public apology and compensation, but Herzog stopped short of an apology, only expressing "regret."

53.     On August 16, 2004, at the 100th anniversary of the start of the genocide, a member of the German government, Heidemarie Wieczorek-Zeul, Germany's Minister for Economic Development and Cooperation, apologized and expressed grief about the genocide. However, the German government quickly made it clear that her speech could not be interpreted as an "official apology" by Germany or a basis for the payment of any compensation, reparations or restitution.

54.     It was not until October 2011, after three years of talks, that the first skulls were returned to Namibia for burial, and additional human remains were not returned until 2014. However, the skulls returned in 2011 were not returned for purposes of burial, but rather to be preserved as physical evidence of the horrific crimes committed by Imperial Germany. Furthermore, there is no way for plaintiffs to know whether the human remains repatriated in 2014 constituted the last of the remains taken with permission of the German authorities, since these repatriations were effected in secrecy and without the knowledge and participation of the plaintiffs, who were the "affected people".

55.     Even though the German government has entered into recent discussions with the Namibian government regarding what it refers to as "historical events" during the German colonial period, it has steadfastly refused to acknowledge that it was a genocide of the Ovaherero and Nama peoples, arguing that any historical event may only be classified as genocide if committed after the implementation of the UN Genocide Convention in 1951.

56.     However, earlier this year the Bundestag –Germany's lower house of parliament – reclassified the alleged mistreatment of Armenians during the Ottoman Empire in the early 20th Century as genocide. This opened the door for a reclassification of the 1904-1908 mistreatment of the Ovaherero and Nama peoples by the German colonial authorities as genocide.

57.     Nevertheless, the German government has continued to refuse to negotiate directly with the leaders and representatives of the Ovaherero and Nama communities, even though those are the two specific communities who were targeted for extermination. Moreover, Germany has publicly stated that any action or settlement it might reach with the Namibian government will not include reparations or compensation to the victims of the genocide.

58.     This most recent act by the German government is yet another "taking" or attempt to strip the Ovaherero and Nama people of their property rights recognized under international law, including the right to make claims and be heard before an impartial and fair tribunal.

## CLASS ACTION ALLEGATONS

59.     Plaintiffs are U.S. citizens and aliens who bring this action on behalf of themselves and all other U.S. and non-U.S. citizens who are, or who are direct descendants of, members of the Ovaherero and Nama indigenous peoples.

60.     This action may be properly maintained as a Class action pursuant to Rule 23, Federal Rules of Civil Procedure, in that the exact number of the members of the Class is not known to Plaintiffs but it is estimated that the Class is so numerous that joinder of individual members herein is impracticable. This action may be properly maintained as a Class action pursuant to Fed. R. Civ. P. Rule 23(b)(1) in that the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the

other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. This action may be properly maintained as a Class action pursuant to Fed. R. Civ. P. Rule 23(b)(2) as the parties opposing the Class have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

61.     There are also questions of law and fact common to the Class which predominate over questions affecting individual members, including:

(a)     Did the German colonial authorities design and implement an intentional policy and practice to exterminate the Ovaherero and Nama people?

(b)     Did the German colonial authorities systematically expropriate, and aid and abet the expropriation, of Ovaherero and Nama lands, cattle and other properties?

(c)     Did the German colonial authorities implement, aid and abet, and authorize a policy and practice of systematic rape of Ovaherero and Nama women?

(d)     Did the German colonial authorities implement, aid and abet and authorize a policy and practice of forcing Ovahereo and Nama into involuntary servitude and forced/slave labor?

(e)     Did the German colonial authorities incarcerate the surviving Ovaherero and Nama people in concentration camps under inhumane and sub-human conditions, without adequate food, water, clothing, shelter, medical care and other basic requirements and tools for survival, at Shark Island and other concentration camps?

(f)     Did German authorities permit and aid and abet the pseudoscientific medical experimentation on Ovaherero and Nama corpses and skulls in a misguided and ghoulish effort

to establish that indigenous Africans were "<u>Untermensch</u>" (inferior or sub-human) and that the German "race" was superior?

(g)     Has German intentionally "marginalized" and excluded Ovaherero and Nama leadership and representatives from any negotiations regarding the genocide and wrongful expropriation of their property, in violation of the U.N. Declaration of the Rights of Indigenous Peoples?

62.     The claims of the named Plaintiffs are typical of the members of the Class and they will be able to fairly and adequately protect the interests of the Class. The named Plaintiffs have no interests antagonistic to the interests of other members of the Class.

**COUNT I**

**(Violations of International Law Under the Alien Tort
Statute, 28 U.S.C. § 1350, Federal Common Law and The Law of Nations)**

63.     Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as though fully set forth herein.

64.     Germany's horrific mistreatment of the Ovaherero and Nama during the colonial period, including but not limited to the mass killings intended to exterminate the Ovaherero and Nama peoples, the systematic rape and abuse of Ovaherero and Nama women, the taking and expropriation of lands, cattle and other property without compensation and in furtherance of Germany's genocidal policies, the herding of Ovaherero and Nama survivors into concentration camps, the exploitation of surviving Ovaherero and Nama as forced/slave laborers, and the use of Ovaherero and Nama corpses and skulls for pseudoscientific experimentation and public display, constituted genocide under international law.

