UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

VEKUII RUKORO, Paramount Chief of the Ovaherero
People and Representative of the Ovaherero Traditional
Authority; JOHANNES ISAACK, Chief and
Chairman of the Nama Traditional Authorities Association;      Civ. No. 17-0062
THE ASSOCIATION OF THE OVAHERERO GENOCIDE
IN THE USA INC.; and BARNABAS VERAA KATUUO,                    **AMENDED**
Individually and as an Officer of The Association of the       **CLASS ACTION**
Ovaherero  Genocide in the USA, Inc., on behalf               **COMPLAINT**
of themselves and all other Ovaherero and Nama indigenous
peoples,

                                    Plaintiffs,          **Jury Trial Demanded**

                -against-

FEDERAL REPUBLIC OF GERMANY,

                                    Defendant.
_____x

Dated: New York, New York
        February 14, 2018

                                    Kenneth F. McCallion
                                    Professor Richard H. Weisberg
                                    MCCALLION & ASSOCIATES LLP
                                    100 Park Avenue – 16th floor
                                    New York, New York 10017
                                    (646) 366-0884

                                    Thomas A. Holman
                                    HOLMAN LAW, P.C.
                                    99 Park Avenue, Suite 2600
                                    New York, New York 10016
                                    (212) 481-1336

                                    Yechezkel Rodal
                                    RODAL LAW, P.A.
                                    3201 Griffin Road, Suite 203
                                    Dania Beach, FL 33312
                                    (954) 367-5308
                                    Attorneys for Plaintiffs

TABLE OF CONTENTS

**SUMMARY OF THE COMPLAINT** ..........................................................................1

INTRODUCTION ...................................................................................................1

    PARTIES ....................................................................................................7

    JURISDICTION AND VENUE .................................................................................9

**FACTUAL ALLEGATIONS** ....................................................................................17

    A.    Background and Context of the Takings ................................................17

    B.    Germany Decides to Take African Property in Violation of International Law ...19

    C.    Defendant and Its Agents Exploit and Violate the Rights of the Ovaherero and Nama Peoples with Fraud, Theft, Rape and Murder .......................19

    D.    Defendant's Campaign of Genocide against the Ovaherero ...................24

    E.    The Ovaherero Resistance .....................................................................26

    F.    Defendant's War and Genocide against the Nama .................................32

    G.    Defendant's Concentration Camps ........................................................34

    H.    Defendant's Takings in Violation of International Law .........................41

        1.    Defendant's Takings of Plaintiffs' Property Rights in Land .............42

        2.    Defendant's Takings of Plaintiffs' Property Rights in Personal Property and Livestock .................................................................43

        3.    Defendant's Takings of Plaintiffs' Concession, Taxation, and Customs Rights and Revenues, as well as Rights to Precious Metals and Other Resources .........45

        4.    Defendant Took Sovereignty Property Rights....................................52

        5.    Defendant Took Labor and Tort Rights and Claims, to which Plaintiffs have Rights by Intestacy.................................................53

        6.    Defendant's Taking of Skulls, Flesh, Brains, Hair, and Other Body Parts and Mortal Remains .......................................................55

        7.    Defendant Took and Dissected the Bodies of Plaintiffs' Family Members56

        8.    The Location of Defendant's Takings.................................................57

    I.    Damages to the Ovaherero and Nama Peoples ......................................58

    J.    Defendant's Use of the Property............................................................62

    K.    Defendant's New York Property that It Exchanged for the Property Taken in Violation of    International Law ..................................................65

    L.    Germany Finally Acknowledges the Genocide, But Refuses to Include the Ovaherero and Nama Leaders In Discussions Relating Thereto ...........70

    M.    Defendant Excludes the Ovaherero and Nama in Talks with Non-Party Namibia73

    N.    Defendant's Acts Have a Direct Effect in the United States ..................74

ii

     1.    U.S. Plaintiffs and Ovaherero and Nama Communities in New York and Elsewhere in the U.S. ...... 74

     2.    Human Remains from the Genocide Discovered to be Located in New York .... 75

     3.    Discovery of Copy of "Blue Book" in New York Public Library ..................... 76

     4.    New York As a Center For Research Relating to the Ovaherero/Nama Genocide ............ 77

  O.    Plaintiffs' Injuries ............................................................. 78

     1.    Economic Injuries ......................................................... 79

     2.    Non-Economic Injury ..................................................... 79

     3.    Punitive Damages ......................................................... 79

**CLASS ACTION ALLEGATONS** ........................................................ **80**

  A.    Predominance of Common Questions ................................... 80

  B.    Superiority ................................................................... 81

  C.    Typicality .................................................................... 82

  D.    Numerosity .................................................................. 82

  E.    Adequacy .................................................................... 82

COUNT I ............................................................................................

(Violations of International Law Under the Alien Tort Statute, 28 U.S.C. § 1350, Federal Common Law and The Law of Nations) ................................... 83

COUNT II ...........................................................................................

(Conversion of Land, Livestock and Other Property) ........................... 84

COUNT III ..........................................................................................

(Conversion of the Concession, Taxation, and Customs Rights) ...................... 85

COUNT IV ..........................................................................................

(Conversion of Precious Metals and Gems and Other Resources) ................... 85

COUNT V ...........................................................................................

(Conversion of the Wages of the Ovaherero and Nama Peoples) ..................... 86

COUNT VI ...........................................................................................

(Conversion of Labor and Pension Rights) ......................................... 87

COUNT VII ..........................................................................................

(Conversion of Skulls, Body Parts, and Mortal Remains) ............................ 87

COUNT VIII .........................................................................................

(Conversion of Sovereignty Property Rights) ...................................... 88

COUNT IX ...........................................................................................

(Unjust Enrichment)..................................................................................88

COUNT X ...................................................................................................

(Accounting)...........................................................................................89

COUNT XI...................................................................................................

(Constructive Trust)...............................................................................89

COUNT XII

(Declaratory Judgment)………………………………………………………89

**JURY TRIAL DEMAND** .......................................................................**90**

**PRAYER FOR RELIEF** ..........................................................................**90**

Plaintiffs, by and through their undersigned attorneys, bring this Amended Class Action

Complaint against Defendant Federal Republic of Germany as follows:

## SUMMARY OF THE COMPLAINT

### INTRODUCTION

1.      Plaintiffs bring this action in their individual and representative capacity on behalf of

all the Ovaherero and Nama peoples for damages resulting from the horrific genocide and unlawful

taking of property in violation of international law by the German colonial authorities during the 1885

to 1909 period in southwestern Africa, part of which was formerly referred to by Germany as German

South West Africa and is now Namibia.

2.      Plaintiffs also bring this action to, among other things, enjoin and restrain the Federal

Republic of Germany from continuing to exclude Plaintiffs from participation in discussions and

negotiations regarding the subject matter of this Complaint, in violation of Plaintiffs' rights under

international law, including the U.N. Declaration on the Rights of Indigenous People to self-

determination for all indigenous peoples and their right to participate and speak for themselves

regarding all matters relating to the losses that they have suffered.

3.      Germany's express written policy to exterminate the Ovaherero and Nama indigenous

peoples in southwestern Africa during the 1904–1908 period was Germany's first genocide of the

twentieth century. In many ways, Germany's genocidal policies and practices towards the Ovaherero

and Nama peoples, including the use of mass exterminations, concentration camps and mistreatment of

a targeted population as a "sub-human" group, was a precursor to Germany's later effort to

exterminate European Jewry. Indeed, some of the architects and key participants of Hitler's "Final

Solution" learned their barbaric practices during the period of the Ovaherero and Nama Genocide.

Even the German "brown shirts" that the Nazis wore in the 1920s and 1930s were "holdovers" from the earlier genocide.

4.       When German colonial authorities arrived in southwest Africa around 1885, they established contact with the Ovaherero and Nama peoples, who owned the land and had their own highly advanced sovereign governmental structures and customs. They called their country Hereroland (also known as Damaraland), and Great Namaqualand. They also owned portions of the Omaheke Desert, and the Amboland and Kaokoveld deserts, as well as surrounding territories, much of which Germany later wrongfully claimed to be "German South West Africa."  For purposes of this Amended Complaint, "southwest Africa" is defined as the geographic territory under the present sovereign control of the Republic of Namibia ("Namibia") and includes the traditional sovereign territories of the Ovaherero and Nama peoples that were wrongfully taken from them both during and following the Ovaherero and Nama Genocide of 1904-1908.

5.       At first, Germany entered into various written treaties and contracts with the Ovaherero and Nama leadership, giving Germany and German colonists the right to settle in certain limited areas. However, Germany soon broke these treaties and contracts, and instead opted to seize valuable Ovaherero and Nama grazing lands without compensation or consent, and with the use of indiscriminate violence. From 1884 to 1903, Germany and its agents unlawfully took over one-fourth (25%) of Ovaherero and Nama lands (originally over 50,000 square miles) and hundreds of thousands of livestock. As their land and livestock herding was the primary economic base of the Ovaherero and Nama peoples, as well as the foundation for Ovaherero and Nama political, cultural and social institutions, these unlawful takings and expropriations caused grave and irreparable harm.

6.       Germany and its agents also subjected Ovaherero and Nama women and children to widespread and systematic rape, murdered Ovaherero and Nama men, women, and children, and

systematically abused and enslaved Ovaherero and Nama men, women, and children for hard labor and other work without compensation.

7.      After announcing that it would open concentration camps as part of its ruthless and lawless expropriation of the remainder of Ovaherero lands, livestock, and property interests, and after decades of indiscriminate brutality and theft, Defendant began a systematic campaign of extermination of the Ovaherero people in January 1904. The Ovaherero peoples rose up in protest and, during some initial military successes, forced the German colonial authorities and German troops to retreat to fortified defensive positions.

8.      Later in 1904, the Nama people also rose up in opposition to Defendant's crimes.

9.      The German colonial authorities sent an urgent plea for help to Germany, requesting military support. Germany responded by sending a large expeditionary force, armed with rifles, cannons, and machine guns. Lieutenant-General Lothar von Trotha was selected to lead the German forces, primarily because he had a reputation for ruthlessness.

10.      General von Trotha, acting under imperial Germany's authority, issued written orders directing that his troops kill every Ovaherero and Nama man, woman and child, without mercy, and to drive any who survived into the desert, where they were sure to die of hunger and dehydration. On October 2, 1904, for example, he wrote: "[E]very Herero, with or without a gun, with or without cattle, will be shot. I will no longer accept women and children…These are my words to the Herero people." He issued similar orders relating to the Nama peoples.

11.       In addition to seeking revenge against the Ovaherero and Nama peoples for the humiliation that the German colonial forces had suffered at the hands of poorly armed "savages," the German authorities calculated that the extermination of these two powerful tribal peoples was the most

efficient way of accomplishing their ultimate goal, namely, the absolute and unconditional expropriation of all Ovaherero and Nama lands and personal property of any real value.

12.     The German troops carried out von Trotha's orders with methodical efficiency. Approximately one hundred thousand people were killed during Germany's reign of terror, with 80% of the Ovaherero and 50% of the Nama brutally annihilated. Following the orders of their commanders, many of the wounded or those that surrendered were murdered by German troops, including unarmed men, women and children who were lured into churches and other gathering places by German missionaries with the promise of amnesty.

13.     Many more of those who survived the initial mass slaughter by German troops made it into the desert, only to die there of hunger and thirst. Those who survived the exodus were forced to settle in what is now Botswana, South Africa and other countries. Some even made it to the United States, where they joined the growing Ovaherero and Nama worldwide diaspora.

14.     The remainder of the survivors were thrown into concentration camps under atrocious and sub-human conditions. The camps had an extraordinarily high death toll, and the survivors, who were well enough to stand, were forced to work as forced/slave laborer. The surviving women were subjected to systematic rape and other abuses.

15.     At Germany's most notorious concentration camp known as Shark Island, German authorities ordered the decapitation of approximately three hundred Ovaherero and Nama men. They then ordered that that their severed heads be boiled in water, and Ovaherero and Nama women and girls were forced to manually scrape off strips of face, flesh, and cooked brains of their fathers and husbands using broken glass shards.  In violation of international law, Defendant then took the polished skulls and shipped them by sea to Germany, where many still remain. These skulls were used for pseudo-scientific experimentation by German academics and racial theorists, who believed that

their "experiments" supported the theory of Germanic superiority and, conversely, the inferiority of all Africans and people of color.

16.     Some of the human remains that were wrongfully taken and transported to Germany were sold to the American Museum of Natural History in New York, where they remain today.

17.     As a result of the Ovaherero and Nama Genocide, the Ovaherero and Nama peoples were stripped of all their valuable real, personal and intangible property, including but not limited to land, livestock, concession, taxation, and customs rights, precious gems and metals, human labor, body parts, and other property.

18.     Defendant's violations of international law also left the Ovaherero and Nama sovereign states in ruins. Germany irreparably and without legal justification deprived the Ovaherero and Nama peoples of their sovereign status and crippled the sovereign polities of Hereroland and Great Namaqualand to such an extent that they were largely disbanded and broken up by German authorities. The Ovaherero and Nama sovereign entities were thereby forced into a much-reduced and limited quasi-sovereign status, which is where they remain under Namibian law, condemned for generations to perpetual and institutionalized poverty, lack of proper education, and social and cultural deprivation.[1] But for Defendant's illegal takings, Hereroland and Great Namaqualand would still stand today as sovereign nations.

19.     Plaintiffs, therefore, bring this class action on behalf of all Ovaherero and Nama peoples worldwide for damages resulting from Defendant's taking and expropriation of their property,

---

[1] See Manfred O. Hinz & Alex Garisib, 3 CUSTOMARY LAW ASCERTAINED: THE CUSTOMARY LAW OF THE NAMA, OVAHERERO, OVAMBANDERU, AND SAN COMMUNITIES OF NAMIBIA xv–xvii, 6–15 (University of Namibia 2016); Article 66 of the Constitution of Namibia; Traditional Authorities Act, Act 17 of 1995, amended by Act 8 of 1997 and Act 25 of 2000 (Namib.) (defining the quasi-sovereign competencies of Traditional Authorities); Community Courts Act § 13, Act No. 10 of 2003 (Namib.).

including their sovereign status, in violation of applicable international law during the period from 1885 through 1915 in southwestern Africa.

20.     In recent years, Defendant finally began admitting that its actions constituted genocide, or at least its equivalent. German development minister, Heidemarie Wieczorek-Zeu, first apologized for the killings in 2004, describing the massacres as a "genocide" on a trip to Namibia, but her remarks were not adopted as official government policy.

21.     In approximately 2015, German Foreign Ministry guidelines started referring to these events as a "genocide," and in July 2016 the German government confirmed in writing to the Parliament that it was official German policy to consider this as a genocide.

22.      Germany has entered negotiations with the Namibian government regarding this dark period in German and African history. Inexplicably, however, Germany has excluded Plaintiffs -- the only legitimate and recognized leaders of the Ovaherero and Nama peoples worldwide, as well as their organizations -- from participation in these negotiations, even though they were the victims of these atrocities.  In so doing, Germany again violated international law, since it is a signatory to the U.N. Declaration on the Rights of Indigenous Peoples ("the U.N. Declaration"), adopted by the U.N. General Assembly on September 13, 2007, which was intended to acknowledge and protect the rights of indigenous peoples.[2]

23.     Despite the incalculable cultural, intellectual, religious and spiritual losses that the Ovaherero and Nama peoples have suffered, Germany systematically and categorically excluded the lawful representatives of the indigenous Ovaherero and Nama peoples from negotiations between Germany and Namibia, and steadfastly refused to even consider making any reparations or compensation to the Ovaherero and Nama peoples for the catastrophic losses that they suffered.

---

[2] U.N. Declaration on the Rights of Indigenous Peoples, Arts. 11 and 18, G.A. Res. 61/295, U.N. Doc. A/61/L.67 and Add. 1 (Sept. 13, 2007). *See*, *infra*, at ¶¶ 291-292.

24.     Plaintiffs, therefore, also bring this action seeking a Declaratory Judgment, pursuant to 28 U.S.C. § 2201, *et seq*., that Defendant has wrongfully excluded Plaintiffs, as the lawful representatives of the Ovaherero and Nama peoples, from participating in discussions and negotiations regarding the subject matter of this Amended Complaint, in violation of Plaintiffs' third-party beneficiary rights under international law, including the U.N. Declaration, the right to self-determination, and the right to participate and speak for themselves regarding matters relating to the losses they have suffered.

## PARTIES

25.     Plaintiff **VEKUII RUKORO**, a citizen and resident of Namibia, is the Paramount Chief of the Ovaherero People and representative of the Ovaherero Traditional Authority, the recognized legal entity representing the overwhelming majority of the Ovaherero people in Namibia and in the diaspora.  As named Plaintiff, he brings this action on behalf of himself and all worldwide members of the Ovaherero people or direct descendants of the Ovaherero people who lived in Hereroland prior to its destruction by Defendant.

26.     Plaintiff **JOHANNES ISAACK**, a citizen and resident of Namibia, is the Chief and Chairman of the Nama Traditional Authorities Association, the recognized legal entity representing the Nama people in Namibia and in the diaspora.  As named Plaintiff, he brings this action on behalf of himself and all worldwide members of the Nama people or direct descendants of the Nama people who lived in Great Namaqualand prior to its destruction by Defendant.

27.     Plaintiff the **ASSOCIATION OF THE OVAHERERO GENOCIDE IN THE USA INC.** ("the Association") is a New York not-for-profit Corporation formed on September 10, 2010, which has had the longstanding purpose of seeking justice and compensation from Defendant for the Genocide of the Ovaherero and Nama peoples.

7

28.     Plaintiff **BARNABAS VERAA KATUUO,** an officer of the Association and a member of the Ovaherero tribe, is a U.S. citizen and resident of Rockland County, New York.  Mr. Katuuo brings this action on behalf of himself and all U.S. citizen members of the Ovaherero people or direct descendants of the Ovaherero people who lived in Hereroland prior to its destruction by Defendant.

29.     Defendant **FEDERAL REPUBLIC OF GERMANY** ("Germany" or "Defendant")[3] is a sovereign state and a federal, parliamentary, representative democratic republic.  According to the German Federal Government, which has adopted and concurred with the rulings of the German Federal Constitutional Court—the Federal Republic of Germany is not only the state *successor* to the 1871–1918 German Empire—also known as the *Kaiserreich* or the Second Reich—but rather the continuing body politic of the same entity, sharing an identical, unbroken legal status under German law and international law.[4] Consequently, all rights and obligations of the German Empire are rights and obligations of the Federal Republic of Germany.

30.     Defendant directed and benefited from the genocide of the Ovaherero and Nama peoples and the expropriation of Ovaherero and Nama land, livestock, concession, taxation, and customs rights, human labor, body parts, and other property without compensation in violation of international law.

31.     Germany is a member of the United Nations and a party to the Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), which was adopted by the General Assembly of the United Nations on December 9, 1948 and entered into force on January 12, 1951.  Nevertheless, for years Defendant denied that its mistreatment of the Ovaherero

---

[3] "Defendant" and "Germany" are used interchangeably to refer to the Federal Republic of Germany and the German Empire.
[4] *See* Bundesverfassungsgericht [BVerfG] [German Federal Constitutional Court] 2 BvF 1/73 (July 31, 1973)**.**

and Nama peoples constituted a genocide, even though the factual and historical record clearly reflected that Defendant's conduct falls squarely within the generally accepted and statutory definition of genocide.

32.     The actions and omissions of Defendant's agents that resulted in or contributed to the takings in violation of international law are attributable to Defendant.