65.     In addition, Germany, as the lawful governmental authority during the colonial period, is liable for aiding and abetting German settlers and residents of then-South West Africa

in the confiscation of lands, cattle and other property from the Ovaherero and Nama in violation of international law, the systematic rape of Ovaherero and Nama women by said German civilian and military personnel, and the unlawful use of Ovaherero and Nama as forced/slave laborers.

66.     Germany is also liable to plaintiffs and the plaintiff class for its violations of the U.N. Declaration of the Rights of Indigenous Peoples, in that it has refused to recognize that the lawful representatives of the indigenous Ovaherero and Nama peoples have a right to participate in negotiations relating to the genocidal policies and practices of the German Imperial authorities during the colonial period, refusal to recognize the right to self-determination of the Ovaherero and Nama, and the refusal to even consider the issue of reparations and compensation to the Ovaherero and Nama for the catastrophic abuses that they were forced to endure.

67.     Germany is liable to the non-U.S. plaintiffs and plaintiff class members for damages under the Alien Tort Statute, 28 U.S.C. §1350, in an amount to be determined at trial.

68.     Germany is liable to the U.S. plaintiffs and plaintiff class members for these violations of international law under federal common law, which incorporates international law, in an amount to be determined at trial.

## COUNT II
### (Conversion)

69.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

70.     Germany's confiscation and unlawful taking of the lands, cattle and other property of the Ovaherero and Nama peoples without compensation constituted a conversion under common law and New York state law.

71.     Germany's aiding and abetting of the confiscation and unlawful taking of the lands, cattle and other property of the Ovaherero and Nama peoples without compensation by

German nationals and others during the colonial period constituted a conversion under common law and New York state law.

72.     As a result, plaintiffs and all Ovaherero and Nama members of the Class were deprived of their property, its use and enjoyments, and any interest and provides which could have been earned thereon.

73.     Germany is liable to the plaintiffs and plaintiff class for such damages in an amount to be determined at trial.

74.     Plaintiffs and other Class members are also entitled to the return of the assets and property that was looted and confiscated directly by the defendant, or which was aided and abetted by the defendant, in an amount to be determined at trial.

**COUNT III**
**(Unjust Enrichment)**

75.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

76.     By its seizure, use and retention of the property looted from the plaintiffs and Class members, through its aiding and abetting of others to convert plaintiffs' property, and by its refusal and failure to return said looted assets to their rightful owners, defendant improperly deprived plaintiffs and other Class members of their property.

77.     Plaintiffs and other Class members are therefore entitled to recover damages in an amount to be determined at trial.

**COUNT IV**
**(Accounting)**

78.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

79.     Plaintiffs and Plaintiff class members are entitled to an accounting from Germany for the losses that they suffered for the confiscation of their lands, cattle and other properties in violation of international law.

## COUNT V
### (Declaratory Judgment)

80.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

81.     Plaintiffs and Plaintiff class members are entitled to an Order declaring that defendant's exclusion of Plaintiffs, as the legitimate and lawful representatives of the Ovaherero and Nama indigenous peoples, from current negotiations regarding the subject matter of this Complaint, is a violation of Plaintiffs' rights under international law, including the U.N. Declaration on the Rights of Indigenous People.

## JURY TRIAL DEMAND

82.     Plaintiffs demand a jury trial on all issues so triable.

**WHEREFORE**, plaintiffs respectfully request that this Court:

    (a)  Certify this as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    (b)  Order that the undersigned attorneys are designated as class counsel;

    (c)  Adjudge and decree that defendants' conduct as described herein was in violation of international law, federal statutory and federal common law, and the law of New York State;

    (d)  Enjoin and restrain defendant from continuing to exclude plaintiffs and other lawful representatives of the Ovaherero and Nama people from participation in discussions and negotiations regarding the subject matter of this Complaint, in violation of plaintiffs' rights under the U.N. Declaration on the Rights of Indigenous People to self-determination for all indigenous peoples and their right to participate and speak for themselves regarding all matters relating to the losses that they have suffered;

(e) Award damages to the plaintiffs and Class members under the Alien Tort Statute and federal common law for the damages sustained by plaintiffs and the plaintiff class as a result of the violation of international law, including the Genocide Convention and the U.N. Declaration on the Rights of Indigenous Peoples;

(f) Award damages to the plaintiffs and Class members for all common and state law violations, including Conversion and Unjust Enrichment;

(g) Direct that defendant conduct an accounting of the value of the lands, cattle and other properties confiscated and taken from the Ovaherero and Nama peoples;

(h) Order that a Constructive Trust be established with regard to all lands, cattle and other property that was looted from plaintiffs and other Class members, and the profits derived therefrom;

(i) Award plaintiffs and other Class members punitive damages in an amount sufficient to punish defendant for its flagrant and outrageous violations of international law and to deter such future conduct; and

(j) Award plaintiffs the costs of bringing this action, including the payment of reasonable attorneys' fees; and

(k) Grant such other and further relief as this Court deems just and proper.


Dated: New York, New York
January 5, 2017

McCALLION & ASSOCIATES LLP

/s/

_____
By: Kenneth F. McCallion

Of Counsel:                                   100 Park Avenue – 16th floor
Professor Richard H. Weisberg,                New York, New York 10017
Benjamin N. Cardozo School of Law             (646) 366-0884
                                              Attorneys for Plaintiffs