## JURISDICTION and VENUE

33.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1330(a), and personal jurisdiction over Defendant under 28 U.S.C. § 1330(b), in that Defendant is a foreign state and the takings exception to jurisdictional immunity pursuant to 28 U.S.C. § 1605(a)(3) applies. Under the jurisdictional provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1601, *et seq*., ("FSIA"), jurisdiction exists over this subject matter and over Defendant, because Plaintiffs' rights in property taken by Defendant from the Ovaherero and Nama peoples in violation of international law are at issue, and property exchanged for the taken property is present in the United States in connection with the numerous commercial activities carried on in the United States by Defendant and Defendant's agencies and instrumentalities. Moreover, under this exception, jurisdiction exists over this subject matter and over Defendant, because this action is, in part, based upon Defendant's acts in Germany in connection with its commercial activities elsewhere that has caused a direct, material, and deleterious effect in the United States in general, and in New York in particular.

34.     A genocide unquestionably was committed by Defendant's mass extermination and systematic expropriation of Ovaherero and Nama lands, cattle and other property as alleged herein and

as conceded by Defendant. *See* paragraph 21, *supra*.[5]

35.    Both the genocidal mass extermination and unlawful takings and expropriations of Ovaherero and Nama land, livestock, concession, taxation, and customs rights, human labor, body parts, and other property without compensation are violations of international law, 28 U.S.C. § 1605(a)(3). The unlawful taking of property without compensation in furtherance of a policy and practice of genocide is a well-recognized violation of international law.

36.    The takings of property alleged herein constitute takings "in violation of international law" under 28 U.S.C. § 1605(a)(3) considering their inseparable connection to the Ovaherero and Namaqua genocide.  Defendant merged the twin goals of takings and genocide into a single policy, practice, and endeavor.  The takings were themselves genocide, and the genocide was itself a taking.

37.    Since the wrongful taking of Ovaherero and Nama properties was inextricably linked to the mass killings and genocide of these peoples, Plaintiffs' property-based claims fall squarely within the FSIA's expropriation exception. Such expropriations, therefore, constitute "tak[ings] in violation of international law."[6]

38.    All of Defendant's acts, as alleged herein, constitute confiscatory and discriminatory acts of taking, including, but not limited to:

a.    all Imperial and Colonial governmental decrees, laws, ordinances, and regulations concerning the disposition of Ovaherero and Nama persons, liberty, and property;

b.    all acts of confiscation by Defendant's agents on Defendant's instruction, knowledge, and consent, which are attributable to Defendant, including all actions of Defendant's military that resulted in harm to the Ovaherero and Nama peoples, including, but not limited, the execution of prisoners, the rape of women and children, the pillaging and

---

[5] *See Convention on the Prevention of the Crime of Genocide (Genocide Convention)*, art. 2, Dec. 9, 1948, 78 U.N.T.S. 277 ("[A]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; [or] (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part . . .); *see also* 18 U.S.C. § 1091(a)(same definition of offense of genocide under U.S. domestic law).
[6] 28 U.S.C. § 1605(a)(3).

destruction of civilian property, and the illegal and discriminatory confiscation of Ovaherero and Nama property, liberty, and land;

c.   the Regulation of April 22, 1896 on the Jurisdiction over Natives in German South West Africa, all other Imperial and Colonial laws on jurisdiction over Hereroland and Great Namaqualand, and all judicial decrees, judgments, orders, injunctions, and writs issued by the Imperial Courts of Otjimbingwe, Swakopmund, Windhoek, Lüderitz Bay, Omaruru, and any other Imperial Courts in prosecutions against Ovaherero and Nama Defendants, as well as in civil cases involving Ovaherero or Nama parties;

d.   all Imperial and Colonial governmental decrees, laws, ordinances, regulations—as well as contractual or administrative arrangements with private individuals, merchants, and companies—concerning the disposition of Ovaherero and Nama property that Defendant took in violation of international law, and the disposition of Ovaherero and Nama persons that Defendant enslaved in violation of international law;

e.   all Imperial and Colonial governmental acts aiding and abetting private parties that were involved in the disposition of Ovaherero and Nama peoples or property;

f.   the Protectorate Law of March 15, 1888;

g.   the Imperial Extermination Order (Imperial District Office of Windhoek, Reference No. 3737, Oct. 2, 1904), calling for the extermination of the Ovaherero people;

h.   the Imperial Extermination Order against Nama (Apr. 22, 1905), calling for the extermination of the Nama people;

i.   the Imperial Decree of December 26, 1905, "Pertaining to the Sequestration of Property of Natives in the Protectorate of South West Africa," declaring the expropriation of all of Hereroland and portions of Great Namaqualand; and,

j.   the Imperial Decree of September 8, 1907, declaring the expropriation of the rest of Great Namaqualand.

39.   These actions enumerated in paragraph 38, *supra*, qualify as "takings," because they are of a kind typically reserved to sovereigns, *i.e.*, governmental or military acts, and not normally exercised by commercial actors.

11

40.    Defendant's takings violated international law as it existed in the period 1885–1915. Namely, the takings were unambiguous violations of i) customary international law;[7] ii) positive international law;[8] and iii) Defendant's legal obligations as codified in its treaties.[9]

41.    For example, in Article 3 of Defendant's Treaty with Eduard Lambert of the Khaua Nama of March 9, 1894, Defendant promised "protection in the territory of the Khaua Hottentots, as soon as the tribe's new boundaries are calculated."[10]  The treaty was substantively and procedurally fraudulent, as Eduard Lambert signed the treaty under duress after Defendant hunted and executed his brother, the Khaua Nama leader Andreas Lambert.  Notwithstanding this fact, Defendant breached the treaty in March 1896, when Germany waged war against the Khaua Nama, and ultimately hunted and killed the signatory to the contract, Eduard Lambert.

42.    Defendant also breached the explicit terms of the Martens Clause of the 1899 Hague Convention—a codification of the existing "protection and empire of the principles" of customary international law—which states:

---

[7] *See, e.g.*, the jurisprudence of Hugo Grotius, Emer de Vattel, George Frederic de Martens, Henry Wheaton, and Francis Lieber.

[8] *See*, the Second Paris Peace Agreement of 1815, the 1841 Quintuple Treaty, the Geneva Conventions of 1864, the Brussels Declaration of 1874, the General Act of the Berlin West Africa Conference of 1885, the 1889 German-Dutch Agreement, the 1890 Anti-Slavery Convention, the 1890 German-Belgian Agreement to Criminalize Trade in Girls, the Hague Conventions of 1899 and its Martens Clause, the 1904 Agreement on Administrative Regulation to Ensure Effective Protection Against Trade in Girls, the Convention for the Amelioration of the Condition of the Wounded and Sick in Armies in the Field of July 6, 1906, the 1907 Hague Conventions and its Martens Clause, and others.

[9] *See e.g.*, Treaty with the Rehoboth Bastards of October 13, 1884; the Treaty with the Bethanien Nama of October 28, 1884; the Treaty with Jacob Isaak of Bersaba (Nama) of July 28, 1885; the Treaty with Manasse of Hoachanas (Nama) of September 2, 1885; the Treaty with Captain Hermanus von Wyk of the Rehoboth Bastards of September 15, 1885; the Treaty with Chief Kamaherero of the Ovaherero of October 21, 1885; the Treaty with the Ovaherero of Omaruru of November 3, 1885; the Treaty with Jan Hendriks of the Veldschoendrager Nama of August 21, 1890; the Treaty with William Christian of the Bondelszwart Nama of August 21, 1890; the Treaty with Eduard Lambert of the Khaua Nama of March 9, 1894; the Treaty with Simon Cooper of the Fransman Nama of March 19, 1894; the Treaty with Dietrich Goliath of Berseba (Nama) of July 7, 1894; the Treaty with David Vilander of the Vilander-Bastards of July 27, 1894; the Treaty with Hendrik Witbooi of the Nama of September 15, 1894; the Treaty with Samuel Maharero of the Ovaherero of December 6, 1894; the Treaties with the Ovaherero of Omururu of November 30, 1894; the Treaty with Samuel Maharero of the Ovaherero of December 6, 1894; the Treaty with David Zwaartbooi of the Zwaartbooi Nama of January 19, 1895; the Treaty with Manasse Lambert of the Khaua Nama of February 4, 1895; the Treaty with Hermanus von Wyk of the Rehoboth Bastards of July 26, 1895; and the Treaty with Hendrik Witbooi of the Nama of November 16, 1895.

[10] The term "Hottentots" was a commonly-used derogatory term referring to the Nama peoples.

> [I]n cases not included in the Regulations adopted . . . populations and belligerents remain under the protection and empire of the principles of international law, as they result from the usages established between civilized nations, from the laws of humanity, and the requirements of the public conscience.

43.     As a further example, Defendant breached Article VI of the General Act of the Berlin West Africa Conference of 1885 ("Article VI"), under which Defendant was obligated to:

> watch over the preservation of the native tribes, and to care for the improvement of the conditions of their moral and material well-being, and to help in suppressing slavery, and especially the slave trade.[11]

44.     Thus, as early as 1884, Defendant obliged itself to the "necessity" and "duty" of preserving and assisting the Ovaherero and the Nama peoples.  Notwithstanding the fact that the Ovaherero and Nama peoples never asked for such "assist[ance]," Defendant breached its obligations by exterminating the same peoples it swore to protect, citing the "necessity" of economic conditions and the "duty" of their white race.

45.     Defendant was particularly aware of its obligations under customary international law at the time, since several German scholars were among the most notable international law experts. For example, the 1868 writings of Heidelberg University Professor Johann Kaspar Bluntschli demonstrated how the principle of protecting civilian non-combatants was a central component of customary international law; he wrote: "The peaceful residents in enemy territory, who are not playing an active role in hostilities . . . are not to be considered or treated as enemies."[12]  Bluntschli understood this concept to stretch as far as "any unnecessary killing":

---

[11] See also, Legislative Report accompanying the General Act of 1885 explaining purpose of Article VI: "With regard to [native] populations, which, for the most part, ought, undoubtedly, not to be considered as placed without the pale of international law, but which in the present state of affairs are scarcely of themselves able to defend their own interests, the Conference has been obliged to assume the role of an unofficial guardian.  The necessity of insuring the preservation of the natives, the duty of assisting them to attain a more elevated political and social state, the obligation of instructing them and of initiating them in the advantages of civilization, are unanimously recognized."
[12] Johann Caspar Bluntschli, *Das Moderne Völkerrecht* [Modern International Law] § 572, 319 (1868)

> Neither the military force nor the individual soldiers have the right to capriciously or pointlessly kill, wound, mistreat, torture, enslave, or sell any individuals, or to mistreat women or harm their purity.
>
> This regulation applies generally: not simply to peaceful private persons, but also regarding protection against enemy forces, although these rules are suspended during active battle. . . Killing without a battle, simply from bloodlust or hate, is also not permitted against enemy soldiers. There exists no *jus vitae ac necis* against the enemy.[13]
>
> . . . Every unnecessary killing—even if an armed enemy—is unjust.[14]

46.    The justification is simple for establishing principles of customary international law

which prohibit the killing of civilian combatants:

> By establishing human rights, the hostilities are pushed back to the narrowest zone possible, and it gives us much space as possible to a spirit of peace and mutual promotion of life.

47.    Finally, according to Bluntschli, native peoples – such as the Ovaherero and Nama

peoples – were entitled to precisely the same treatment as any other peoples:

> Wars of extermination and annihilation against peoples and tribes that are capable of life and culture are violations of international law.
>
> . . . Simply because certain peoples are considered [uncivilized], they should still be treated humanely, and one may not simply deprive them of human rights. They are perhaps difficult to subject to a legal order, and teaching them the ways of civilization may perhaps be a thankless task that requires great effort and potentially meager results. However, it is nonetheless the job and indeed the obligation of civilized nations, to try and promote civilized conduct in even the wildest of tribes, and help them achieve the heights of human dignity. Never again is it permitted for states or soldiers to hunt for wild peoples like foxes and wolves.

48.    Thus, during the years 1884–1915, Germany was undoubtedly familiar not only with the

works of Professor Bluntschli, but also the entire corpus of customary international law dealing with

human rights, the law of war, and the prohibition of genocide, rape, and brutality.

---

[13] *Id*. at § 574, 321
[14] *Id*. at § 579, 323.

49.     The 1902 writings of Franz von Liszt, Professor of Law at the University of Berlin, also

confirm that the aforementioned prohibitions remained established at the very time and place of some

of Defendant's most egregious violations against international and natural law:

> A party waging war may use only those methods that are necessary to destroy the
> opponent's resistance . . .
>
> Imprisonment is permissible in war today only when it secures the life, health,
> and property of the prisoner . . .
>
> After the end of hostilities, prisoners of war should be released . . .
>
> [When occupying foreign territory], private property cannot be violated, except
> in the event of an emergency.

50.     Defendant's property-based violations, which it interwove with its crimes against

humanity, were also, independent of the genocide, violations of international law.

51.     An acclaimed treatise published in 1836 declared the "modern rule" concerning the

disposition of property belonging to the enemy.  Unless acting in reprisal to a belligerent opponent's

seizure of property, a state violates customary international law if it seizes the property of the opponent:

> [T]he modern rule of international usage [is] that the property of the
> enemy found within the territory of the belligerent state, or debts due to
> his subjects by the government or individuals, at the commencement of
> hostilities, are not liable to be seized and confiscated as prize of war. .[15]

52.     The "model rule" described above in paragraph 55 was eventually codified in the 1874

Brussels Declaration, to which Defendant was a party.

53.     During the time when the takings occurred, state practice also confirms that

Defendant's takings were in violation of customary international law.  For example, in the 1860s the

United Kingdom condemned Belgium's violations of "rights of humanity" in the Congo; and France,

---

[15] Wheaton, Henry, *Elements of International Law*. Philadelphia: Carey, Lea & Blanchard (1836) (available on the Internet at http://gallica.bnf.fr/ark:/12148/bpt6k935676/f1.image.r=.langEN)(comparing the modern rule with that asserted by Chief Justice Marshall in Brown v. United States, 12 U.S. 110, 122–30 (1814)).

the United Kingdom, and Russia condemned the Ottoman Empire's massacres against the Armenians in 1894–96, as "crimes against humanity and civilization." [16]  Unafraid of double standards, Kaiser Wilhelm II also condemned the Ottoman Empire's actions.

54.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over claims brought under the common law and laws of the State of New York.

55.    Venue properly lies in this Judicial District under 28 U.S.C. § 1391(f)(1), because a substantial part of the property that is the subject of this action is situated in the City and State of New York:

    a.  A 7,000 square-foot townhouse, located at 119 E. 65th Street in the Borough of Manhattan;

    b.  A 133,750 square-foot building, located at 871 First Avenue in the Borough of Manhattan;

    c.  A 1,591 square-foot condo, located at 346 E. 49th Street in the Borough of Manhattan and associated easement; and,

    d.  A 16,147 square-foot building, located at 1014 Fifth Avenue in the Borough of Manhattan.

56.    This Court also has personal jurisdiction over the foreign Defendant pursuant to Fed. R. Civ. P. 4(k)(2).

57.    Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c). Furthermore, there is no foreign independent or impartial forum in which to bring this action.

---

[16] *See* A. Kämmerer und J. Föh, *Das Völkerrecht als Instrument der Wiedergutmachung?*, 42 Archiv des Völkerrechts 294, 314–15 (2004).

## FACTUAL ALLEGATIONS

58.    Imperial Germany first established its colony in southwestern Africa in 1883, and then signed a treaty with the Chief of the Ovaherero tribe, Kamaharero, on October 21, 1885. The treaty was signed on behalf of Imperial Germany by Heinrich Ernst Goring, the Colonial Governor and father of Nazi Luftwaffe commander Hermann Goring.

59.    Germany's impetus to expand into Africa in the 1880s was fueled largely by the concept of "Lebensraum" ("living space") espoused by German geographer Friedrich Ratzel, which was based upon the misguided belief in German biological and racial supremacy, and that Germany and its "Volk ohne Raum" ("people without space") had an obligation to colonize other lands to create the extra "living space" needed to cure Germany's urban overcrowding. Although Adolph Hitler later expanded this concept with deadly efficiency during the Third Reich, it first took root in the Defendant's colonization of South West Africa.

A.    **Background and Context of the Takings**

60.    Defendant's takings in violation of international law arose from its failed conquest of Africa, its illegal occupation of Ovaherero and Nama lands, its development, encouragement, and adoption of theories of white supremacy, its illegal commercial activities involving theft, exploitation, enslavement, and colonization, and the genocide that Defendant conceived, financed, directed, and executed against the Ovaherero and Nama peoples.

61.    Before being virtually annihilated by German forces, the Ovaherero people collectively encompassed the Ovaherero of the highlands, the Ovambanderu of the Sandveld, and the Ovahimba of the Kaokoveld.  They spoke the Otjiherero language with its dialects, including Ovaherero, Ovambanderu, Ovahimba, Ovatjimba, Ovayemba, and Vakwandu.  Over the course of the 19th century, the Ovaherero people evolved from a confederation of chieftaincies into a unified sovereignty

under the leadership of the Maherero dynasty.  The region's arid climate prevented large-scale agriculture, and so the Ovaherero prospered as cattle herders.  The Ovaherero held collective property and ownership rights over the land of Hereroland as a collective people.  Ovaherero society—and, in particular, the advanced and highly formalized rules of inheritance—was governed by structured laws, which every Ovaherero youth was obligated to learn.

62.     The Nama people, who resided in Great Namaqualand in Southwestern Africa and South Africa for many centuries, are a Khoikhoi-speaking people, and, like the Ovaherero, were a confederation of tribes across the southern portion of southwest Africa.

63.     Like the Ovaherero, the Nama were prosperous cattle herders.  Also, like the Ovaherero, over the course of 19th century, the Nama people evolved from a confederation of chieftaincies with some degree of internal conflict into a unified sovereignty.  By the start of the 20th century, the Nama population of Namaqualand had grown to approximately 20,000 people with cattle herds numbering approximately 100,000.

64.     Between 1884 and 1892, Germany signed treaties they never intended to honor with both peoples and tried to turn the Ovaherero and Nama against each other. However, in 1892 the Ovaherero and Nama peoples reached lasting peace.

65.     Today, the Ovaherero people are comprised of six traditional authorities:

   a)  Kakurukouje Traditional Authority;
   b)  Maharero Traditional Authority;
   c)  Otjikaoko Traditional Authority;
   d)  the Vita Royal House;
   e)  Zeraua Traditional Authority; and,
   f)  Ovambanderu Traditional Authority.

66.     Today, the Nama people are comprised of ten traditional authorities:

   a)  Afrikaner Traditional Authority;
   b)  Blouwes Traditional Authority;
   c)  Bondelszwart Traditional Authority;
   d)  Kaikhaun Traditional Authority;
   e)  Simon Kooper Traditional Authority;

   f) Soromas Traditional Authority;
   g) Swarzbooi Traditional Authority;
   h) Topnaar Traditional Authority;
   i) Vaalgras Traditional Authority; and,
   j) Witbooi Traditional Authority.

**B.    Germany Decides to Take African Property in Violation of International Law**

67.    Newly unified and seeking its "place in the sun," Germany aimed to compete with other European empires that had established colonies in Africa and elsewhere.  To that end, Defendant hosted the Berlin West Africa Conference from November 15, 1884 to February 26, 1885.  In Articles VI and IX of the Conference's General Act, Defendant and the other participants pledged to "support the native population [of Africa] and improve their moral and material situation," and to end the slave-trade.  Under the guise of humanitarianism, Germany began its racist, imperialist, and expropriative annexation of African territories, as negotiated with the leading European powers.

68.    On April 30, 1885, Germany directed, authorized, invested in, and assisted in the founding of the *Deutsche Kolonialgesellschaft für Südwest Afrika* (German South West Africa Company), whose leadership included German aristocracy, industrialists, and politicians.

**C.    Defendant and Its Agents Exploit and Violate the Rights of the Ovaherero and Nama Peoples with Fraud, Theft, Rape and Murder**

69.    Its purported claims to Africa now successfully negotiated with its fellow Europeans, Germany set off to compel the Ovaherero and Nama peoples into fraudulent treaties for the purpose of exploiting them and taking their land, people, and property.  Defendant's acts in Southwestern Africa were conducted by, on the instruction of, and with the support of innumerable agents of Defendant, including the highest political officers: Friedrich Wilhelm Viktor Albert von Preußen, King of Prussia, who served as Defendant's agent as Kaiser of the German Empire from 1888–1918 ("Kaiser Wilhelm II"), and Count Bernhard Heinrich Martin Karl von Bülow, who served as Defendant's agent and

19

Chancellor of the German Reich from 1900–09 ("Chancellor von Bülow").  Their official actions and omissions—like those of all of Defendant's agents—are attributable to Defendant.

70.    Defendant dispatched Imperial Commissioner Göring to what Germany referred to as South West Africa.

71.    Commissioner Göring and Chief Kamaherero entered into a "protection" treaty between Defendant and the Ovaherero people, dated October 21, 1885, in which Defendant promised the "absolute highest level of protection" to the Ovaherero people and promised that all Germans would respect the customs and laws of Hereroland, which belonged to the Ovaherero people.  In exchange, the Ovaherero people gave Defendant certain mineral and easement rights and promised that German settlers and merchants could work in peace in Hereroland.

72.    Defendant continually breached this treaty in spirit and letter through its official policies and practices throughout 1885–88, in which Defendant and its agents aided and abetted, permitted, and institutionalized the theft of Ovaherero cattle, the exploitation of mineral rights without just compensation, the abuse and injury of Ovaherero men and laborers, and the rape of Ovaherero women and children in numerous related and unrelated episodes.

73.    In 1888–1890, Defendant continued these policies and practices, and continued to illegally enforce its draconian Imperial Criminal Code, in order to exploit the Ovaherero people to the maximum extent possible.

74.    In 1889 Defendant's agent Captain von François established Fort Wilhelmsfeste on the road connecting Swakopmund to the major Hereroland city of Otjimbingwe.  He blocked the import of arms into Hereroland, thereby depriving the Ovaherero people of the ability to defend themselves.

20

75.     Defendant's treaties with the Ovaherero and Nama were procedurally and substantively fraudulent, as Defendant never intended to comply with its treaty obligations.  In 1884–85 Defendant signed such treaties with the Topnaars and the Red Nation Nama tribes, amongst others.

76.     In response to a Ovaherero-Nama peace treaty entered into in November 1892, Defendant sent *Schutztruppe* reinforcements to "divide and conquer" the Ovaherero and Nama by trying to re-instigate war between these two peoples, and to implement Defendant's policy of illegal takings.

77.     On the night of April 12, 1893, Captain von François and his troops furtively encircled Hoornkrans and assumed fortified positions.  Von François gave the firing orders at dawn.  Within thirty minutes, sixteen thousand rounds of ammunition were fired at the sleeping Nama peoples of Hoornkrans.  Under surprise attack, Chief Witbooi ordered his men to retreat to the far side of the valley, so as to draw German fire away from the women and children.  But instead, Defendant's agents ignored the men and concentrated on killing as many women and children as possible.  Seventy-eight Nama women and children were killed.

78.     Chief Witbooi's 12-year-old son, Klein Hendrik—who was born with crippling partial paralysis—was wounded while fleeing.  He was crawling unarmed in a river bed where a German soldier found him and executed him with a pointblank shot to the head.

79.     One Witbooi tribesman, Petrus Jafta, witnessed the massacre from a hilltop.  He testified under oath:

> I and two other men got on a small hilltop and saw some women sitting a distance away.  We called to them to get away, but they remained until the Germans passed.  One of the soldiers shot one of these women.  The others begged for their lives and asked the Germans to make slaves of them rather than kill them. . . . One woman was killed while her child clung to her screaming; a soldier shot the child through the head, blowing it to pieces.  I saw the child shot.  The soldier aimed at it . . . Many children were killed in the houses.

80.     One German soldier who participated in the attack, wrote of the brutality:

> On all sides terrible scenes were disclosed to us. Under and over the hanging rocks lay the corpses of seven Witbooi, who in their death agony, had crawled into the hollow, and their bodies lay pressed tightly together. In another place the body of a . . . woman obstructed the footpath, while two three-to-four-year-old children sat quietly playing besides their mother's corpse.

81.   Chief Witbooi described the brutality of Defendant's agents in a letter to Captain van Wijk dated April 18, 1893:

> [Von François] captured our place, and destroyed the place in the most terrible manner, as I had never imaged from a white civilized nation, which knows the laws and conduct of war, but he robbed me, and small children, which still lay at their mother's breast, and bigger children and women and children he shot them dead, and many corpses, which he had already shot dead, he placed in the grass houses which he lit and burnt the bodies to ash.

82.   Defendant waged an intermittent war of brutality against the Nama people from 1893–1895, during which time Defendant's agents and German settlers stole Nama cattle and other valuable property, including gemstones and precious minerals, abused, injured, and murdered Nama men, and raped Nama women and children.

83.   Major-General Theodor Gotthilf Leutwein arrived in South West Africa in 1895. Defendant continued its campaign against the Nama, and, with its artillery and machine guns, forced Chief Witbooi's surrender.

84.   As Governor Leutwein admitted, "divested of all ideals and talk of humanity, the aim of all colonization lies ultimately in profit." In order to methodically expropriate the land and property rights of the Ovaherero and Nama, Defendant required a suitable local bureaucracy. With dates of establishment in parentheticals, these expropriation offices included:

   a.   the *Zentralbureau des kaiserlichen Gouvernements* (Central Office of the Imperial Government) (1884);

   b.   *Kaiserliche Bezirksämter* (Imperial District Offices) in Swakopmund (1892), Windhoek (1893), Omaruru (1894), Karibib (1894), Okahandja (1894), Outjo (1897), Gobabis (1898), and Zessfontein (1901);

   c.   *Kaiserliche Gerichte* (Imperial Courts) in Otjimbingwe (1885), Swakopmund (1885), Windhoek (1885), Lüderitz Bay (1906), and Omaruru (1909);

22

      d.   the *Kaiserliches Hafenbauamt* (Imperial Harbor Construction Office) at Swakopmund (1896); and,

      e.   the *Eingeborerenkommissariat* (Office of the Native Commissioner) in Windhoek (1900).

85.    Seeking new lands for settlement in late 1895, Defendant identified the Mbandjeru Ovaherero tribe and the Khaua Nama tribe for conquest and expropriation. Defendant directed and aided and abetted the theft of 12,000 head of cattle, among other valuable property. Conflict ensued. Defendant conquered both tribes by 1897 and executed Chiefs Nikodemus and Kahimemua.

86.    Between 1884–1903, Defendant continually harmed and took the property of the Ovaherero and Nama peoples in violation of international law by placing German settlers on Ovaherero and Nama land, and aiding and abetting the settlers in the taking of their cattle, land, and other valuable property. The number of German settlers rose from 310 in 1891 to 2,998 in 1903.

87.    By 1903 Defendant and its agents had seized over a quarter of Ovaherero and Nama lands (originally over 50,000 square miles).

88.    Defendant intensified its expropriation efforts with (i) the April 10, 1898 Imperial Decree establishing reservations for forced relocation of the Ovaherero and Nama peoples; (ii) the seizure of land acquired to bisect Hereroland with a railway to Otavi, thereby expropriating lands 10–20 kilometers from the track in both directions; and (iii) the 1903 Credit Ordinance.

89.    As a result of Defendant's takings and other violations, the Ovaherero and Nama herds had dwindled to just 50,000 head of cattle by 1903, down from their wealth of several hundreds of thousands of cattle in the 1880s. With their cattle gone, Ovaherero and Nama herders were forced into wage labor, slavery and servitude, which process was accelerated by usurious and fraudulent loans that were foisted upon many of the Ovaherero and Nama herders by Defendant's agents and German banks and traders, all of which were supported and subsidized by Defendant. Under the 1903 Credit Ordinance, German creditors' claims against Ovaherero and Nama debtors were to prescribe after twelve months.

With Defendant's direction, support, and aiding and abetting, armed German creditors responded by immediately descending upon impoverished Ovaherero and Nama debtors on horseback, enforcing their claims through theft of all remaining Ovaherero and Nama cattle and other valuable property.

90.    In Hereroland, Lieutenant Ralph Zürn continued Defendant's policies and practices of expropriation. In November 1903 he had been appointed as commander of the fort at Okahandja, the central capital and metropolis of all Hereroland, and the home of Paramount Chief Maharero and his family.  It was a holy place for all Ovaherero; the Maharero dynasty's ancestors were buried there, and it was there that Chief Maharero maintained his clan's holy fire—the *Okuruo*—which must remain lit for eternity under customary Ovaherero law.

91.    Lieutenant Zürn and other German agents carried out a series of fraudulent and barbaric acts on the Ovaherero residents of Okahandja.

92.    In December 1903, Zürn summoned Ovaherero leaders and demanded that they sign a contract handing over numerous tracts of ancestral land.  When the leaders refused, they were physically removed from Zürn's office, and Zürn subsequently forged their signatures.  On December 8, 1903, Zürn announced these new northern borders to Hereroland.

93.    Lieutenant Zürn and other Germany agents also dug up the holy graveyards of the Maharero dynasty and defiled the corpses of the royal clan's ancestors.  This was a flagrant and severe violation of customary Ovaherero law.

**D.    Defendant's Campaign of Genocide against the Ovaherero**

94.    Throughout South West Africa, German settlers were able to establish lucrative plantations by exploiting the labor of the local indigenous Ovaherero and Nama. Since the German colonial authorities and the German settlers considered the indigenous peoples to be *Untermenschen*

("subhuman"), Ovaherero and Nama tribeswomen were subjected to virtually incessant rape and other abuses, and then their men were killed for attempting to defend them.

95.    German settlers routinely stole the ancestral lands and cattle of the native Ovaherero and Nama, often facilitated by the predatory and confiscatory German bank lending practices enforced at gunpoint by the German colonial authorities.

96.    In early January, false rumors had begun spreading regarding an Ovaherero uprising. German traders had spread the false rumors that the Ovaherero were buying goods on credit to stock up in preparation for an attack.

97.    On January 10, 1904, one trader, Alex Niet, falsely reported to Lieutenant Zürn that he witnessed 300 armed Ovaherero poised to attack Okahandja. Zürn telegrammed Okahandja, and hid in his fort with the German settlers, traders, and newly arrived *Schutztruppe* reinforcements.

98.    Lieutenant Zürn sent out numerous scouts over the next two days, all of whom returned with no indication of a threat.  Nonetheless, the Germans had begun gossiping, spreading rumors, and preparing for what they ultimately desired: an opportunity to kill their African neighbors and take their property under the guise of an Ovaherero "revolt."

99.    On January 12, 1904, Germany began its war against the Ovaherero people.  Lieutenant Zürn ordered his soldiers to open fire on any Ovaherero people who happened to be in the proximity of the fort.

100.    The Ovaherero had been subjected to Defendant's systematic policies and practices of expropriation and abuse, by which Defendant directed and aided and abetted in the murder of Ovaherero men, the theft of land and cattle without compensation, the threat of being removed to reservations under Defendant's guard, and the incessant rape and sexual exploitation of Ovaherero women and children.

25

### E.     The Ovaherero Resistance

101.     The Ovaherero did not want war. Lieutenant Zürn's actions, however, forced the Ovaherero to defend themselves.

102.     In early 1904, the Ovaherero surrounded the town of Okahandja and cut links to Windhoek, the colonial capital.

103.     Under the explicit humanitarian directives of Chief Mahararo, the Ovaherero forces were directed not to harm any German woman, children, or missionaries, and no violence was to be conducted against the English, the Boers, or any other tribes.  Fewer than 150 German settlers and soldiers, including fewer than five women and one child, lost their lives in the initial Ovaherero military response.

104.     Following the attack, the settlers, the Colonial government, and the German pro-colonial classes of industrialists, politicians, and nationalists rallied for total war.

105.     German troops began spreading out through Hereroland, taking defensive positions, and lynching any Ovaherero men they found.

106.     Germany ultimately rejected the idea of mere enslavement of these native peoples. Instead, frustrated with Governor Leutwein's failures at the battle of Oviumbo and unwilling to accept anything short of absolute expropriation, the Kaiser replaced Leutwein with a new agent who would complete the expropriation with the requisite amount of violence: Lieutenant-General Adrien Dietrich Lothar von Trotha.  General von Trotha served as Defendant's agent as Governor and Supreme Commander of "German South West Africa" from May 1904 until November 1905.  Defendant instructed General von Trotha to "end the war by fair or foul means," and entrusted the command to him with "fullest confidence in [his] insight, energy, and experience."

107.    On June 11, 1904, Lieutenant General von Trotha arrived with an expeditionary force of 14,000 troops.

108.    Von Trotha made clear his intentions to crush the resistance and to annihilate the Ovaherero and Nama peoples, leaving the land free for fulfillment of the German dream of Lebensraum. Prior to the Battle of Waterberg on August 11-12, 1904, where his troops defeated the Ovaherero, General von Trotha issued the following proclamation:

> I believe that the [Ovaherero] nation as such should be annihilated, or, if this was not possible by tactical measures, have to be expelled from the country...This will be possible if the water-holes from Grootfontein to Gobabis are occupied. The constant movement of our troops will enable us to find the small groups of nation who have moved backwards and destroy them gradually.

109.    Von Trotha further wrote: "It is my intention to destroy the rebellious tribes with streams of blood and money." His men used the German word "Vernichtung," meaning "extermination."

110.    By August 1904, over 60,000 Ovaherero people had gathered at Waterberg, including the elderly, handicapped, unarmed men, women, and children.  They planned to surrender.

111.    General von Trotha's troops descended upon Waterberg, encircling the Ovaherero camp with a battalion of 4,000 men, 1,500 rifles, hand grenades, thirty state-of-the-art artillery pieces, and twelve state-of-the-art machine guns, split into six divisions in a star-shaped formation.  It was a deadly firing squad.

112.    General von Trotha left one exit open to the Ovaherero: a valley leading to the Omaheke Desert to the east, which he used as a tactical barrier.  The tens of thousands of Ovaherero men, women, and children that were not killed in the assault were forced to abandon their belongings and herds and escape into the desert.  One German Officer described it: "The entire national wealth of

the Herero was left by the wayside." The German troops carefully gathered up any valuables, which were expropriated by Defendant and its agents, and shipped them back to Germany.

113.    Defendant continued its goals of annihilation, and pursued the Ovaherero men, women, and children mercilessly.  Officers Ludwig von Estorff and Berthold von Deimling were deployed with their divisions in pursuit on August 13, 1904, cutting down Ovaherero men, women, and children that they encountered, even those unarmed and unable to offer resistance.

114.    The Omaheke Desert is a vast sandvelt with high desert temperatures, virtually no rainfall, sparse vegetation, sparse and limited sources of water, dried arroyos, and typically under 5 millimeters of rainfall during August and September.  Its ecosystem does not support much life.  Some of the Ovaherero, including Chief Samuel Maharero, were able to survive the arduous trek across the desert to the British protectorate Bechuaunaland—today, Botswana—where they took refuge.  Others fled to Ovamboland, and others to South Africa.  But most of the Ovaherero, who entered the desert, perished.

115.    In September, Defendant cordoned off the Omaheke desert with a 250-kilometer armed perimeter.  General von Trotha wrote:

> [We must drive the opponent] back into the desert should he not fight, where thirst and privation will complete his destruction.

116.    Defendant's extermination and genocidal policies and practices were fully implemented at this point, since Germany had no intention of permitting the Ovaherero to surrender.  Defendant's explicit goal was to annihilate them entirely as a people.  General von Trotha wrote:

> The sealing-off of the eastern border of the colony and pursuit of a policy of terror against every remaining Herero in the land will continue as long as I remain in the territory.  The nation [of the Ovaherero] must perish.  If we do not succeed in killing them with guns, then it must be achieved in this fashion.

28

117.    Defendant, steeped in blood and thirsty for more, decided to commemorate and memorialize its genocide under color of law. Von Trotha issued Imperial Order No. 3737, dated October 2, 1904. It was an Extermination Order:[17]

> I, the Great General of the German Soldiers, send this letter to the Herero people.
>
> The Herero people are no longer German subjects . . . The Herero people must now leave the country. If they refuse, I will force them to leave with my Big Cannon. Every Herero found inside the German border, with or without a gun or cattle, will be shot. I shall spare neither women nor children: send them back to their people or shoot them. These are my words to the Herero people.

118.    Von Trotha gave orders that captured Ovaherero males were to be executed, while women and children were to be driven into the desert so that they would die of starvation and thirst. He argued that there was no need to make exceptions for Ovaherero women and children, since they would "infect German troops with their diseases." Von Trotha further explained that his campaign to annihilate the Ovaherero peoples "is and remains the beginning of a racial struggle."

119.    At one point, General von Trotha collected a large group of prisoners, including men, women, and children. He forced half of them to watch the lynching of the other half. He handed out so-called courtesy copies of his Extermination Order printed in Otjiherero and cast the survivors into the desert to distribute his message of doom.

120.    Defendant sent patrols into the Omaheke and surrounding territories and rewarded its agents for the mass murder of the Ovaherero people. To ensure accurate reporting of how many Ovaherero men were murdered on such patrols, Defendant required its agents to cut off victims' ears as evidence.

121.    The Extermination Order gave a veneer of legal legitimacy to the extermination policies and practices that were already in place.

---

[17] Von Trotha's command became known as a "*Vernichtungsbefehl*," i.e., an "extermination order."

122.    The extermination continued, and Defendant's agents murdered any survivors they found, including men, women, and children who approached the perimeter seeking aid.

123.    Private Adolf Fischer reported on the Omaheke's effects on the Ovaherero people:

> Whenever we dismounted, our feet would hit against the human bodies.  There was a young woman with wilted breasts, her frozen face covered with flies and curled up next to her hip an aborted birth.  There was also an old woman, who had great difficulty walking.  Eight or ten leg rings made from rough iron pearls—the sign of dignity and wealth—had eaten her flesh to the bone . . . There was a boy.  He was still alive; staring into the night with a stupid grin from an empty mind . . . Whoever took part in the chase through the Sandveld lost his belief in righteousness on Earth.

124.    Lieutenant Graf Schweinitz, who had also traveled the Omaheke, graphically described the total annihilation of the Ovaherero people in 1905:

> There's a path that leads out of Onduru towards Omuramba.  Alongside the path are human skulls, rib cages, and thousands of fallen cattle and other livestock.  This is the path on which the Ovaherero fled.
>
> In the thicker vegetation, where cattle dying of thirst cluttered for shade from the punishing sun, hundreds of cadavers lie around and on top of each other.  In many places, holes of 15 to 20 meters were dug in a vain search for water.  Everything suggests this was a march of death . . .
>
> The cooking of the dead and the violent screams of insanity – they will echo forever in the hallowed silence of eternity.

125.    Defendant's General Staff had knowledge of, directed, and supported these atrocities. Its official publication *Der Kampf* (The Fight) stated:

> This bold enterprise shows up in the most brilliant light the ruthless energy of the German command in pursuing their beaten enemy. No pains, no sacrifices were spared in eliminating the last remnants of enemy resistance. Like a wounded beast the enemy was tracked down from one water-hole to the next, until finally he became the victim of his own environment.  The arid Omaheke Desert was to complete what the German army had begun:  The extermination of the Herero people.

126.    Defendant's commander-in-chief, Kaiser Wilhelm II, was thrilled by the results achieved by his loyal General von Trotha.  Kaiser Wilhelm II wrote to him:

> You have entirely fulfilled my expectations when I named you commander of the colonial troops, and I take pleasure in expressing, once again, my utter gratitude for your accomplishments so far.

127.     The rhetoric used by von Trotha to justify the extermination of the Ovaherero and Nama peoples eerily presaged the language later used by Hitler to justify the mass extermination of the Jewish people as an "ethnic cleansing" necessary for the resurrection of a New Germany. Von Trotha saw the annihilation of the Ovaherero and Nama peoples as serving a higher purpose, as part of the establishment of a new world order. He said: "I destroy the African tribes with streams of blood... Only following this cleansing can something new emerge, which will remain."

128.     But in the winter of 1904, Chancellor von Bülow became concerned about what he considered to be major human rights violations. He believed that Defendant's actions, conducted under color of law through the will of the German people, might tarnish the German people's reputation for years, if not centuries. Chancellor von Bülow predicted that the genocide has the potential to "demolish Germany's reputation among civilized nations and indulge foreign agitation."

129.     Defendant rescinded the Extermination Order in December 1904 and replaced it with an Enslavement Order. Nonetheless, the Extermination Order survived in spirit and policy. For example, the 250-kilometer armed perimeter blocking the Ovaherero people's return from the desert was maintained until mid-1905. Most of the Ovaherero were already dead by then. Nonetheless, patrols against Ovaherero survivors in the Omaheke and elsewhere continued until 1911.

130.     On December 1, 1905, Friedrich von Lindequist, who had replaced Leutwein as Civil Governor, issued an order that all surviving Ovaherero surrender and report to shelters that Defendant established at Omburo and Otjihaenena, where they need not "fear being shot at." By April 1906, several thousand Ovaherero survivors had arrived at these stations. From there, they were transported to the concentration camps at Omaruru and Windhoek for slave labor and death.

31

131.    By May 1, 1906, Defendant's agents had captured a total of 14,769 Ovaherero men, women, and children who had surrendered. They were promptly enslaved and relocated to concentration camps.  Approximately half of them perished.

## F.     Defendant's War and Genocide against the Nama

132.    In the period 1884–1904, Defendant's confiscatory policies and practices against the Ovaherero were implemented with careful precision against the Nama people as well.  As with the Ovaherero, Defendant's pre-1904 actions aimed at the goal of the absolute expropriation of all Nama land, livestock, and other property.

133.    Defendant negotiated with the Nama during its war against the Ovaherero, biding its time until prepared to handle both fronts.

134.    In August 1903, Defendant appointed Dr. Paul Rohrbach, the Commissioner for Settlement in Windhoek, to conduct an economic analysis of the costs and benefits of exterminating the Nama people.  Dr. Rohrbach found:

> From the point of view of the economy of the country, the Hottentots are generally regarded, in the wider sense, as useless, and, in this respect, providing no justification for the preservation of this race.

135.    In another analysis, Georg Wasserfall, the editor of the German South West Africa Newspaper, proposed exterminating the Nama peoples *instead* of the Ovaherero:

> The Hereros should not be destroyed—the Witboois, yes—the reason being that the Hereros are needed as laborers, and the Witboois are an insignificant tribe.

136.    Convinced that extermination, genocide, and total expropriation were required to secure the wealth of Great Namaqualand for itself, two companies of German soldiers and an artillery battery were sent to Great Namaqualand in April 1904 to begin staging its assault.

32

137.    On May 25, 1904, an Imperial Officer in Keetmanshoop informed the Governor that a revolt was likely.  He noted that several hundred lawsuits had been brought in recent months against Nama debtors by German firms and traders in Keetmanshoop.  Judgment creditors had been enforcing their fraudulent judgments against Nama judgment debtors by stealing the only possessions they had left: their cattle, gemstones and other valuables.

138.    In July 1904, Chief Jacob Morenga of the Bondelszwart Nama tribe recognized the threat.  He sought to liberate his people from Defendant's confiscatory, violent, and oppressive policies, practices, and takings.  Morenga and a few colleagues began an uprising by robbing German farmers of their ammunition and arms.

139.    In September 1904, a German force was sent to capture Morenga, but failed.  Morenga soon commanded a guerilla force of 400 Bondelszwart soldiers.

140.    In early October 1904, Chief Witbooi described Defendant's crimes in an official declaration of war sent to Governor Leutwein.

141.    Defendant's plan and policy was to treat the Nama peoples with the same fate that met the Ovaherero.  On October 24, 1904, General von Trotha returned to Windhoek from his ongoing genocide of the Ovaherero to assess the Nama situation.  He placed Colonel Berthold von Deimling in command of the Nama war, provided for reinforcements of 4,000 men, and began construction of a railway into Great Namaqualand for logistical support.  Colonel von Deimling strategized the methods for destroying the Nama people:

> We must not allow the Hottentotts to escape, rather we must encircle and destroy them before they do so.

142.    In December 1904, Defendant's forces attacked the Witbooi Nama in their homeland of Rietmond, forcing them to escape and abandon their belongings, valuables and cattle.

143.    In April 1905, General von Trotha took personal command over the Nama campaign. As his first order of business, General von Trotha set about drafting a new Extermination Order, using the Ovaherero Extermination Order as a template.  He issued the Extermination Order to the Nama people in the city of Gibeon on April 22, 1905:

> [T]hose few refusing to surrender will suffer the same fate suffered by the Herero people, who, in their blindness, believed that they could successfully wage war against the mighty German Emperor and the great German People.  I ask you: Where are the Herero people today?  Where are their chiefs today?

144.    The Extermination Order made clear that the genocide would continue until each and every Nama man, woman, and child was either enslaved or murdered:

> The Nama who chooses not to surrender and lets himself be seen in German territory will be shot until all are exterminated.

145.    Most Nama tribes were forced into surrender by mid-1906.  Defendant enslaved approximately 2,000 Nama men, women, and children that were taken prisoner during the war and the ensuing surrender.  They were placed in concentration camps with the Ovaherero, and all of their land, livestock, and other property were expropriated.

## G.    Defendant's Concentration Camps

146.    By the end of 1904, German settlers, merchants, farmers, the military, shipping companies, mining companies, and railroad companies were facing sharp labor shortages, leading to a decline in productivity and trade across all sectors.  The labor shortage was due primarily to the fact that Defendant had begun killing their Ovaherero and Nama laborers.

147.    To solve these labor issues, Defendant herded all surviving Ovaherero and Nama peoples into concentration camps, where they were made available to colonists and private companies as slave laborers or exploited in medical experiments.  The camps were established at Okahandja, Omaruru, Karibib, Keetmanshoop, Lüderitz Bay, Swakopmund, Windhoek, and elsewhere.

Approximately 2,000 Nama people and 14,769 Ovaherero people—mostly women and children—were enslaved in the concentration camps.[18]

148.    All prisoners were first divided into two categories: those who were fit to work and those who were not. For administrative purposes, pre-printed death certificates uniformly gave the cause of death as "death by exhaustion following privation."

149.    Defendant housed the inmates in dilapidated tents surrounded by walls, barbed wire, and guards.  Defendant also permitted private concentration camps to be erected at the industrial facilities of firms that purchased slaves from Defendant.  Ovaherero and Nama people of all ages and gender were treated uniformly and housed together without distinction.  Those who surrendered and those who were captured received the same fate.

150.    Under the belief that it owned the Ovaherero and Nama as property, Defendant used inmates as slave labor for public and private projects.  Defendant transported men, women, and children slaves to line command posts, and then to Imperial District Offices, where they were rented out by day or by month to settlers, merchants, farmers, the military, shipping companies, mining companies, and railroad companies.  Records indicate that some lessors paid the District Offices fifty pfennigs per day or ten Reichsmark per month per leased slave.

151.    Again, under the belief that it owned the Ovaherero and Nama as property, Defendant would also sell individuals as human merchandise.  Some slaves were sold in bulk.  Defendant benefited from the taxes, tariffs, customs, and duties that it charged for the export of human property.  Receipts and records indicate that at least one such customs charge amounted to twenty Reichsmark per exported slave.

---

[18] Defendant called the camps "*Konzentrationslager*" (Concentration Camps), as early as January 1905 in a telegram sent from Defendant's Imperial Chancellery.

152.    The Ovaherero and Nama prisoners were subjected to relentless hard labor, such as hauling iron or dragging carts and wagons in the place of beasts of burden.  Defendant typed out pre-printed death certificates for all such prisoners, with an accompanying space to enter the slave's identification number after the pre-printed cause of death: "death by exhaustion."

153.    The Ovaherero and Nama had been accustomed to a varied diet of dairy, meat, and fruit.  Due to the deprivation of food and absence of normal nutrition, the prisoners suffered numerous illnesses, including scurvy, bronchitis, and chicken pox.  Pneumonia was also rampant.  Despite these illnesses, Defendant's policies and practices were for the camp medical offices to leave the Ovaherero and Nama peoples untreated.  According to the records of the medical offices, most of the ill had entered the camps in reasonably good health and developed their illnesses at the camps.

154.    The Ovaherero and Nama women and children faced the worst fate.  They were given lower rations, and many starved to death.  Defendant's agents sexually abused and raped the women and children, and, again, under the belief that it owned the Ovaherero and Nama as property, Defendant rented out the bodies of women and children to private individuals.

155.    Life at the Swakopmund concentration camp was particularly painful for the Ovaherero and the Nama prisoners.

156.    Missionary Dr. Heinrich Vedder lamented the inhumane conditions at Swakopmund, and of the high death rate due to exhaustion, starvation, and disease:

> From early morning until late at night, on weekdays as well as on Sundays and holidays, they had to work under the clubs of tough overseers until they collapsed. Added to this, the food was extremely scarce.  Rice without any necessary additions was not enough to support their bodies, already weakened by life in the field and used to hot sun of the interior, from the cold and restless exertion of all their powers in the prison conditions of Swakopmund.  Like cattle hundreds were driven to death and like cattle they were buried.

36

157.    Dr. Vedder, who had lived amongst the Ovaherero for many years, empathized with their suffering, fought for their redemption, and was bitter about Defendant's actions:

> They suffered greatly from the cold in the coastal towns. Their clothing had long since been torn to tatters. Men and women went about in sacking, their only protection from the cold. Many got inflammation of the lungs and died. During the worst period an average of 30 died daily. It was the way the system worked. General von Trotha gave expression to this system in an article which he published in the *Swakopmunder Zeitung*: "The destruction of all rebellious native tribes is the aim of our efforts."

158.    The sickest individuals, including children, the elderly, the handicapped, and pregnant women were forced into daily hard labor as slaves. Missionary Kuhlmann unsuccessfully asked the colonial government to exercise some humanity and only send healthy Ovaherero men out of the camps for hard labor, "because the others just die there."

159.    In a letter to Deputy Governor Hans Tecklenburg dated May 29, 1905, Dr. Fuchs, the civilian District Commissioner of Swakopmund, presented the results of an investigation to colonial command. He and Dr. Sowade, his Chief Medical Officer, had become concerned about the camp conditions, and they had researched slave mortality rates. They found that 10 percent of the slaves had died in the last two weeks of May 1905. Dr. Fuchs recommended immediate improvements in camp conditions:

> The death-rate of natives in Swakopmund has undoubtedly risen enormously. The cause, and I agree with the Chief Medical Officer's view, is the defective accommodation, clothing and feeding of natives, particularly among prisoners of war, together with the raw unaccustomed climate, and the weak physical conditions of the prisoners brought here. . . . I do not think that these pitiful cases should be sent here to Swakopmund. They should be sent inland to recover under the control of the Government.

160.    In a letter dated June 15, 1905, Dr. Sowade reported further to Defendant:

> In Swakopmund there are over 1,000 Herero prisoners, men, women, and children. Most of those who arrive here are literally skin and bone.

161.    Dr. Fuchs's report was read and circulated widely through command in Windhoek and the General Staff in Berlin.  Dr. Fuchs's recommendations were categorically denied.  The labor market in the Swakopmund region was simply too weak to allow the slaves to recuperate.  Defendant implemented policies that reflected its values: the needs of the weak, children, and elderly slaves were subordinate to the needs of local businesses that were hoping for streamlined operations and expanded profits.  Deputy Governor Tecklenburg explained Defendant's decision:

> What is happening in Swakopmund is also happening in Lüderitz Bay.  There is a great demand for native labor.  As the Hottentots are scarcely available, the Hereros come into question.  Of course it is desirable that these should be strong and healthy in the interests of labor and also of humanity, but it can scarcely be avoided that also old and sick people and weak children should be sent to Swakopmund and Lüderitz Bay for whom everything appears to have been done.  Instructions have been given to attend to these various points and to keep weak people back in Omaruru stations.  It is difficult to send back the weak Hereros interned in Swakopmund as suggested by Dr. Fuchs because there are no replacements for them.

162.    Admitting that some Ovaherero people would likely survive imprisonment, Deputy Governor Tecklenburg further believed the high death rates in the camps were unequivocally in Defendant's economic interests:

> The more the Herero people now feel the consequences of the uprising on their own bodies, the less the coming generations will feel inclined to rebel.  Sure, the death of so many natives has a negative commercial impact, but the natural life-force of the Hereros will soon allow them to recover their numbers.  The future generations, which could possibly be mixed with a bit of Damara blood, could thus be fed with an understanding of their inferiority to the white race.

163.    That is, by feeding future generations of the Ovaherero with "an understanding of their inferiority to the white race," Deputy Governor Tecklenburg sought to economically and politically impair the future generations of the entire Ovaherero people, including Plaintiffs and the Classes.[19]

---

[19] "The Classes" are denominated by Plaintiffs in ¶ 316, *infra*.

164.    The Lüderitz Bay concentration camp was located on Shark Island, a small island—and now peninsula—just off the coast.  Here, Defendant practiced prison techniques that it later employed at similarly structured death facilities in the 1930s and 1940s.

165.    The mortality rate from disease, exhaustion, and malnutrition at Shark Island and other concentration camps was in the range of 45–74 percent.   Despite these harsh conditions, all Ovaherero men, women, and children who could stand were taken outside the camp every day as forced laborers, while the sick and dying were left without medical assistance.  Shootings, hangings, and beatings of the forced laborers were widely reported by eyewitnesses, in the press, and in Defendant's well-maintained Imperial records.  One eyewitness reported:

> Cold—for the nights are often bitterly cold there—hunger, thirst, exposure, disease, and madness claimed scores of victims every day, and cartloads of their bodies were every day carted over to the back beach, buried in a few inches of sand at low tide, and as the tide came in the bodies were out, food for the sharks.

166.    Defendant conducted medical experiments on live prisoners, for example, in the human-experiment laboratory of Dr. Eugen Fischer and Dr. Bofinger, who injected Ovaherero and Nama that were suffering from scurvy with poisons, including arsenic and opium.  After the inmates inevitably died, the doctors autopsied the bodies and reported the results to Defendant.

167.    Defendant's doctors also experimented with dead body parts from prisoners, including the experiments of zoologist Dr. Leopard Schultzel, who was pleased by the ready availability of body parts:

> I could make use of the victims and take parts from fresh native corpses, which made a welcome addition . . .

168.    At Shark Island, 778 Ovaherero and Nama bodies were dissected in post-mortems for Defendant's medical research.  Various German doctors were involved in these dissections, including Drs. Dansauer, Jungels, Mayer, and Zöllner.

169.     Ovaherero and Nama skulls had been requested by the Pathological Institute in Berlin and the University of Breslau, including by Professor Klaatsch, for experimentation, display, and scientific research in the field of *Rassenlehre* (Race Theory), a field of scientific study in Germany that espoused the superiority of the white race.  Anthropologist William Waldeyer in Berlin also requested skulls.

170.     At Shark Island, Defendant decapitated an estimated three hundred Ovaherero men by axe, machete, or saw.  Defendant then boiled the severed heads in water.  Subsequently, Defendant equipped Ovaherero women and girls with glass shards, and forced them to strip the boiled heads clean of flesh.  This routine required the women and girls to strip off the noses, faces, scalps, and neck tissue, and then remove the inner tissue, tongues, and brains, from the boiled heads of their husbands and fathers, leaving only the polished skulls.  Once so cleaned, Defendant packaged the skulls for international transport, and shipped them to Germany.[20]

171.     Defendant also decapitated at least seventeen Nama people.  As with the Ovaherero, Defendant boiled the Nama heads, and forced Nama women and children to peel the boiled faces off in strips, using crude shards of glass.  Defendant then packaged the skulls for international transport and shipped them to Germany.

172.     Some heads of women and children were treated likewise, including the head of a one-year-old Nama girl.  In late 1906, Dr. Bofinger decapitated the infant girl and removed and weighed her brain, before placing her head in preservatives, sealing it in a tin, and sending it for further examination by his colleague Christian Fetzer at the Institute of Pathology at the University of Berlin.

---

[20] The details of the methods used to obtain these skulls were recorded in the "Health Report of the Imperial *Schutztruppe* for South West Africa during the Herero and Nama Rebellion during January 1, 1904 to March 31, 1907" (*Sanitätsbericht über die kaiserliche Schutztruppe für SWA während des Herero und Hottentottenaufstandes für die Zeit vom 1/1/04 – 31/3/07*) (1909), as well as the letter from the State Secretary of the Imperial Ministry of Colonies (*Reichs-Kolonialamt*) to the Imperial Governor in Windhoek, dated July 31, 1908.

173.     These barbaric acts were undertaken on the instruction of, with knowledge of, to the benefit of, and through the complicity of Defendant and Defendant's agents.  Despite such knowledge and complicity, Defendant and Defendant's agents continued to refer to the Ovaherero and Nama peoples as "savages."

174.     Defendant also shipped the intact corpses of Ovaherero and Nama men, women, and children to Germany.  Following their murders, often by hanging, corpses were placed in preservatives and sent to Germany for dissection.  The scientific results of these dissections and the current whereabouts of the subjects' mortal remains are unknown.

175.     Dr. Eugen Fischer, amongst others, performed the medical experiments on the remains of Ovaherero and Nama victims.  He was a leading German race scientist, who later become Chancellor of the University of Berlin, where he taught medicine to and worked alongside Nazi racial theorists and doctors throughout the 1920s, 1930s, and 1940s.

176.     When the Shark Island Concentration Camp and other camps were closed, the surviving Ovaherero and Nama were distributed as indentured servants or slaves to German settlers, merchants, farmers, the military, shipping companies, mining companies, and railroad companies.  The Ovaherero and Nama were also prohibited from owning land or livestock, both of which were necessary for survival.

177.     Of the approximately 14,769 Ovaherero and 2,000 Nama people enslaved in the concentration camps, a total of 7,682 died between October 1904 and March 1907, a mortality rate of approximately 50 percent.

## H.     Defendant's Takings in Violation of International Law

178.     Defendant's direction, funding and support of, and aiding and abetting of the crimes alleged herein, including, but not limited to murder, genocide, rape, and destruction of the sovereign

Ovaherero and Nama polities, comprises the context for Defendant's *property-based crimes*. Through and by the crimes alleged herein, Defendant took several discrete categories of property in violation of international law in which Plaintiffs and the Classes possess property rights, and profited from these takings, including Plaintiffs' (i) land rights; (ii) rights in personal property and livestock; (iii) concession rights, tax rights, customs rights, and precious metals; (iv) sovereignty-related property rights; (v) the tort and labor rights of Plaintiffs' family members; (vi) the skulls, flesh, brains, hair, and other mortal remains of Plaintiffs' family members; (vii) and the corpses of Plaintiffs' family members. Defendant's government during the time period in question, the German Empire—also known as the *Kaiserreich* or Second Reich—was originally forged by economic forces and served first and foremost its named purpose of *Wirtschaftskörper*, *i.e.*, an economic body.   Economic motives governed the four constitutional conventions from 1867–71 that gave rise to the German Empire, and the state was founded for the goal of commercial, financial, and industrial development.   In its unquenchable thirst for increasing profits, Defendant expropriated nearly every property interest that the Ovaherero and Nama peoples had.

### 1.   Defendant's Takings of Plaintiffs' Property Rights in Land

179.    Defendant engaged in the genocide of the Ovaherero and Nama peoples with the active and explicit goal of thereby obtaining their land rights, and as such, Defendant's illegal takings of Ovaherero and Nama land were in violation of international law.   Amongst its many takings of land, Defendant took Ovaherero land that encompassed the city of Windhoek.   The expropriated land rights included, but were not limited to, the right to cultivate, develop, and sell and lease the land.   From 1884–1915, Defendant used the land rights that it had taken from the Ovaherero and Nama peoples in violation of international law, including but are not limited to, the lease and sale of such lands to private industrial,

finance, and railway companies, the cultivation of such lands for domestic governmental use, and the erection of governmental and military facilities, offices, and camps.

180.    According to records of the German Colonial authorities (Kolonial-Abteilung), most of the confiscated lands of the Ovaherero and Nama peoples were sold to white settlers, with the proceeds going to the German treasury.[21]   The German colonial authorities regulated the sale and lease of confiscated land, under guidelines stating that the sales should only be made to European settlers wishing to cultivate the lands. Former members of the German colonial military forces (Schutztruppe) were sold the expropriated lands by the German colonial authorities at a 50% discount.

181.    As a result of these confiscations and expropriations without compensation, the Ovaherero and Nama peoples were left with no land to pasture livestock, notwithstanding that their livestock already had been taken from them. These native peoples could only remain on the land if they were working on farms now owned by German settlers. Defendant's declared intention was not only to take these native lands and distribute them to German settlers, but by confiscating the Ovaherero and Nama of their lands and livestock, they were also stripping them of all their political and economic power, as well as their means to resist. Plaintiffs are entitled to an accounting and the disgorgement of all revenues Defendant obtained through its illegal takings, plus interest, in an amount to be determined at trial.

## 2.    Defendant's Takings of Plaintiffs' Property Rights in Personal Property and Livestock

182.    Defendant engaged in the genocide of the Ovaherero and Nama peoples with the active and explicit goal of thereby taking the herds, livestock and personal property of the Ovaherero and Nama peoples.  As such, Defendant's criminal theft of personal property and tens of thousands of cattle from

---

[21] Statement of Secretary Prince zu Hohenlohe-Langenburg, Reichtag, 11th term, 73rd session, 23 March 1906, Reichstagsprotokolle 1905/06 vol. 3, pp. 2230-1, 2239.

the Ovaherero and Nama peoples constituted takings in violation of international law.  The property rights in livestock included the right to sell, slaughter, and milk the cattle, amongst others.  Over the period from 1884–1915, Defendant used the cattle that it took in violation of international law to its benefit in manners including, but not limited to, the sale of such cattle to private ranchers, and the slaughter and milking of such cattle.  By 1913 the Germans possessed approximately 205,643 head of cattle in South West Africa, much of which were taken from the Ovaherero and Nama.

183.    Defendant's colonial administration obtained substantial income from well-documented auctions of cattle confiscated from the Ovaherero and Nama, and by redistributing some of the cattle to German settlers who had claims for compensation payments, the colonial authorities also achieved substantial savings, since Defendant did not have to make any cash payments regarding those claims.

184.    At Hoornkrans on the morning of April 13, 1892, Defendant took personal property from the Nama people in violation of international law, including, but not limited to 212 stirrups, 74 horseshoes, 12 coffee pots, 12 coffee-grinders, 122 pieces of cutlery, 44 bits and bridles, 3 violins, and one pair of opera glasses.

185.    At Hoornkrans on the morning of April 13, 1892, Defendant also took personal property from Chief Hendrik Witbooi in violation of international law, including, but not limited to his personal bible.

186.    These takings of personal property are typical and exemplative of Defendants' taking and stripping of all valuable personal property from the Ovaherero and Nama peoples, including diamonds, valuable coins, gold, silver, gemstones, ostrich feathers, copper products, and valuable jewelry.

187.    Plaintiffs are entitled to an accounting and the disgorgement of all revenues Defendant obtained and savings Defendant realized through this illegal taking, plus interest, in an amount to be

determined at trial.  Plaintiffs are further entitled to the return of all personal property taken in violation of international law.

### 3.    Defendant's Takings of Plaintiffs' Concession, Taxation, Customs Rights and Revenues; Additional Rights Taken to Precious Metals and Other Resources

188.    Beyond the taking of land rights and personal property in violation of international law, Defendant also took various other related property rights of Plaintiffs in violation of international law. Over the course of Defendant's occupation of Hereroland and Great Namaqualand, Defendant sold and auctioned concession rights under color of law to private companies in return for concession fees; Defendant also exercised taxation rights and obtained taxation revenue, all of which were taken in violation of international law. It also exercised customs, duties, and tariff rights and thereby obtained revenues, all of which were taken in violation of international law.

189.    Through its annihilation of the Ovaherero and Nama political and sovereign entities, as well as its peoples, Defendant achieved unlawful governmental control over broad swaths of land that belonged to the Ovaherero and Nama peoples.  By 1914, these territories included the entire coast of modern-day Namibia from the Orange River to the Cunene River, extending approximately 200–300 miles inland.  By 1914 Defendant had sold a substantial portion of the land it had taken, and issued concession rights to private corporations, including, but not limited to the following companies:

   a.    the German South West Africa Company, which claimed ownership over the bottom half of the Namibian coastline, extending inland by approximately 100 miles; as well as mineral rights over broad amounts of territory, including a territory of at least 500 square miles in Hereroland, centered around the Hereroland capital Okahandja, and other smaller territories to the south, including near Hoornkrans (the former headquarters of Paramount Chief Hendrik Witbooi of the Nama), along the Konipi river in the land of the Bethanien Nama, as well as in the land of the Red Nation Nama;

   b.    the *Kaoko Land und Minengesellschaft* (Kaoko Land and Mining Company), which claimed ownership over much of the Kaokoveld Desert on the north coast of modern-day Namibia, extending inland by approximately 100 miles, as well as mineral rights in the northwestern desert near Guiarob and Otjtambi;

c. the South West Africa Company, which claimed ownership over an area of at least 100 square miles outside the city limits of Otavi; as well as mineral rights in much of Amboland surrounding the Etoscha Pan in northern modern-day Namibia, *i.e.*, due east of the northern holdings of the Kaoko Land and Mining Company, and including the western stretches of the Omaheke Desert, which had hired Ovaherero labor prior to their genocide and enslavement for work at their copper mines, typically paying Ovaherero men 3 Reichsmark per month;

d. the *Otavi Minen- und Eisenbahngesellschaft* (Otavi Mining and Railway Company), which claimed land ownership over the city of Otavi, as well as mineral rights in numerous copper deposits near Otavi;

e. South African Territories Ltd., which claimed mineral rights in a broad portion of southern Great Namaqualand, including the land of the Bondelszwart Nama and the Veldschoendrager Nama; and,

f. the *Hanseatische Land- und Minengesellschaft* (Hanseatic Land and Mining Company), which claimed mineral rights in two territories located in the mid-west of modern-day Namibia, including the city of Rehoboth and the surrounding river valleys and mountains of the Rehoboth region, as well as Aminias and the surrounding southern portions of the Umab Desert.

190. Defendant actively supported the industrialization and exploitation of the land following the genocides and by means of its takings. For example, Defendant subsidized the construction of railways with its Colonial Loan program, *e.g.*, through 175 million Reichsmark appropriated for railway construction on May 7, 1908, and an additional 76 million Reichsmark in 1910.

191. Defendant engaged in the genocide of the Ovaherero and Nama peoples with the goal of taking concession, taxation, and customs rights of the Ovaherero and Nama peoples in violation of international law. As such, the takings of such rights themselves constitute takings of property rights in violation of international law.

192. Prior to the expropriation of these rights, the Ovaherero and Nama peoples exercised and profited from these rights. For example, in 1890–94 Ovaherero Chief Manasse Tijisiseta of Omaruru—a political opponent of Paramount Chief Samuel Mahararo—charged mining concession fees, customs, grazing fees, alcohol fees, and taxes, such as a highway wagon tax of 10 shillings and tax delinquency fines of £5. Chief Manasse collected concession fees and taxes from the Rheinisch Missionary of

Omaruru, from settlers who wished to establish trading posts, from Boer trekkers who wished to work the land, and from mining companies that sought to speculate in the mountains outside Omaruru.

193.    Defendant's unlawful expropriation of the Ovaherero and Nama peoples' concession, taxation, and customs rights resulted in substantial revenues.[22]  Defendant sought to squeeze more economic output from the colony through passage of the Law on Income and Expenditures of Protectorates of March 30, 1892.  According to a 1910 report by the *Kolonialwirtschaftliches Komitee* (Colonial Economic Committee) with data obtained from the *Kaiserliches Statistisches Amt* (Imperial Ministry of Statistics), exports from the lands wrongfully taken from the Ovaherero and Nama peoples between 1885 and 1908, not including diamonds and gold, totaled in the multi-millions of Reichsmarks, with exports primarily in ostrich feathers, copper ore, wool, and hides.

194.    Another source of revenue from Defendant's use of concession, taxation, and customs rights was the industrial export of cattle, hides, artifacts, and ostrich feathers.  Deputy Governor Hintrager recorded the value of cattle, hides, and ostrich feather exports from South West Africa in 1900 and between 1907–13 in Reichsmark:

| Year | Cattle, hides, and ostrich feather exports in Reichsmark |
|---|---|
| 1900 | 907,565 |
| 1907 | 333,485 |
| 1908 | 1,447,820 |
| 1909 | 1,980,616 |
| 1910 | 2,125,778 |
| 1911 | 1,785,151 |
| 1912 | 2,097,664 |
| 1913 | 3,463,830 |
| Total | 14,141,909 |

---

[22]For example, the government earned tax, concession, and export revenues, and obtained land from companies such as the Kaoko Land and Mining Company under the Land Tax Ordinance of March 19, 1909, supplemented by the Ordinance of October 12, 1910.  In 1912, the Kaoko Land and Mining Company had a property tax liability of 270,455 Reichsmark, but due to liquidity problems, offered the government portions of its land in lieu of payment of back-taxes.

195.    By taking the Ovaherero and Nama concession, taxation, and customs rights in their cattle, hides, and ostrich feathers through genocide in violation of international law, Defendant deprived the Ovaherero and Nama peoples of the corresponding concession, taxation, and customs revenues.  Defendant obtained revenues by selling the concession rights to private firms, by taxing all related revenues, and by charging customs, tariffs, and duties on the exported cattle, hides, and ostrich feathers.  Assuming *arguendo* that Defendant obtained such revenues only in the amount of one-third the value of the exported cattle, hides, and ostrich feathers between 1900–13, revenues would total 4,713,969 Reichsmark, or about $1 million dollars at the average conversion rate in that period.

196.    The mining industry was the most important source of revenues from the expropriated concession, taxation, and customs rights.  Defendant conducted its genocide pursuant to the explicit and practiced policy of taking these Ovaherero and Nama precious metal concession, taxation, and customs rights.  During 1885–1907, German mining operations in Hereroland and Great Namaqualand already were producing revenues.  As a result of Defendant's genocidal policies and practices, and its illegal taking and use of the property rights described herein, mining operations across the land boomed, and private mining firms exported great wealth in precious metals that were mined and taken from the expropriated lands.

197.    German miners looted rich copper deposits in the Otavi and surrounding regions, and by 1913, the Otavi mines were producing 70,000 metric tons of copper per year.  The Otavi Mining and Railway Company (Otavi Company) constructed a railway line from Swakopmund, through Otavi, to the Tsumeb mines north of Otavi.  Defendant owned the railway leading east to the Grootfontein mines.  The Otavi Company first started laying railway track prior to the genocide and had to obtain permission to start laying the track from Paramount Chief Samuel Maharero.  Defendant used threats of force to compel Chief Maharero to permit the company to lay the track.  However,

Chief Maharero refused to grant the Otavi Company any mineral rights, as the Ovaherero people had mined the rich Tsumeb mountains for centuries, using its copper for jewelry and spear heads. Following the genocide and taking of Ovaherero property, the Otavi Company benefitted from Defendants' expropriation of Ovaherero lands and mining operations by, with Defendant's permission, purchasing and renting enslaved Ovaherero and Nama men, women, and children for labor in these mining and other commercial operations.

198.    Deputy Governor Hintrager recorded the value of copper exports from South West Africa between 1906–13 in Reichsmark:

| Year | Copper exports in Reichsmark |
|---|---|
| 1906 | 46,877 |
| 1907 | 1,282,515 |
| 1908 | 6,296,000 |
| 1909 | 4,654,862 |
| 1910 | 5,697,208 |
| 1911 | 3,753,703 |
| 1912 | 6,523,258 |
| 1913 | 7,929,000 |
| Total | 36,183,423 |

199.    By taking the Ovaherero and Nama copper deposit concession rights, taxation rights, and customs rights through genocidal acts in violation of international law, Defendant deprived the Ovaherero and Nama peoples of their corresponding concession, taxation, and customs revenues. Defendant obtained immense revenues by selling these concession rights to copper mining firms, by taxing the firms' profits, and by charging customs, tariffs, and duties on the exported copper. Assuming *arguendo* that Defendant obtained such revenues only in the amount of one-third the value of the exported copper ore between 1906–13, this would total 12,061,140 Reichsmark or about $2.6 million dollars at the average conversion rate during those years.

200.    Diamond dealers and speculators also saw success in their South West Africa operations over the course of Defendant's illegal occupation and confiscation of Ovaherero and Nama lands and diamond mining operations. These diamond operations increased significantly when additional diamond mining resources were discovered in 1908 in portions of the Namib Desert that were traditionally owned by the Ovaherero and/or Nama. In violation of international law, Defendant's agent, Colonial Secretary Bernhard Dernburg, issued exclusive mining and concession rights to the German South West Africa Company on September 22, 1908, and established an official sales agency, the *Diamantenregie des südwestafrikanischen Schutzgebietes* (Diamond Agency for the South West African Protectorate), through which a consortium of German banks marketed and exported diamonds that were discovered on lands taken from the Ovaherero and Nama peoples.

201.    Lucrative diamond mines were established at locations including, but not limited to, Pomona, Elisabethbucht, Oranjemund, Kolmanskup, and Lüderitz. While Ovaherero and Nama women and girls were being forced to peel off the boiled faces of their husbands and fathers on Shark Island, German diamond miners and their families were enjoying the luxuries of the casino, ice factory, ballroom, and bowling alley just ten miles away in Kolsmanskop.

202.    Deputy Governor Hintrager recorded the value of diamond exports from South West Africa between 1908–13 in carats and Reichsmark:

| Year | Diamond exports in carats | Diamond exports in Reichsmark |
|---|---|---|
| 1908 | 38,275 | 51,180 |
| 1909 | 483,266 | 15,435,522 |
| 1910 | 846,695 | 26,869,014 |
| 1911 | 773,308 | 23,034,146 |
| 1912 | 1,051,777 | 30,414,078 |
| 1913 | 1,500,000 | 58,910,000 |
| Total | 4,690,000 | 154,713,940 |

203.    Thus Germany, aided and abetted by various private firms, stole vast treasures from the lands that were taken from the Ovaherero and Nama peoples in violation of international law, and Defendant thereby profited through the exercise of the concession, taxation, and customs rights that were taken from the Ovaherero and Nama peoples through genocide in violation of international law. By 1913 diamond production in South West Africa accounted for a quarter of the value of total global diamond exports.

204.    By taking the Ovaherero and Nama diamond deposit concession, taxation, and customs rights through genocide in violation of international law, Defendant deprived the Ovaherero and Nama peoples of their corresponding concession, taxation, and customs revenues. Defendant obtained immense revenues by selling diamond deposit concession rights to the Diamond Agency for the South West African Protectorate, by taxing all diamond-related revenues, and by charging customs, tariffs, and duties on the exported diamonds. In one instance, for example, Defendant and the German South West Africa Company entered into an agreement, under which the company opened its land (i.e., the land which rightfully belonged to the Ovaherero and Nama peoples) to public mining, entitling the company to a two percent duty on all exported diamonds. In return, Defendant imposed an export duty of one-third the value of exported diamonds. Assuming *arguendo* that Defendant obtained tax, concession, and export revenues in the amount of one-third of all diamond exports, then the figures above indicate that Defendant obtained such revenues in the amount of 51,571,308 Reichsmark between 1908–13, or about $13 million dollars at the average conversion rate in that period.

205.    Plaintiffs are entitled to an accounting and the disgorgement of all revenues Defendant obtained through these illegal takings, plus interest, in an amount to be determined at trial.

206.    Finally, with the use of genocide, in violation of international law Defendant supported, directed, and aided and abetted in the taking of the gems, precious metals, cattle, hides, ostrich feathers,

and other artifacts themselves that were located on and under the lands of the Ovaherero and Nama peoples in Hereroland and Great Namaqualand.  Plaintiffs are entitled to an accounting of all precious gems and metals and other resources that Defendant took or aided and abetted in the taking of and are entitled to the return of all such precious gems, metals, and other resources, and disgorgement of all revenues Defendant obtained through these illegal takings, plus interest, in an amount to be determined at trial.

### 4.  Defendant Took Sovereignty Property Rights

207.    Although Defendant failed to successfully annihilate the Ovaherero and Nama peoples, it succeeded in destroying the sovereign political entities of Hereroland and Great Namaqualand. Because Defendant took their respective sovereignties, the Ovaherero and Nama peoples lost their status as equals to Defendant and all other sovereign states, and lost attendant property rights.

208.    Plaintiffs, therefore, also bring this action in their individual capacity and representative capacity as lawful heirs to the sovereign polities themselves, and the attendant property rights respectively.  Under customary Ovaherero and Nama law—as in the United States—the sovereignty of Hereroland and Great Namaqualand resides in their respective *peoples*.  As such, the property rights attendant to sovereignty are passed through intestacy to Plaintiffs and the Classes.

209.    Defendant's policy and practice of aiding and abetting the rape of Ovaherero and Nama women and children actively contributed to the goal of taking the property rights attendant to sovereignty through sterilization.  Diseased German rapists caused physical damage to the reproductive organs of the Ovaherero and Nama women and children and spread venereal disease to Ovaherero and Nama women and children, rendering them sterile.  The Ovaherero and Nama birth rates plummeted in the years following the genocide.  This policy and practice sought to sterilize the Ovaherero and Nama peoples, in furtherance of annihilation, by preventing the birth of new generations.

210.    The property rights attendant to sovereignty include, but are not limited to, the right to sovereign equality under international law; sovereign procedural and substantive rights through treaties, interstate organizations, and representation at the United Nations; and the rights, privileges, jurisdictional immunities, and attachment immunities of sovereign status.

211.    By taking these intangible, invaluable property rights of sovereignty, Defendant realized enormous gains and savings by preventing its victims from pursuing legal recourse through channels that are otherwise open to sovereign polities, including, but not limited to, the League of Nations, the United Nations, the African Development Bank, the African Union, the South African Development Community, the Southern African Customs Union, and the International Court of Justice.

212.    Plaintiffs are entitled to an accounting and the disgorgement of all such savings and revenues obtained through these illegal takings, plus interest, in an amount to be determined at trial.

### 5.    Defendant Took Away Plaintiffs' Labor and Tort Rights and Claims, But Plaintiffs' Rights by Intestacy Remain

213.    Through enslavement, Defendant took the labor rights and other natural and civil rights of the Ovaherero and Nama peoples in violation of international law, including, but not limited to their rights to payment for their labor, pensions, worker's compensation, unemployment compensation, overtime payment, hardship bonuses, and, as members of the Ovaherero and Nama peoples, their rights to life and liberty.  By taking these valuable intangible property rights, Defendant consequently took the valuable labor claims, wrongful death claims, and other tort claims from the victims and their heirs.

214.    Under customary Ovaherero law and Nama law, all legal rights and obligations of an individual are passed upon death by intestacy to familial and communal heirs; these property rights were and are held on a communal basis by the sovereignty that inhered in the Ovaherero people and Nama people respectively.  Plaintiffs and the Classes are the sole, rightful, and legal heirs to the rights in property taken by Defendant from the Ovaherero and Nama peoples in violation of international law.

Through inheritance, Plaintiffs and the Classes have assumed all legal rights and claims that accrued to the Ovaherero and Nama peoples in connection with Defendant's takings.

215.    The disposition over one's labor and the fruits of one's labor is a property right that inheres in the laborer's person.  Defendant engaged in the genocide of the Ovaherero and Nama peoples with the active and explicit goal of enslaving those peoples and taking their labor and the fruits of their labor without compensation in violation of international law.  Defendant profited by taking the intangible property rights of self-determination of one's labor and freedom from enslavement.  Defendant used these property rights to construct valuable railways, government-owned facilities, and docks, to earn rental income by renting out slaves to regional industry by day and by month, and by selling the enslaved Ovaherero and Nama people to individuals, private companies and slave traders for domestic labor or export.

216.    The proceeds of these sales to individuals, companies, and slave traders went directly to Defendant's treasury, to be comingled with other monies and assets to be used for other purposes. In addition, Defendant derived substantial savings from the use of forced and/or slave laborers from these indigenous populations since they did not have to hire workers at prevailing wages and salaries to construct the Otavi railway and other railway projects, and to perform other necessary work on various civil administration projects undertaken by the German Colonial authorities.

217.    In addition to lost wages, Plaintiffs also assert property rights in various tort claims, including, but not limited to, wrongful death claims, for the wrongful taking of the lives of Ovaherero and Nama peoples, and thereafter depriving the Ovaherero and Nama peoples of a forum for their claims to be heard.

218.    Plaintiffs are entitled to an accounting and disgorgement of all savings that Defendant realized through these illegal takings—*i.e.*, back wages, payment of pensions and other labor benefits,

as well as wrongful death and other tort claims, that are due to all former Ovaherero and Nama slaves—plus interest, in an amount to be determined at trial.

### 6. Defendant's Taking of Skulls, Flesh, Brains, Hair, and Other Body Parts and Mortal Remains

219.    Defendant decapitated approximately 311 Ovaherero and Nama people, and as described above, forced women and girls to scrape the faces and flesh off the boiled heads.  Defendant engaged in the genocide of the Ovaherero and Nama peoples, for among other purposes, to conduct experiments with their body parts.  To that end, Defendant took the skulls in violation of international law.  As a necessary step to accomplish Defendant's dastardly objective, Defendant also took the faces, flesh, and brains of the Ovaherero and Nama men in violation of international law.

220.    Defendant profited from these takings through its scientific and medical research. Regardless of whether Defendant's pseudo-scientific research resulted in any genuine scientific or medical discoveries, Defendant's publicly funded research institutions received an economic benefit.

221.    After years of denial, in 2011 Defendant's Museum of Medical History at the Charité in Berlin returned twenty skulls of Ovaherero and Nama people to Namibia.  These included eleven Nama and nine Herero skulls, which had belonged to four women, fifteen men, and a boy.

222.    Numerous skulls and body parts of the Ovaherero and Nama peoples remain in Defendant's possession.  Defendant has returned some, but not all such skulls, body parts, and other mortal remains.  Defendant's publicly funded research institutions continue to discover the skulls, body parts, and other mortal remains of Ovaherero and Nama peoples.

223.    In April 2017, Professor Philipp Osten, the Museum Director of the Museum of Medical History ("MMH") at the Medical School of Hamburg-Eppendorf, announced that seventy-three skulls were newly discovered, which the Museum had purchased between 1917–33.

224.    The MMH's inventory books detail the origins of all such purchases. For example, the books identify Object No. 832 as the skull that belonged to an Ovaherero man.  The jaw is missing, and the back of the skull is somewhat broken.  It was purchased for the Museum by J. Flemming on August 1, 1924.

225.    Hamburg University Professor Jürgen Zimmerer[23] recently began a diligent and searching effort to determine the origins of all human body parts collected from Defendant's colonies. Professor Zimmerer and a team of several doctoral students are in the process of analyzing the origins of approximately 5,000 objects from Africa, including skulls, body parts, and other mortal remains.

226.    Plaintiffs have property rights to the skulls referenced herein, as well as all other skulls, body parts, and other mortal remains of Ovaherero and Nama people in Defendant's possession. Plaintiffs are entitled to the return of all such skulls, body parts, and other mortal remains taken in violation of international law, an accounting and disgorgement of medical and scientific research revenues derived from the above described mortal remains, plus interest, in an amount to be determined at trial.

227.    Plaintiffs are also entitled to an accounting of all medical discoveries, academic findings, and scientific conclusions drawn from the research and experiments conducted by Defendant's agents on the skulls, body parts, and other mortal remains of the Ovaherero and Nama peoples.

### 7.  Defendant Took and Dissected the Bodies of Plaintiffs' Family Members

228.    Defendant murdered Ovaherero and Nama men, women, and children by hanging, placed their bodies in preservatives, and shipped their bodies to Germany for dissection by zoologists and racial theorists.  These were takings of property in violation of international law.

---

[23] Professor of History at the University of Hamburg, Germany, and President of the International Network of Genocide Scholars.

229.    Under traditional Ovaherero law, Nama law, and New York law, the disposition over an individual's body following death is a property right that inheres in the decedent's lawful heirs—not in the decedent's murderers.  Defendant's profited by committing these murderous takings.

230.    Defendant also exhumed the bodies of Plaintiffs' holy ancestors, which rested in sanctified cemeteries, including the bodies of the royal Maherero clan.  Defendant took and shipped those bodies to Germany.

231.    Defendant profited from these murderous takings through its scientific and medical research.  The scientific results of these dissections and the current whereabouts of the subjects' dissected bodies are unknown.  It is irrelevant whether the dissections led to scientific or medical discoveries, as the mere opportunity to engage in such dissections and experiments conferred a benefit on Defendant's publicly funded research institutions.

232.    Plaintiffs have the right to bury or determine the disposition of the dissected bodies of their family members.  Plaintiffs are entitled to the return of all bodies taken in violation of international law, an accounting and disgorgement of all revenues Defendant obtained through these egregious takings, plus interest, in an amount to be determined at trial.

233.    Plaintiffs are entitled to an accounting of all medical discoveries, academic findings, and scientific conclusions drawn from the research, dissections, and experiments conducted by Defendant's agents on the bodies of the Ovaherero and Nama peoples.

### 8.  The Location of Defendant's Takings

234.    Hereroland and Great Namaqualand stood as sovereign equals to Defendant.  The acts comprising the takings alleged herein did not occur within Defendant's sovereign territory. Mislabeling the area that belonged to the Ovaherero and Nama peoples as "German South West Africa" does not confer de jure or de facto sovereignty on that territory of South West Africa.

Defendant's takings occurred in Hereroland (also known as Damaraland), Great Namaqualand, the Omaheke Desert, portions of Amboland and the Kaokoveld Desert, and surrounding territories.

235.    In the alternative, Plaintiffs allege that the territories in which Defendant committed the acts comprising its takings in violation of international law were not under the control of any sovereign state, and that the acts comprising Defendant's takings were acts of piracy in *terrae nullius* with a status under international law analogous to that of international waters.

## I.    Damages to the Ovaherero and Nama Peoples

236.    Prior to the Ovaherero genocide, approximately 100,000 Ovaherero people lived in Hereroland.  Following the genocide, Defendant had decimated the Ovaherero population such that only approximately 14,769 Ovaherero survived in Southwest Africa, and a few thousand lived in exile.

237.    Prior to the Namaqua genocide, approximately 20,000 Nama people lived in Great Namaqualand.  Following the genocide, only approximately 10,000 survived.  A 1911 census found an Ovaherero population of 15,130, and a Nama population of 9,781.  The death count includes the approximately 7,700 enslaved persons that Defendant killed in concentration camps.

238.    Defendant left the surviving Ovaherero and Nama peoples destitute, enslaved, hiding in the mountains, and in exile.  Their families, culture, wealth, wellbeing, and societies were irreparably harmed.  From 1907 until Defendant lost its purported "colony" to the British in 1915, Defendant continued its policies of takings, slavery, exploitation, theft, and murder.

239.    Before releasing the slaves from the concentration camps in 1908, Defendant passed a series of "Native Ordinances" on August 18, 1907 that further expropriated property from the Ovaherero and Nama.  First, under the Vagrancy Ordinance, any Ovaherero or Nama man or woman unable to prove the source of his or her livelihood was punished by flogging or imprisonment. Second, under the Husbandry Ordinance, the Ovaherero and Nama were prohibited from engaging in

animal husbandry, which had been their livelihood for hundreds of years. Third, under the Identification Ordinance, all Ovaherero and Nama over the age of six were required to wear a chain around their neck at all times, to which a metal disc was attached with unique identification numbers kept in Defendant's central registries and intended to keep track of allocated labor. The ordinance compelled all Ovaherero and Nama individuals to register their comings and goings.

240.    To ensure that the Bondelszwart Nama tribe was kept in a state of intergenerational impoverished servitude, Defendant developed a resettlement plan, under which the Bondelszwart Nama of the south would be transported to Grootfontein in the north near Otavi, where they would be in an unfamiliar place without means of survival. Deputy Governor Oskar Hintrager described this plan on December 22, 1908:

> My view is that in the interest of the Empire and of the Protectorate we must not indulge in silly humanitarian sentiments, but practice a utilitarian policy . . . the Bondels now in locations must be deported to Grootfontein in the north where they will constitute no threat. This should be done by force, and the sooner the better.

241.    Defendant also subjected the Ovaherero and Nama peoples to the illegal, discriminatory criminal jurisdiction of Imperial Courts. In such courts, Defendant continued to illegally try and punish thousands of Ovaherero and Nama people, almost exclusively for nonviolent offenses such as vagrancy or insubordination. For example, on one occasion, Ovaherero and Nama women were put to work as slaves on the railway line being constructed from Lüderitz to the town of Aus. Those that resisted this labor were prosecuted and punished, such as the three Ovaherero women identified at their criminal trials as Anna,[24] Justine,[25] and Johanna,[26] who were convicted at the Imperial Court in Lüderitz Bay.

---

[24] Namibian National Archives Windhoek, Records of the Imperial District Office of Lüderitz Bay at 220, Criminal Case No. 49 (Imperial Court of Lüderitz Bay).
[25] Namibian National Archives Windhoek, Records of the Imperial District Office of Lüderitz Bay at 221, Criminal Case No. 85 (Imperial Court of Lüderitz Bay).
[26] Namibian National Archives Windhoek, Records of the Imperial District Office of Lüderitz Bay at 220, Criminal Case No. 81 (Imperial Court of Lüderitz Bay).

Indeed, that particular Imperial Court was opened in 1906 for the exclusive purpose of punishing under color of law Ovaherero and Nama peoples during their captivity at Shark Island.

242.    Imperial criminal law was governed by the Imperial Decree of November 8, 1896, which established the punishments of flogging, birching, fines, imprisonment with hard labor, imprisonment in irons, and death.  Corporal punishment had been abolished in Germany itself since 1871.  The Ovaherero and Nama were routinely and discriminatorily convicted[27] and punished for nonviolent crimes such as "dereliction of duty," "indolence," and "insubordination."  Imperial law permitted slave-owners to flog slaves without trial and without an Imperial officer present.

243.    The well-preserved Imperial records show the number of officially recorded floggings and birchings following conviction.  These numbers do not include the rampant occurrence of extrajudicial floggings, birchings, and other punishments:

| Year | Floggings and Birchings |
|---|---|
| 1901–02 | 257 |
| 1902–03 | 473 |
| 1903–04 | 340 |
| 1904–05 | 187 |
| 1905–06 | 294 |
| 1906–07 | 336 |
| 1907–08 | 534 |
| 1908–09 | 703 |
| 1909–10 | 928 |
| 1910–11 | 1,262 |
| 1911–12 | 1,655 |

244.    Floggings did not just inflict pain, but also caused permanent injury or death.  Flogging was often conducted with the use of the sjambok—a heavy hippopotamus hide whip—which ripped

---

[27] As early as the 1890s, the discriminatory Imperial Rules of Evidence prescribed that a German's testimony legally and factually outweighs the cumulative unanimous testimony of up to six Africans.

apart the flesh of the person being flogged. For example, in 1912, a German farmer, Ludwig Cramer, flogged his Ovaherero slave Maria with the full knowledge and consent of Defendant's officers and agents. Her injuries were severe, as described by a doctor she visited:

> From the lower edge of the shoulder blades right to the loins, an absence of skin 20 by 18 cementers in size covered with putrefying skin, except at the edges, which had granulated for a distance of one centimeter. Under the mortified skin exuded stinking matter, and some fly maggots were also visible. The edges were sharply defined:
>
> On the right shoulder-blade were four to five deep lengthwise furrows, to the extent of a palm's breadth. On the right shoulder an absence of skin in extent 12 by 8 centimeters, also covered with putrefying skin, malodorous matter exuding under it. On the left shoulder an injury the size of a 5 Mark piece in the same condition. On the upper lip, forehead, in front diagonally across the breast, were older weals as if blows from a stick.
>
> The statement of the injured person that she received the wounds through a [flogging] agrees with the conditions found.
>
> The woman is not yet out of danger.

245. The mortality rate in Ovaherero and Nama communities reached dangerous levels in the years following the genocide. Because Defendant had taken their herds, the Ovaherero and Nama were deprived of the dairy-based diet they had thrived on for centuries, and as a result, scurvy took many lives. Malnourishment, poverty, lack of access to clean drinking water, and disease led to high mortality and infant mortality rates in Ovaherero and Nama communities.

246. Defendant's takings caused a stagnant birth rate in the Ovaherero and Nama communities. As reported in the *Deutsche Kolonialzeitung* (German Colonial News) in 1908, many Ovaherero and Nama women and girls had become sterile from the incessant rape by Defendant's agents who carried venereal diseases. Defendant's actions and takings also compelled many pregnant Ovaherero and Nama women to perform abortions on themselves, as they feared raising children in the hell that Defendant created.

247.    Through its takings and murders, Defendant also destroyed the repositories of Ovaherero and Nama knowledge, culture, and practice, and interrupted the mechanisms for institutional transmission of such knowledge, culture, and practice.  Over previous centuries and millennia, the Ovaherero and Nama peoples had refined expertise in fields as diverse as geology, animal husbandry, mythology, astronomy, fashion, trade, engineering, art, military tactics, storytelling, zoology, masonry, dance, hunting and trapping, philosophy, botany, forging and blacksmithing, tobacco farming, medicine and surgery, mountaineering, sports, jewelry, poetry, gardening, ivory-, bronze-, and iron-working, road building, bureaucracy and government, drama and comedy, wagon making, pharmaceuticals and homeopathy, ornithology, shoemaking, pottery, dye working, law, irrigation, fortification, ranching, religion and mysticism, celestial navigation, dairy processing, river and aquifer management, veterinary science, transhumance, weapon-making, court administration, marriage and burial ceremonies, writing and literature, brewing, education, equestrianism, ecology and forestry, archery, mining, well drilling, architecture, tailoring, marksmanship, carpentry and woodworking, horticulture, weaving, mercantilism, culinary arts and vegetarianism, music, and bridge building.  As lasting and stable societies, they had refined these rich traditions.  Defendant's actions cut the transmission lines for this knowledge, much of which has been irreparably lost, thereby injuring Plaintiffs and Plaintiffs' classes and/or subclasses.

248.    Defendant implemented its policy of exterminating the Ovaherero and Nama peoples from the face of the earth.  Defendant failed, despite its efforts. The resilient Ovaherero and Nama peoples have endured, retaining what remains of their proud cultures and identities, and now live on as Ovaherero and Nama peoples in Namibia and in the diaspora worldwide.

## J.    Defendant's Use of the Property

249.    Upon realization of the benefits achieved by its takings of Ovaherero and Nama property in violation of international law, Defendant commingled these fungible values within its

general Imperial treasury and departmental treasuries of various Imperial ministries, agencies, and instrumentalities ("Defendant's commingled funds").

250.    Defendant's Imperial Government retained complete control over the budget of its colonial authorities in South West Africa ("the colonial budget"). The process relating to the colonial budget was complex, with the colonial authorities first making a proposal, which after being considered and approved by the German Government and the Reichsschatzamt, was submitted to the Parliament for adoption as law. The German Government was directly responsible for the financial administration of South West Africa, at least until a reform act was passed in 1909, which gave some degree of financial administrative control to the colonial authorities.

251.    The German Empire received substantial financial benefit from the land and other property confiscations and forced labor. Contributing substantially to the colonial budget and the German treasury was the income generated and expenses saved through, *inter alia*, the use or sale of confiscated land or cattle; the use or sale of confiscated land or cattle for compensating white settlers; the use of forced labor for the purposes of the colonial administration or military forces (Schutztruppe); or the allocation and/or rental of prisoners and forced laborers to commercial enterprises.

252.    Defendant benefited directly from the income generated by the takings and expenses saved in the territories of the Ovaherero and Nama that were unlawfully seized and incorporated into a territory Germany labeled "German South West Africa."

253.    A significant portion of the wealth Defendant amassed during its "colonial experiment" in southwestern Africa was derived from its taking of property from the Ovaherero and Nama peoples. Germany became one of the wealthiest nations on earth, while as a consequence of Defendant's takings, Plaintiffs still languish in relative poverty and deprivation.

254. The German economy expanded rapidly during the colonial period starting in approximately 1884, and by 1900, the German Empire was the largest economy in Europe. After World War II, and beginning in the 1950s, Germany again experienced an "Economic Miracle" (*Wirtschaftswunder*) and continuing over the course of the remaining 20th Century and thereafter. Defendant evolved into an economic and political superpower, with the world's fourth-largest nominal GDP, the highest trade surplus of $310 billion, and third-largest annual exports of $1.3 trillion dollars.

255. Economists have hailed Defendant as the fastest-growing developed economy worldwide, in light of its continued stunning economic growth. As the economic powerhouse of the European Union, Defendant plays a leading economic and geopolitical role globally as a member of the G8 and G20 groups of nations and the North Atlantic Treaty Organization and is indisputably regarded as a global leader in commerce, industry, trade, and innovation.

256. In comparison, the Ovaherero and Nama peoples, having been deprived of their sovereignty and wealth by Defendant as alleged herein, continue to experience a state of socioeconomic stagnation with many of its peoples living in relative poverty both in Namibia and in the diaspora. Namibia is currently one of the most unequal societies on the planet: wealth, land, and privilege are overwhelmingly held by the German-speaking White Namibian descendants of German settlers. For example, in 1998 the average incomes of Otjiherero- and Khoikhoi-speaking households in Namibia were respectively only 10.1 percent and 7.9 percent of the average income of German-speaking White Namibian households. While many Ovaherero and Nama individuals have made great strides, the majority of the Ovaherero and Nama communities live in poverty, exposed without aid to the hardships of unemployment, poor schools and secondary educational opportunities, depressed healthcare capacities and an HIV/AIDS epidemic, juvenile crime and delinquency, political oppression and few

opportunities for political representation, challenging economic prospects, and a PTSD- and mental health crisis related to the intergenerational trauma that Defendant caused.

257.    Many Ovaherero and Nama people are religious, with a large number practicing Christianity, and a small but growing Muslim population among the Nama. Christianity was introduced to the Ovaherero and Nama peoples through the German Rheinisch Missionary, which had arrived several decades before Defendant in South West Africa. Like many Germans, a great number of Ovaherero and Nama people live today as pious and devout Lutherans.

K.    **Defendant's New York Property that It Exchanged for the Property Taken in Violation of International Law**

258.    A portion of Defendant's enormous wealth is attributable to, was exchanged for, and can be traced from the property it took from the Ovaherero and Nama peoples in violation of international law. Defendant has invested this wealth worldwide with a particularly large investment in the city and state of New York. Defendant's investments in New York City constitute property exchanged for the property taken in violation of international law and which were derived from a portion of Defendant's commingled funds. This property is present in New York City in connection with commercial activities carried on in the United States by Defendant.

259.    Defendant's properties in New York are used in connection with Defendant's commercial activities, and include, but are not limited to, the following real estate:

  a.    A 7,040 square-foot townhouse, located at 119 E. 65th Street in the Borough of Manhattan (the "65th Street Property");

  b.    A 133,750 square-foot building, located at 871 First Avenue in the Borough of Manhattan (the "First Avenue Property");

  c.    A 1,591 square-foot condo, located at 346 E. 49th Street in the Borough of Manhattan (the "49th Street Condo") and associated easement; and,

     d.  A 16,147 square-foot building, located at 1014 Fifth Avenue in the Borough of Manhattan (the "Haunted Castle").

260.    The 65th Street Property is a four-unit, four-story townhouse, built in 1910, zoned for commercial use, and identified as Block 1400, Lot 9.

261.    Since its purchase, now, and in the future, the 65th Street Property was, is, and will be used in connection with Defendant's commercial activities, including, but not limited to:

     a.  the performance and existence of contractual obligations related to the housing of German officials and employees in New York City;

     b.  the performance and existence of contractual obligations related to contracts for maintenance, restoration, cleaning, and other services provided by contractors located in New York City;

     c.  for example, such commercial activities include a maintenance and restoration "General Construction" project conducted by acclaimed architect, Frederick Schwartz for the contract price of $2,310,000, filed with the New York City Department of Buildings on April 1, 2009;

     d.  Defendant's long-standing commercial activities in New York City and the United States in support of cultural propagation, German-language programs, and other programs to develop American interest in the German people, language, culture, and country with the ultimate goal of commercial growth through cultural growth;

     e.  the performance and existence of contractual obligations under insurance contracts with domestic insurance providers related to property insurance, fire insurance, and other insurance coverage regarding the 65th Street Property; and,

     f.  the possible future sale of the 65th Street Property.

262.    The First Avenue Property, located at Block 1341, Lot 28 in the Borough of Manhattan, was purchased as an empty lot by Deed of Sale on April 15, 1996. Defendant thereafter constructed the high-rise on the First Avenue Property in the 1990s. The property is zoned for residential and commercial use, and houses Defendant's Mission to the United Nations, its Consulate General, and commercial offices of the German Academic Exchange Service (*Deutscher Akademischer Austauschdienst*, also known as "DAAD").

66

263.     Since its purchase, now, and in the future, the First Avenue Property was, is, and will be in connection with Defendant's commercial activities, including, but not limited to:

    a.   the performance and existence of contractual obligations related to the housing of German officials, employees, and visitors to New York City;

    b.   the performance and existence of contractual obligations related to contracts for maintenance, restoration, cleaning, and other services provided by contractors located in New York City;

    c.   Defendant's long-standing commercial activities in New York City and the United States in support of cultural propagation, German-language programs, and other programs to develop American interest in the German people, language, culture, and country with the ultimate goal of commercial growth through cultural growth;

    d.   the performance and existence of contractual obligations under insurance contracts with domestic insurance providers related to property insurance, fire insurance, and other insurance coverage regarding the First Avenue Property;

    e.   the possible future sale of the First Avenue Property; and,

    f.   the performance and existence of contractual obligations related to the DAAD, its commercial affiliates and employees, and its cultural, scientific, and academic partners, including both individuals and organizations.

264.     The 49th Street Condo is composed of a Commercial Unit and Residential Unit, identified as Block 1341, Lots 1701 and 1702 respectively in the Borough of Manhattan.  Defendant owns only the "Commercial Unit."  Defendant also owns an easement ("49th Street Easement") that Defendant maintains for commercial and maintenance purposes in relation to the Commercial Unit.  The 49th Street Easement was purchased by Easement Agreement on November 26, 1996.

265.     The 49th Street Condo and the 49th Street Easement were, are, and will be in connection with Defendant's commercial activities, including, but not limited to:

    a.   the performance and existence of contractual obligations related to the housing of German officials, employees, and visitors to New York City;

    b.   the performance and existence of contractual obligations related to contracts for maintenance, restoration, cleaning, and other services provided by contractors located

in New York City;

    c.    Defendant's long-standing commercial activities in New York City and the United States in support of cultural propagation, German-language programs, and other programs to develop American interest in the German people, language, culture, and country with the ultimate goal of commercial growth through cultural growth;

    d.    the performance and existence of contractual obligations under insurance contracts with domestic insurance providers related to property insurance, fire insurance, and other insurance coverage regarding the 49th Street Condo and 49th Street Easement; and,

    e.    the possible future sale of the 49th Street Condo and 49th Street Easement.

266.    The Fifth Avenue Property, referred to by German media as the "Haunted Castle" (*Spukschloss*), is located at Block 1494, Lot 72. The Haunted Castle was built in 1905–06, by James W. Gerard, former Justice on the Supreme Court of the State of New York, and American Ambassador to Defendant prior to and during the First World War. It is an ornate six-story townhouse located directly across the street from the New York Metropolitan Museum of Art.

267.    Defendant purchased the Haunted Castle in the early 1950s. Since then, the Haunted Castle has served many purposes, including, but not limited to residential and commercial space for cultural attachés, programs, and installations such as the Goethe Institute. Renowned German thinkers, writers, and artists have visited and resided there, including, but not limited to, Hannah Arendt, Uwe Johnson, Günter Grass, Rainer-Werner Fassbinder, Volker Schlöndorff, Wim Wenders, and Jürgen Habermas.

268.    The Goethe Institute was housed in the Haunted Castle between 1957 and 2010. In 2016 Defendant announced that the Haunted Castle will now be used as a permanent "German Academy of Art" in connection with a variety of commercial activities. During both time periods and in the future, the Haunted Castle was, is, and will be used in connection with Defendant's commercial activities, including, but not limited to:

    a.   the performance and existence of contractual obligations related to the housing of German officials, employees, and visitors to New York City; and,

    b.   the performance and existence of contractual obligations related to contracts for maintenance, restoration, cleaning, and other services provided by contractors located in New York City.

269.   For example, such commercial activities at the Haunted Castle include, but are not limited to:

    a.   Defendant's recent contract with H2 Consulting PE P.C. for "General Construction" maintenance and restoration work for the contract price of $10,000, filed with the New York City Department of Buildings on May 29, 2017;

    b.   Defendant's contract with Walter M. Schlegel PE for boiler repair and maintenance work for the contract price of $11,000, filed with the New York City Department of Buildings on May 22, 1991;

    c.   Defendant's long-standing commercial activities in New York City and the United States in support of cultural propagation, German-language programs, and other programs to develop American interest in the German people, language, culture, and country with the ultimate goal of commercial growth through cultural growth;

    d.   the performance and existence of contractual obligations under insurance contracts with domestic insurance providers related to property insurance, fire insurance, and other insurance coverage regarding the Haunted Castle;

    e.   the possible future sale of the Haunted Castle; and,

    f.   the performance and existence of contractual obligations related to commercial and cultural exhibitions in New York City, including, but not limited to, Max Bechman's art exhibit in 1968, Rainer Werner Fassbinder's video installation in 1973, Rirkrit Tiravanija's art exhibit in 1992, Nam June Paik's art exhibit in 1999, Candida Höfer's art exhibit in 2004, and the October 2010 "Hotel Savoy" art installation by director Dominic Huber—an interactive theater experience, in which theatergoers wandered through the Haunted Castle's "spooky" set design.

270.   The Haunted Castle is currently valued at over $50 million.

**L.    Germany Finally Acknowledges the Genocide, But Refuses to Include the Ovaherero and Nama Leaders in Discussions Relating Thereto**

271.    In 1985, the United Nations' Whitaker Report classified the massacres as an attempt to exterminate the Ovaherero and Nama peoples of South-West Africa, and therefore the earliest cases of genocide in the 20th century.

272.    In 1998, German President Roman Herzog visited Namibia and met Ovaherero leaders. Chief Munjuku Nguvauva demanded a public apology and compensation, but Herzog stopped short of an apology, only expressing "regret."

273.    On August 16, 2004, at the 100th anniversary of the start of the genocide, a member of the German government, Heidemarie Wieczorek-Zeul, Germany's Minister for Economic Development and Cooperation, apologized and expressed grief about the genocide:

> We Germans accept our historic and moral responsibility, and the guilt incurred by Germans at that time . . . The atrocities committed at that time would have been termed genocide.

274.    However, the German government quickly made it clear that her speech could not be interpreted as an "official apology" by Germany or a basis for the payment of any compensation, reparations or restitution.

275.    Minister Wieczorek-Zeul also has explained that Defendant's 2004 admission of liability was tied to the equally implicit admission that "there exists a continuing injury against the living descendants."[28] In other words, Minister Wieczorek-Zeul and other prominent present and former members of the German government have admitted that the Plaintiffs, who are the living descendants of the Ovaherero and Nama peoples subjected to the genocide and unlawful takings, suffer a continuing intergenerational injury due to, among other things, the expropriation of land, all personal wealth and

---

[28] Forward by Heidemarie Wieczorek-Zeul *in* Reinhart Kößler & Henning Melber, *Völkermord – und Was Dann?* 9 (Brandes & Apsel 2017) (". . . *eine fortdauernde Verletzung der Nachfahren der Opfer*.").

valuables, and the absence of adequate educational and social institutional supports by which the Ovaherero and Nama could have continued to thrive but for those takings.

276.    Former German ambassador to Namibia, Wolfgang Massing, stated in 2005:

If Germany were to admit that it was genocide, then the case for reparations will find basis in merit.

277.    It was not until October 2011, however, after three years of talks, twenty skulls were returned to Namibia for burial, and additional human remains were returned in 2014.  However, the skulls returned in 2011 were not returned for purposes of burial, but rather to be preserved as physical evidence of the horrific crimes committed by Defendant.  These human remains are not the last of the remains in Defendant's possession.

278.    Beginning in 2015, German Foreign Ministry guidelines began referring to the killings as a "genocide."  At or around the same time, Defendant acknowledged the "Armenian genocide" as a genocide for the first time.  The Armenian genocide, like the Ovaherero/Nama genocide, was marked by large-scale genocidal expropriation.  In September 1915, the Ottoman parliament passed the "Temporary Law of Expropriation and Confiscation," taking all property and land of the Armenians. In connection with the Armenian genocide, Bundestag President Norbert Lammert[29] stated:

[A]nyone who refers to the Turkish massacre of Armenians in 1915 as genocide must also acknowledge that atrocities committed by German imperial troops a decade before in what is now Namibia should also be described as such.

279.    Minister Wieczorek-Zeul also stated:

There were tens of thousands of Herero and Nama victims, not only through fighting but also illness and the targeted killing through allowing people to die of thirst and hunger . . . Others died in concentration camps and in slave labor."

280.    Like the Ovaherero and Nama peoples, the Armenians died through numerous causes, including, but not limited to targeting killings, thirst, and hunger, whether in concentration camps or

---

[29] President of the Bundestag from 2005 to 2017.

slave labor.  Thus, since Germany considers the Ottoman/Turkish treatment of the Armenians to be a genocide, it must acknowledge that the same or similar actions it took against the Ovaherero and Nama were genocidal.

281.    At a press conference held on July 10, 2015, the spokesperson for the German Foreign Office, Dr. Martin Schafer, stated the German Government's official position on the war of extermination in South West Africa is that "[t]he war of extermination in Namibia from 1904 to 1908 was a war crime and genocide."

282.    In its June 22, 2016 response to questions from members of the Bundestag (German Parliament), the German Government acknowledged that the statements made on July 10, 2015 by Dr. Shafer on behalf of the German Foreign Office "reflect the position of the Federal Government."[30]

283.    The current President of Germany and the former Foreign Minister Frank-Walter Steinmeier also admitted in 2015 that its actions in South West Africa amounted to a "war of annihilation and constitute a war crime and genocide."  This followed a formal declaration by the German federal government, apologizing for the "genocide."

284.    On numerous occasions, Defendant, through formal channels, made admissions to the world and the Plaintiff class members that Defendant's actions amounted to genocide.

285.     Defendant admitted its commission of genocide in legislative proceedings and its ongoing discussions with Namibia and has benefited politically from making this admission. Defendant's admission of genocidal conduct constitutes both an admission of jurisdiction and an admission of liability.

286.    Nevertheless, despite its admission that what the atrocities it had committed amounted to a genocide, the German government has continued to refuse to negotiate directly with the leaders

---

[30] *See* Bundestag printed paper no: 18-8859 of 22.06.2016.

and representatives of the Ovaherero and Nama communities, even though those are the two specific communities who were targeted for extermination.

287.    The exclusion of Plaintiffs from these discussions by Germany amounts to yet another "taking" and attempt to strip the Ovaherero and Nama people of their valuable intangible property rights recognized under international law, including the right to make claims and be heard before an impartial and fair tribunal.

## M.    Defendant Excludes the Ovaherero and Nama in Talks with Non-Party Namibia

288.    Defendant has sought to negotiate with Namibia, a non-party to the dispute, concerning the claims described herein.  These negotiations—including the prospect of settlement through payment, investment, or other tangible or intangible aid—constitute "commercial activity."

289.    Despite the incalculable economic, cultural, intellectual, and spiritual losses that the Ovaherero and Nama peoples have suffered, Defendant has systematically and categorically excluded the lawful representatives of the indigenous Ovaherero and Nama peoples from negotiations between Defendant and Namibia and has steadfastly refused to even consider compensating the Ovaherero and Nama peoples for the losses it inflicted upon them.

290.    Defendant's acts violate the Ovaherero and Nama people's rights under international law to raise its claims and be heard before an impartial tribunal.

291.    Defendant's acts also violate its obligations under the U.N. Declaration on the Rights of Indigenous Peoples, which explicitly provides, at Article 11 (2):

> States shall provide redress through effective mechanisms, which may include restitution, developed in conjunction with indigenous peoples, with respect to their cultural, intellectual, religious and spiritual property taken without their free, prior and informed consent or in violation of their laws, traditions and customs.

292.    In addition, Article 18 of the U.N. Declaration provides as follows:

Indigenous peoples have the right to participate in decision-making in matters which would affect their rights, through representatives chosen by themselves in accordance with their own procedures, as well as to maintain and develop their own indigenous decision making institutions.

293.    The Ovaherero and Nama peoples hereby demand that they be given the right to exercise their rights to redress as third-party beneficiaries under the Declaration.

294.    Defendant's exclusion and violation of the U.N. Declaration continues the racist, imperialist policies manifested at the 1884–85 at the Berlin West Africa Conference.  In 1884, Defendant—in a typical manifestation of its xenophobic folly—did not view the Ovaherero and Nama peoples as "sovereign equals," but rather as belonging to a lesser, uncivilized object race lacking agency over its people or fate.  In 2018, Defendant continues to refuse to include the Ovaherero and Nama peoples in its discussions with Namibia, again treating the Ovaherero and Nama peoples as lesser, uncivilized objects without "sovereign equality" to the supposed grandeur of Defendant's "Federal Republic."  Defendant ignores, objectifies, and marginalizes the Ovaherero and Nama peoples now as it did in 1884 in Berlin.

N.    **Defendant's Acts Have a Direct Effect in the United States**

1.    **U.S. Plaintiffs and Ovaherero and Nama Communities in New York and Elsewhere in the U.S.**

295.    Many descendants of the Ovaherero and Nama peoples and lawful claimants as Plaintiff class members have emigrated from Namibia, and now call the United States their home as U.S. Citizens, lawful residents, and patriotic Americans.  There are approximately 140 Ovaherero class members in the New York metropolitan area alone, most of whom are members of the Plaintiff Association. Other members of the Classes reside throughout the United States and are active in various organizations dedicated to the preservation of Ovaherero and Nama culture, and educational and outreach programs regarding the Ovaherero/Nama Genocide.

296.    Defendant's unlawful takings in connection with the genocide, as well as its refusal to

negotiate with Ovaherero and Nama representatives in violation of the U.N. Declaration, has had a

direct and proximate effect on class members residing in the United States.  They were deprived of

their property and other financial and economic resources, as well as educational and cultural

opportunities that would have been available to them but for Defendant's genocide and unlawful

takings, were forced to flee their homeland, deprived of their citizenship rights in their own indigenous

sovereign countries, and forced to make a new start in other countries, including the United States.

## 2. Human Remains from the Genocide Discovered in New York

297.    In September 2017, the American Museum of Natural History ("AMNH") in New York

City confirmed to Plaintiffs that it was in possession of Namibian human remains, which related to the

1904-1908 German genocide of the Ovaherero and Nama peoples.

298.    The human remains were originally collected by Professor Felix von Luschan, a

German anthropologist and ethnologist at the Museum for Ethnology in Berlin from 1885-1910. He

was also a member of the German Society for Racial Hygiene. Over the span of many years, von

Luschan built up two large collections containing thousands of specimens: one for the Berlin museum

and one in his own private possession. Both collections contained skulls and skeletons of Namibians

that had been shipped from Africa to Berlin during the German colonial period.

299.    According to Dr. Holger Stoecker, a historian at Humboldt University in Berlin familiar

with the collection, after von Luschan's death in 1924, his widow sold his private collection to the

AMNH in New York. Upon information and belief, Felix Warburg, the German-born New York

banker, donated the money for the transfer of the collection from Berlin to New York.

300.    Of the eight human remains from Namibia at the AMNH, at least two appear to be

genocide victims, including one from Shark Island, the notorious German concentration camp located

at Luderitz Bay, and one from Windhoek, where the German colonial authorities also maintained a concentration camp for the Ovaherero and Nama prisoners.

301.    The discovery of Namibian and Ovaherero remains at the AMNH shows that the Genocide of the Ovaherero and Nama peoples in the early part of the 20th Century involved not only the mass killing of Ovaherero and Nama men, women and children, and the confiscation of their lands and livestock, but also involved the desecration of their remains. Hundreds of skulls and skeletons were carted away to Berlin by German scientists and researchers. These desecrated remains were used extensively in pseudo-scientific experiments to support racist theories that speciously claimed that African races were inferior to the German peoples.

### 3.    Discovery of Copy of "Blue Book" in New York Public Library

302.    Plaintiffs have discovered that a rare copy of the "Blue Book," published in 1918, is located at the New York Public Library's main branch on Fifth Avenue in Manhattan. The book, "Union of South Africa – Report On the Natives of South-West Africa And Their Treatment By Germany," was prepared by South African officials in Windhoek, and published in the United Kingdom by His Majesty's Stationery Office (HMSO) and presented to both Houses of Parliament that year.[31]

303.    This Blue Book is an invaluable record which includes testimony to the atrocities from genocide survivors. The presence of a Blue Book copy in New York is extraordinary since between the two World Wars Great Britain considered Germany briefly as an ally and attempted to suppress records of Germany's genocide of the indigenous peoples of South West Africa by, among other things, destroying all copies of the Blue Book. The copy located at the New York Public Library is one of the few surviving copies.

---

[31] After World War I the administration of South West Africa was transferred to the United Kingdom and South Africa.

#### 4.  New York Is A Center For Ovaherero/Nama Genocide Research

304.    New York has become one of the leading research and conference centers for the study of the Ovaherero/Nama genocide. The AMNH has had a series of meetings with Plaintiffs and members of the Ovaherero and Nama communities regarding human remains from the German genocide in the Museum's possession, and there are ongoing discussions relating to the possible establishment of a permanent online Ovaherero/Nama Genocide exhibition (which would include human remains and artifacts).

305.    In addition, the Schomburg Center for Research in Black Culture, located at 515 Malcolm X Blvd in Manhattan, in association with the Plaintiff Association, has undertaken research and held a recent conference, "The First Genocide of the 20th Century," chaired by Dr. Ngondi Kamatuka, who himself is a descendent of the Ovaherero/Nama Genocide and now a U.S. citizen.

306.    Columbia University has sponsored an ongoing research program and another major educational conference focused on the German south west African genocide, bringing together leaders and members of the Ovaherero and Nama communities with photojournalists and documentary film makers based in New York, who have documented the lasting and continuing impact that the Defendant's genocide has had on the descendants of these victims both in Africa and in the United States. The Holocaust Studies and Human Rights Program of Cardozo Law School, Yeshiva University, has also committed some of its resources to this project.

307.    The Ovaherero/Nama Genocide has been given significant attention by the Holocaust Memorial and Education Center, Glen Cove, New York, which sponsored an international conference, research and educational program, and has hosted the filming of a public television program and series with WLIW21 and WNET.

308.     In short, the Ovaherero and Nama communities in New York have a wide range of historical, educational and cultural ties with numerous not-for-profits, museums, cultural/educational entities and multimedia programs in the New York area.

## O.     Plaintiffs' Injuries

309.     Under customary Ovaherero law and Nama law, the rights of a decedent are passed by intestacy, and property that inhered in the Ovaherero people and Nama people respectively is held on a communal basis by the sovereignty.  Plaintiffs and the Classes are the heirs to the rights in property taken by Defendant from the Ovaherero and Nama peoples in violation of international law.

310.     In the alternative, Plaintiffs Paramount Chief Rukoro of the Ovaherero and Chief Isaack of the Nama are the sole, rightful, and legal representatives of the continuing bodies politic of the Ovaherero people and Nama people respectively, and thereby represent bodies that are not legal *successors* to the Ovaherero people and the Nama people of 1884–1915, but rather are one and the same with an identical, unbroken legal status.  As such, the claims and rights asserted herein were never inherited, but have inhered since their origins in the bodies politic represented by Plaintiffs.

311.     Further, in the alternative, Plaintiffs and the Classes have suffered the injuries alleged herein directly and proximately, in that Defendant engaged in a lawless course of conduct to annihilate not only the Hereroland and Great Namaqualand polities in their entirety, but also to annihilate the existence of the Ovaherero and Nama peoples *qua* peoples—including all descendants.    The genocide and takings led to intergenerational impoverishment that has lasted for over one-hundred years.

312.     Plaintiffs and the Classes have been directly and proximately injured by Defendant, as set forth *supra*, and as described below.

### 1. Economic Injuries

313.    Defendant deprived Plaintiffs and the Classes of their valuable rights in the land, cattle, minerals and precious metals, concession, taxation, and customs revenues, the fruit of the labor of family members and their associated pension rights, as well as other property.  Defendant's actions have caused Plaintiffs and the Classes to incur exorbitant medical and disability expenses; to lose wages; to find unsatisfactory replacement property; and, to incur the costs of funerals and burials; all totaling an amount to be proven at trial.

### 2. Non-Economic Injury

314.    Defendant's taking of the skulls, body parts, and bodies deprived Plaintiffs and the Classes of the mortal remains of their family members.  Defendant's genocidal conduct and mass murder subjected Plaintiffs and the Classes to a loss of consortium, mental anguish, pain and suffering, disfigurement, reputational injury, and spiritual injuries sustained by Defendant's destruction of the sovereign polities of Hereroland and Great Namaqualand.  Defendant also injured Plaintiffs and the Classes by destroying the institutional mechanisms for transmission of the peoples' knowledges, traditions, and practices, and thereby depriving Plaintiffs and the Classes with those knowledges, traditions, and practices.  The amount of these damages will be proven at trial.

### 3. Punitive Damages

315.    In light of Defendant's malice, ill will, and blatant disregard for human dignity and human rights, Plaintiffs assert the right to punitive damages in an amount sufficient to punish Defendant for its flagrant violations of international law and to deter any such future conduct.

## CLASS ACTION ALLEGATONS

316.    Plaintiffs are U.S. citizens and aliens who bring this action on behalf of themselves and all other U.S. (the "U.S. Class") and non-U.S. citizens ("the non-U.S. Class") who are, or who are direct descendants of, members of the Ovaherero and Nama indigenous peoples ("the Classes").

317.    Neither the members of U.S. Class, the members of the non-U.S. Class, nor the ancestral members of the Ovaherero and Nama indigenous peoples are or were Defendant's citizens. Any and all citizens of Defendant are excluded from the Classes.

318.    This action may be properly maintained as a Class action pursuant to Rule 23, Federal Rules of Civil Procedure. This action may be properly maintained as a Class action pursuant to Fed. R. Civ. P. 23(b)(1) in that the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. This action may be properly maintained as a Class action pursuant to Fed. R. Civ. P. 23(b)(2) as the parties opposing the Class have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## A.    Predominance of Common Questions

319.    There are also questions of law and fact common to the Class which predominate over questions affecting individual members, including:

(a)    Did the German colonial authorities design and implement an intentional policy and practice to exterminate the Ovaherero and Nama people?

(b)    Did the German colonial authorities systematically expropriate, and aid and abet the expropriation, of Ovaherero and Nama land, personal property, livestock, concession, taxation,

and customs rights, human labor, body parts, and other property?

(c)     Did the German colonial authorities implement, aid and abet, and authorize a policy and practice of systematic rape of Ovaherero and Nama women?

(d)     Did the German colonial authorities implement, aid and abet and authorize a policy and practice of forcing Ovahereo and Nama into involuntary servitude and forced/slave labor?

(e)     Did the German colonial authorities incarcerate the surviving Ovaherero and Nama people in concentration camps under inhumane and sub-human conditions, without adequate food, water, clothing, shelter, medical care and other basic requirements and tools for survival, at Shark Island and other concentration camps?

(f)     Did German authorities permit and aid and abet the pseudoscientific medical experimentation on Ovaherero and Nama corpses and skulls in a misguided and ghoulish effort to establish that indigenous Africans were _Untermensch_ (inferior or sub-human) and that the German "race" was superior?

(g)     To that end, did Defendant force Ovaherero and Nama women and girls to use glass shards to manually scrape the flesh, face, and scalp off of the boiled heads of their husbands and fathers?

(h)     Did Defendant's takings violate international law?

(i)     Has German intentionally marginalized and excluded Ovaherero and Nama leadership and representatives from any negotiations regarding the genocide and wrongful expropriation of their property, in violation of the U.N. Declaration of the Rights of Indigenous Peoples?

## B.    Superiority

320.    Defendant's takings treated the Ovaherero and Nama as classes to be uniformly annihilated, and for their land to be uniformly expropriated according to Defendant's desire.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs and Plaintiff class members have all suffered and will continue to suffer economic harm and damage as a result of Defendant's unlawful and wrongful conduct, which was directed towards the Ovaherero and Nama peoples as a whole, rather than specifically or uniquely against any individual.

81

321.    Defendant has acted uniformly with respect to Plaintiffs and the Classes.  Absent a class action, most class members would likely find the cost of litigating their claims prohibitively high and would thus have no effective remedy at law or equity.  Most Plaintiff class members are impoverished with limited access to lawyers and courts.  Because of the relatively small size of each individual class member's claim, it is likely that only a few class members would be able to afford to seek legal redress for Defendant's misconduct.  Absent a class action, Plaintiff class members will continue to incur damages, and they will remain without effective remedy.

322.    Class treatment in this Court will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication by providing common answers to the common questions of law that predominate in this action.

323.    Class-wide relief and judicial supervision under Rule 23 assures fair, constituent, and equitable treatment and protection of all Plaintiff class members, and uniformity and consistency in Defendant's discharge of its legal obligation to make restitution and pay damages.

**C.    Typicality**

324.    The claims of the named Plaintiffs are typical of the members of the Classes and they will be able to fairly and adequately protect the interests of the Classes. The named Plaintiffs have no interests antagonistic to the interests of other members of the Classes.

**D.    Numerosity**

325.    While the exact number of Class members is unknown to Plaintiffs currently, it is estimated that the Classes are so numerous that joinder of individual members herein is impracticable.

**E.    Adequacy**

326.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained competent counsel, experienced in class action litigation and litigation

involving international human rights, takings of private property, and complex civil litigation.

Plaintiffs are members of the Classes and do not have interests antagonistic to or in conflict with the

other members of the Classes.

## COUNT I
### (Violations of International Law Under the Alien Tort
### Statute, 28 U.S.C. § 1350, Federal Common Law and The Law of Nations)

327.    Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as though fully

set forth herein.

328.    Germany's horrific mistreatment of the Ovaherero and Nama during the colonial

period, including but not limited to the mass killings intended to exterminate the Ovaherero and Nama

peoples, the systematic rape and abuse of Ovaherero and Nama women, the taking and expropriation

of lands, cattle and other property without compensation and in furtherance of Germany's genocidal

policies, the herding of Ovaherero and Nama survivors into concentration camps, the exploitation of

surviving Ovaherero and Nama as forced/slave laborers, and the use of Ovaherero and Nama corpses

and skulls for pseudoscientific experimentation and public display, constituted genocide under

international law.

329.    In addition, Germany, as the purported governmental authority during the colonial

period, is liable for aiding and abetting German settlers and residents of then-South West Africa in the

confiscation of lands, cattle and other property from the Ovaherero and Nama in violation of

international law, the systematic rape of Ovaherero and Nama women by said German civilian and

military personnel, and the unlawful use of Ovaherero and Nama as forced/slave laborers.

330.    Germany is also liable to Plaintiffs and the Classes for its violations of the U.N.

Declaration of the Rights of Indigenous Peoples, in that it has refused to recognize that the lawful

representatives of the indigenous Ovaherero and Nama peoples have a right to participate in

negotiations relating to the genocidal policies and practices of the German Imperial authorities during the colonial period, refusal to recognize the right to self-determination of the Ovaherero and Nama, and the refusal to even consider the issue of reparations and compensation to the Ovaherero and Nama for the catastrophic abuses that they were forced to endure.

331.    Germany is liable to the non-U.S. Plaintiffs and the non-U.S. Class for damages under the Alien Tort Statute, 28 U.S.C. §1350, in an amount to be determined at trial.

332.    Germany is liable to the U.S. Plaintiffs and the U.S. Class for these violations of international law under federal common law, which incorporates international law, in an amount to be determined at trial.

## COUNT II
### (Conversion of Land, Livestock and Other Property)

333.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

334.    Germany's confiscation and unlawful taking of the lands, cattle and other property of the Ovaherero and Nama peoples without compensation constituted a conversion under common law and New York state law.

335.    Germany's aiding and abetting of the confiscation and unlawful taking of the lands, cattle and other property of the Ovaherero and Nama peoples without compensation by German nationals and others during the colonial period constituted a conversion under common law and New York state law.

336.    As a result, Plaintiffs and all Ovaherero and Nama members of the Classes were deprived of their property, its use and enjoyments, and any interest and provides which could have been earned thereon.

337.    Germany is liable to the Plaintiffs and the Classes for such damages in an amount to be determined at trial.

338.     Plaintiffs and the Classes are also entitled to the return of the assets and property that was looted and confiscated directly by the Defendant, or which was aided and abetted by the Defendant, in an amount to be determined at trial.

## COUNT III
### (Conversion of the Concession, Taxation, and Customs Rights)

339.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Amended Complaint as though fully set forth herein.

340.     Germany's taking of the concession, taxation, and customs rights of the Ovaherero and Nama peoples without compensation constitutes a conversion under New York law.

341.     Germany's aiding and abetting of taking of the concession, taxation, and customs rights of the Ovaherero and Nama peoples without compensation by private parties constitutes a conversion under common law and New York law.

342.     As a result, Plaintiffs and the Classes have been deprived of their concession, taxation, and customs rights, its use and enjoyments, and any interest that would have been earned thereon.

343.     Germany is liable to Plaintiffs and the Classes for damages in an amount to be determined at trial.

## COUNT IV
### (Conversion of Precious Metals and Gems and Other Resources)

344.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Amended Complaint as though fully set forth herein.

345.     Germany's taking of the precious metals, precious gems, and other natural resources of the Ovaherero and Nama peoples without compensation constitutes a conversion under New York law.

346.    Germany's aiding and abetting of taking of the precious metals, precious gems, and other natural resources of the Ovaherero and Nama peoples without compensation by private parties constitutes a conversion under common law and New York law.

347.    As a result, Plaintiffs and the Classes have been deprived of their rights in the precious metals, precious gems, and other natural resources, its use and enjoyments, and any interest that would have been earned thereon.

348.    Germany is liable to Plaintiffs and the Classes for damages in an amount to be determined at trial.

349.    Plaintiffs and the Classes are also entitled to the return of all precious metals, precious gems, and other natural resources confiscated directly by Defendant, or which was aided and abetted by Defendant, and which are owned by Defendant, in an amount to be determined at trial.

## COUNT V
### (Conversion of the Wages of the Ovaherero and Nama Peoples)

350.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Amended Complaint as though fully set forth herein.

351.    Germany's taking of the wages of the Ovaherero and Nama peoples without compensation constitutes a conversion under New York law.

352.    Germany's aiding and abetting of taking of the wages of the Ovaherero and Nama peoples without compensation by private parties constitutes a conversion under common law and New York law.

353.    As a result, Plaintiffs and the Classes have been deprived of their rights in the back-pay of wages, its use and enjoyments, and any interest that would have been earned thereon.

354.    Germany is liable to Plaintiffs and the Classes for damages in an amount to be determined at trial.

## COUNT VI
### (Conversion of Labor and Pension Rights)

355.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Amended Complaint as though fully set forth herein.

356.    Germany's taking of the labor and pension rights of the Ovaherero and Nama peoples without compensation constitutes a conversion under New York law.

357.    Germany's aiding and abetting of taking of the labor and pension rights of the Ovaherero and Nama peoples without compensation by private parties constitutes a conversion under common law and New York law.

358.    As a result, Plaintiffs and the Classes have been deprived of their rights in the labor and pension rights, and its use and enjoyments.

359.    Germany is liable to Plaintiffs and the Classes for damages in an amount to be determined at trial.

## COUNT VII
### (Conversion of Skulls, Body Parts, and Mortal Remains)

360.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Amended Complaint as though fully set forth herein.

361.    Germany's taking of the skulls, body parts, and other mortal remains of the Ovaherero and Nama peoples without compensation constitutes a conversion under New York law.

362.    Germany's aiding and abetting of taking of the skulls, body parts, and other mortal remains of the Ovaherero and Nama peoples without compensation by private parties constitutes a conversion under common law and New York law.

363.    As a result, Plaintiffs and the Classes have been deprived of their rights in the skulls, body parts, and other mortal remains, and its use and enjoyments.

364.    Germany is liable to Plaintiffs and the Classes for damages in an amount to be determined at trial.

365.    Plaintiffs and the Classes are also entitled to the return of all skulls, body parts, and other mortal remains confiscated directly by Defendant, or which was aided and abetted by Defendant, and which are owned by Defendant, in an amount to be determined at trial.

## COUNT VIII
### (Conversion of Sovereignty Property Rights)

366.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Amended Complaint as though fully set forth herein.

367.    Germany's taking of the property rights of the Ovaherero and Nama nations without compensation constitutes a conversion under New York law.

368.    Germany's aiding and abetting of taking of the property rights of the Ovaherero and Nama nations without compensation by private parties constitutes a conversion under common law and New York law.

369.    As a result, Plaintiffs and the Classes have been deprived of their property rights of the Ovaherero and Nama nations, and their use and enjoyment.

370.    Germany is liable to Plaintiffs and the Classes for damages in an amount to be determined at trial.

## COUNT IX
### (Unjust Enrichment)

371.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

372.    By its seizure, use and retention of the property looted from the Plaintiffs and Class members, through its aiding and abetting of others to convert Plaintiffs' property, and by its refusal and

failure to return said looted assets to their rightful owners, Defendant improperly deprived Plaintiffs and other Class members of their property.

373.    Plaintiffs and the Classes are therefore entitled to recover damages in an amount to be determined at trial.

## COUNT X
### (Accounting)

374.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

375.    Plaintiffs and the Classes are entitled to an accounting from Germany for the losses that they suffered for the confiscation of their lands, cattle and other properties in violation of international law.

## COUNT XI
### (Constructive Trust)

376.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Amended Complaint as though fully set forth herein.

377.    Plaintiffs and the Classes are entitled to establishment of a constructive trust, as Defendant cannot in good conscience retain the beneficial interests of its takings, and equity compels Defendant to serve as trustee to Plaintiffs.

## COUNT XII
### (Declaratory Judgment)

378.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

379.    Plaintiffs and the Classes are entitled to an Order, pursuant to Title 28, United States Code, Section 2201, declaring that Defendant's aforesaid intentional and unlawful actions have caused and continue to cause Plaintiffs and the Classes damages as a direct and proximate result of

Germany's refusal to respect Plaintiffs' rights, among other things, (i) as the legitimate successors to sovereign nations; (ii) as successors to the rights of the Ovaherero and Nama peoples; (iii) as successors to the rights of generations of victims to damages and restorative justice; and (iv) as the sole and lawful persons, and indispensable parties, to all discussions and negotiations regarding the issues presented herein.

380.    Plaintiffs and the Classes also are entitled to an Order, pursuant to Title 28, United States Code, Section 2201, declaring that Defendant's exclusion of Plaintiffs, as the legitimate and lawful representatives of the Ovaherero and Nama indigenous peoples, from current negotiations regarding the subject matter of this Complaint, is a violation of Plaintiffs' rights under international law, including the U.N. Declaration on the Rights of Indigenous People.

381.    Pursuant to 28 U.S.C. § 2201, there exists a real, immediate and urgent need for Plaintiffs to obtain a declaration of the rights and legal relations between them and the Defendant.

382.    In the absence of such a declaration of rights and legal relationship between the parties, Defendant will continue to deprive and obstruct Plaintiff's rights to damages and restorative justice.

## JURY TRIAL DEMAND

383.    Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court designate Plaintiffs as the named representatives of the Classes, designate any appropriate subclasses, under applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendant, as follows:

(a) Certify this as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) Order that the undersigned attorneys are designated as class counsel;

(c)  Adjudge and decree that Defendant's conduct as described herein was in violation of international law, federal statutory and federal common law, and the law of New York State;

(d)  Enjoin and restrain Defendant from continuing to exclude Plaintiffs and other lawful representatives of the Ovaherero and Nama people from participation in discussions and negotiations regarding the subject matter of this Complaint, in violation of Plaintiffs' rights under the U.N. Declaration on the Rights of Indigenous People to self-determination for all indigenous peoples and their right to participate and speak for themselves regarding all matters relating to the losses that they have suffered;

(e)  Award damages to the Plaintiffs and the Non-U.S. Class under the Alien Tort Statute, and to both Classes under international law, federal common law, and New York law, including conversion and unjust enrichment, for the damages sustained by Plaintiffs and the Classes as a result of Defendant's violations, including its violation of the Genocide Convention and the U.N. Declaration on the Rights of Indigenous Peoples;

(f)  Award damages to the Plaintiffs and the Classes for all common and state law violations, including the conversions and unjust enrichment;

(g)  Direct that Defendant conduct an accounting of the value of the land, personal property, livestock, concession, taxation, and customs rights, human labor, body parts, and other property rights taken from the Ovaherero and Nama peoples;

(h)  Order that a Constructive Trust be established with regard to the value of all land, personal property, livestock, concession, taxation, and customs rights, human labor, body parts, and other property rights that were taken, and the profits derived therefrom;

(i)  Award Plaintiffs and the Classes punitive damages in an amount sufficient to punish Defendant for its flagrant and outrageous violations of international law and to deter such future conduct;

(j)  Award Plaintiffs the costs of bringing this action, pre- and post-judgment interest on any amounts awarded, reasonable attorneys' fees; and,

(k)  Grant such other and further relief as this Court deems just and proper.


Dated: New York, New York
        February 14, 2018

McCALLION & ASSOCIATES LLP

/s/
_____
By: Kenneth F. McCallion
100 Park Avenue – 16th floor
New York, New York 10017
(646) 366-0884

Of Counsel:
Professor Richard H. Weisberg,
Benjamin N. Cardozo School of Law

Thomas A. Holman
Holman Law, P.C.
99 Park Avenue, Suite 2600
New York, New York 10016
(212) 481-1336

Yechezkel Rodal
Rodal Law, P.A.
3201 Griffin Road, Suite 203
Dania Beach, FL 33312
(954) 367-5308

Attorneys for Plaintiffs