# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Vekuii Rukoro, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **17 cv 00062 (LTS)** |
| **v.** ) | |
| ) | |
| **Federal Republic of Germany,** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT
MATTER JURISDICTION, FOR LACK OF PERSONAL JURISDICTION, FOR
FAILURE TO EXHAUST REMEDIES IN GERMANY AND UNDER THE DOCTRINES
OF POLITICAL QUESTION AND _FORUM NON CONVENIENS_**

Dated: March 13, 2018

Jeffrey Harris, Esq. JH2121
Max Riederer von Paar, Esq.
Walter E. Diercks, Esq.
RUBIN, WINSTON, DIERCKS, HARRIS
& COOKE, LLP
1201 Connecticut Avenue, N.W., Ste 200
Washington, D.C. 20036
jharris@rwdhc.com

Attorneys for Defendant

## TABLE OF CONTENTS

The Alleged Facts Relevant to Defendant's Motion ........................................................1

Argument ...........................................................................................................................2

I.      The Complaint should be dismissed for lack of subject matter jurisdiction
        as the Federal Republic of Germany is immune from prosecution under
        the FSIA's broad grant of immunity to foreign states.  The expropriation
        in violation of international law exception to that grant of immunity
        does not apply in this case ............................................................................... 2

        A.  Property rights not taken in violation of international law  ..........................................4

            1.  Doctrine of Intertemporal Law .......................................................4

            2.  Inner Dealings of the German Reich in one of its
                Colonies not Governed by International Law ......................................7

            3.  No Violation of International Law for Expropriation of Nationals ....................8

            4.  International Law on Genocide of the time ..........................................9

            5.  International Humanitarian Law of the Time ....................................9

        B.  Property not Present in the United States................................................ 10

II.     The Complaint should be dismissed for lack of personal jurisdiction pursuant
        to Fed. R. Civ. P. 12(b)(2)...................................................................17

III.    The Court Lacks Subject Matter Jurisdiction under the Political
        Question Doctrine ......................................................................18

IV.     The Court should decline to exercise jurisdiction pursuant to the prudential
        exhaustion doctrine and the *forum non conveniens* doctrine ......................................21

        A.  Exhaustion of Remedies in Germany ......................................................21

        B.  *Forum non Conveniens* ....................................................................23

        CONCLUSION................................................................................24

The Amended Complaint was filed on February 14, 2018 by the Plaintiffs. The Defendant, the Federal Republic of Germany, is a foreign state as that term is defined in the Foreign Sovereign Immunities Act ("the FSIA"), 28 U.S.C. § 1602, *et. seq*. The Amended Complaint alleges that the Defendant, which would otherwise be immune from jurisdiction in this Court under the FSIA, lost that immunity pursuant to 28 U.S. C. § 1605(a)(3), the FSIA's so-called expropriation exception in violation of international law.

## The Alleged Facts Relevant to Defendant's Motion

The Amended Complaint alleges that the Ovaherero and Nama peoples were victims of unlawful taking of their property, including land, livestock, concession, taxation, and custom rights, precious gems and metals, human labor, body and parts, during the period 1885 to 1909 at the hands of the then-German colonial authorities and that Plaintiffs represent the Ovaherero and Nama peoples. (*See*, *e.g.,* Am. Comp. ¶ ¶ 16, 72). It also alleges that the Defendant's actions ". . . deprived the Ovaherero and Nama peoples of their sovereign status and crippled the sovereign polities to such an extent that they were largely disbanded and broken up by German authorities." (Am. Comp. ¶ 18). The Plaintiffs state that they bring this action "on behalf of all Ovaherero and Nama peoples worldwide for damages resulting from Defendant's taking and expropriation of their property, including their sovereign status, in violation of applicable international law during the period 1885 through 1915 in southwestern Africa." (Am. Comp. ¶ 19).

The Amended Complaint also alleges that the property rights of Ovaherero and Nama individuals ". . . were and are held on a communal basis by the sovereignty that inhered in the Ovaherero and Nama peoples respectively. Plaintiffs and the Classes are the sole, rightful and legal heirs to the rights in property taken by Defendant from the Ovaherero and Nama peoples in

1

violation of international law." (Am. Comp. ¶ 214). Thus, the Amended Complaint alleges that the Plaintiffs are the sole legal heirs of two sovereign nations that communally owned the property allegedly taken by Defendant. (Am. Comp. ¶ 309). Alternatively, the Amended Complaint alleges that the property rights at issue were never inherited, but "have inhered since their origins in the bodies politic represented by the Plaintiffs." (Am. Comp. ¶ 310).

During the period set out above, the German colonial authorities allegedly seized their land and livestock and the German authorities allegedly turned a blind eye to systematic rape and the use of the people in forced labor. (*See, e.g.,* Am. Comp. ¶¶ 14, 82, 154, 158). The German Imperial troops allegedly killed over 100,000 people and forced the survivors into concentration camps. (*See, e.g.,* Am. Comp. ¶¶ 3, 12, 14, 130-31, 145, 147, 328). The Amended Complaint alleges that there has been no reparation or compensation for these acts. (*See, e.g.,* Am. Comp. ¶¶ 100, 181, 215, 328). The Plaintiffs allege that they have not been permitted to participate in recent talks entered into by the Federal Republic of Germany and the Republic of Namibia. (*See, e.g.,* Am. Comp. ¶ 289).[1]

## <u>Argument</u>

I.  **The Amended Complaint should be dismissed for lack of subject matter jurisdiction as the Federal Republic of Germany is immune from prosecution under the FSIA's broad grant of immunity to foreign states. The expropriation in violation of international law exception to that grant of immunity does not apply in this case.**

As a foreign state, the Federal Republic of Germany is immune from suit in the courts of the United States, including this lawsuit brought by Plaintiffs purportedly under the provisions of the FSIA. The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" except as provided in the Act. 28 U.S.C. 1604.

---

[1]  The Federal Republic of Germany understands that for purposes of a motion to dismiss the Plaintiffs' allegations must be accepted as true.  Given the serious nature of these allegations, the Federal Republic of Germany states unequivocally that its silence on these allegations is not to be regarded as acquiescence.

Thus, the FSIA is the sole source of subject matter jurisdiction against a foreign state. *Cabiri v. Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999) (*citing Argentine Republic v. Amerada Hess Shipping Corp*, 488 U.S. 428, 439, 109 S. Ct 683, 690, 102 L. Ed. 2d 818 (1989)).[2] The broad grant of immunity is found in 28 U.S.C. 1603 and states:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act [enacted Oct. 21, 1976] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

Under the FSIA, a foreign state is immune from the jurisdiction of the United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 123 L. Ed. 2d 47, 113 S. Ct. 1471 (1993). The exceptions to this broad grant are contained in 28 U.S.C. 1605.[3] The exceptions set forth in the statute provide "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 393 (2015). Thus, "if no exception applies, the district court has no jurisdiction." *Odhiambo v. Republic of Kenya*, 764 F.3d 31 (D.C. Cir. 2014); *cert. denied*, 2016 U.S. LEXIS 4064, 136 S. Ct. 2504, 195 L. Ed.2d 839 (2016).

> The statute [FSIA] must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity. [citation and fn omitted]   At the threshold of every action in a district court against a foreign state, therefore, the court must satisfy itself that one of the exceptions applies -- and in doing so it must apply the detailed federal law

---

[2]   The Amended Complaint mentions the Alien Tort Claims Statute ("ATS") in paragraph 327 *et. seq*. The Amended Complaint does not explicitly rest its claim to subject matter jurisdiction on the ATS, nor could it, because the *Argentine Republic v. Amerada Hess Shipping Corp.* holding that the FSIA is the sole source of subject matter jurisdiction against a foreign state was a reversal of a Court of Appeals holding that the ATS could provide a basis for asserting jurisdiction over a foreign state, notwithstanding the FSIA. *Amerada Hess Shipping Corp. v. Argentine Republic*, 830 F.2d 421 (2d Cir. 1987). In addition, the Supreme Court has ruled that the ATS does not provide a cause of action for conduct occurring in the territory of another sovereign in part because "there is no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms." *Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 123 (2013).

[3]   Section 1607, which addresses counterclaims by foreign states, is not implicated in the instant motion.

standards set forth in the Act.

*Verlinden B. V. v. Central Bank of Nigeria*, *supra* 461 U.S. at 483-484.

Section 1605 (28 U.S.C. 1605) contains a list of exceptions to the general grant of immunity. Plaintiffs allege that this case falls within the expropriation exception contained in 28 U.S.C. 1605(a)(3). To establish subject matter jurisdiction pursuant to the expropriation or "takings" exception of the FSIA, a plaintiff must demonstrate each of four elements:

> (1)     that rights in property are at issue,

> (2)     that the property was "taken,"

> (3)     that the taking was in violation of international law, and, depending on whether the defendant is a sovereign or an agency or instrumentality of a sovereign, either

> (4)(a)   that property . . . is present in the United States in connection with a commercial activity carried on in the United States by the foreign state (applicable to sovereigns), or

> (4)(b)   that property . . . is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States (applicable to agencies and instrumentalities of sovereigns).

28 U.S.C. § 1605(a)(3).

## A. PROPERTY RIGHTS NOT TAKEN IN VIOLATION OF INTERNATIONAL LAW

The expropriation exception requires a taking of property "*in violation of international law*." *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.* 137 S. Ct. 1312, 1317, 197 L.Ed.2d 663 (2017). The Amended Complaint's allegations that the German Authorities expropriated land and livestock that belonged to the Ovaherero and Nama people standing alone, is insufficient to establish the required violation of international law.

### 1.   *Doctrine Of Intertemporal Law*

Today's international law is not identical to the international law applied over 110 years ago and cannot be applied to the case at hand. As a general proposition, international law does

4

not permit retroactive application. The temporal sphere of application of any norm of public international law must be determined in accordance with the general principle of law by which any fact, action or situation must be assessed in the light of the rules that are contemporaneous with it. *In re Agent Orange Product Liability Litigation*, 373 F. Supp. 2d 7, 81 (E.D.N.Y., 2005) (*citing* Decl. of Kenneth Howard Anderson, Jr., Nov. 2, 2004). The Doctrine of Intertemporal Law, which stands for the premise that changes to the rules in international law do not apply retroactively, applies here. The Doctrine of Intertemporal Law is a well-settled principle in international customary law. In 1899, an international arbitral body ordered that the Guyana-Venezuela Border Dispute should be resolved according to the territorial rules "at the times of the acquisition." (Award regarding the Boundary between the Colony of British Guiana and the United States of Venezuela, *Venezuela v. Great Britain*, (2007) XXVIII RIAA 331, (1899) 92 BFSP 160, (1901) 8 RGDIP 71, 3rd October 1899, Arbitration). The principle was also applied in another important case law example in the context of equitable maritime delimitation in 1909 (*Grisbådarna Case, Norway v Sweden, Award*, (1961) XI RIAA 147, (1910) 17 RGDIP 177, ICGJ 404 (PCA 1909), (1910) 4 AJIL 226, 23rd October 1909, Permanent Court of Arbitration [PCA]; Ad Hoc - Geneva), where the Permanent Court of Arbitration  relied on the principle of law applicable at the time when the original boundary treaty of 1661 was concluded (at 159). The fact that the principle of contemporaneity also applies to treaty law and treaty interpretation was re-emphasized by the Permanent Court of Arbitration in 1910 in the North Atlantic Coast Fisheries Case (*North Atlantic Coast Fisheries Case, Great Britain v United States, Award*, (1961) XI RIAA 167, ICGJ 403 (PCA 1910), (1910) 4 AJIL 948, (1910) 1 Hague Court Reports 141, 7th September 1910, Permanent Court of Arbitration [PCA]; Ad Hoc – Geneva; at 196). It was affirmed in the *Island of Palmas Case of 1928*, D'Amato, Anthony*, International Law,*

5

*Intertemporal Problems in Encyclopedia of Public International Law* 1234, 1235 (1992).

> "[A] juridical fact must be appreciated in the light of the law contemporary with it, and not of the law in force at the time when the dispute in regard to it arises or fails to be settled."

Island of Palmas Case, 2 U.N. Rep. Intl. Arb. Awards 829, 845 (1928),

http://legal.un.org/riaa/cases/vol_II/829-871.pdf.

The principle of intertemporal law remains a universal legal standard today, enshrined in Art. 28 of the Vienna Convention on the Law of Treaties of 1969 (VCLT), to which the Federal Republic of Germany is a party (26 November 1987, Federal Law Gazette "Bundesgesetzblatt," part II, p. 757), but which also stands as universally accepted customary international law:

> Unless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party.

Art. 28 of the Vienna Convention on the Law of Treaties of 1969, 1155 U.N.T.S. 331, 339 (entered into force Jan. 27, 1980)[4]. *In re Agent Orange Product Liability Litigation*, *supra.,* 373 F.Supp.2d at 81 (A party is not bound by a treaty prior to the date such a treaty enters into force for it; treaties are not retroactive).

Finally, it is supported by the consistent jurisprudence of the International Court of Justice (ICJ), stating that a question has "to be interpreted by reference to the law in force at that period," *Western Sahara Advisory Opinion*, I.C.J. Reports 1975, p. 12, at 38 para. 79. *Jurisdictional Immunities of the State (Germany v. Italy)*, Judgment, I.C.J. Reports 2012, p. 99, 124 ¶ 58 (Judgt. of Feb. 3) ("the compatibility of an act with international law can be determined only by reference to the law in force at the time when the act occurred."); http://www.icj-

---

4 While the United States has not ratified the Vienna Convention on the Law of Treaties, United States courts rely on it as "an authoritative guide to the customary international law of treaties."  *Mora v. New York*, 524 F.3d 183, 196 n. 19 (2d Cir. 2008).

cij.org/files/case-related/143/143-20120203-JUD-01-00-EN.pdf.

History cannot be rewritten, as far as its legal framework is concerned. Legal rules change as time goes by, but the law of the 21st century cannot be introduced back more than 110 years in history.

### 2.  *Inner Dealings of the German Reich in One of its Colonies Not Governed by International Law*

Namibia was at the time in question German South West Africa, a colony of the German Reich. Ovaherero and Nama peoples were residents of that German colony and subjects of the German Reich, governed by German law. The Supreme Court in *Helmerich* stated that: "A sovereign's taking or regulating of its own nationals' property within its own territory is often just the kind of foreign sovereign's public act (a '*jure imperii*') that the restrictive theory of sovereign immunity ordinarily leaves immune from suit." *Helmerich*, *supra* 137 S. Ct. at 1321. Since the Ovaherero and Nama peoples resided in German South West Africa, which at that time was governed and ruled by the German Reich, subject to then applicable laws of the German Reich, the alleged expropriation was a part of the sovereign's regulation within its territory and as such did not violate international law applicable during that time.

While this colonial relationship would be completely incompatible with the current state and practice of international law, it adequately depicts the state of law at the time in question – which is relevant when legally assessing proceedings that took place more than 110 years ago. Thus, since domestic German law governed the relations between the German Reich and the residents of German South West Africa during the times in question and the alleged takings were governed by Germany's domestic law, no violation of international law as applied during the time between 1885 and 1909 occurred. The territory of what was called German South West Africa at the time in question formed an integral part of the German Reich itself:

7

> The Territorial Rights of a State comprehend: (…) The Colonies and Possessions outside the original boundaries of the Mother-State, independent of geographical situation or position." and further "Colonies and Possessions form an integral part of the State to which they belong, independent of geographical conditions.

Ferguson, Manual of International Law for the Use of Navies, Colonies and Consulates,

Vol. 1, The Hague, London, Hongkong, 1884, p. 97, 107

The applicability of domestic law of the German Reich in its colony is supported by the German legislation and jurisprudence of that time. The so-called "protectorates" ("Schutzgebiete"), formed under than applicable German law are "constituents of the German Reich's own legal personality under constitutional and international law," German Reich's Supreme Court Reporter for Civil Matters (RGZ) Vol. 105 (1922), p. 260, 263, and all executive and legislative powers in these "protectorates" fell under the authority of the German Emperor (§ 1 of the German Reich's "Schutzgebietsgesetz" of 1900, RGBl. 1900, p. 809, 813). Thus, the inner dealings between the German Reich and the Ovaherero and Nama people at the time were not conducted in a sphere that was devoid of any legal rule at all. Rather, it was the domestic laws of the then German Reich that applied to the issue at hand. These laws applied exclusively in this matter that, from a historic point of view, must be categorized entirely as domestic.

### 3.  *No Violation Of International Law for Expropriation of Nationals*

The expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law. *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1105 (9th Cir. 1990); *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1396-98 (5th Cir. 1985); *Dreyfus v. Von Finck*, 534 F.2d 24, 31(2d Cir. 1976) (violations of international law do not occur when the aggrieved parties are nationals of the acting state); *Yang Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 101 (D.D.C. 2005). "[C]onfiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether

8

compensation has been provided, do not constitute violations of international law." *F. Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 487 (S.D.N.Y. 1966), *aff'd*, 375 F.2d 1011 (2d Cir. 1967); *see also*, *United States v. Belmont*, 301 U.S. 324, 81 L. Ed. 1134, 57 S. Ct. 758 (1937).

### 4.   *International Law on Genocide of the Time*

Plaintiffs attempt to evade the black letter international law of expropriation of the time by alleging that the expropriation of property was a part and parcel of the genocide of the Ovaherero and Nama peoples.  The legal concept of genocide does not apply in this case, which concerns events that took place in the period between 1885 and 1909. Genocide as a violation of international law, was first defined as a legal concept by the Convention on the Prevention and Punishment of the Crime of Genocide, United Nations General Assembly Resolution 260 dated 9 December 1948 (U.N. Treaty Series, Vol. 78, p. 277), which is not retroactively applicable as to the alleged atrocities that took place between 1885 and 1909. A party is not bound by a treaty prior to the date such a treaty enters into force for it; treaties are not retroactive. *In re Agent Orange Liability Litigation*, *supra.* 373 F.Supp.2d at 81; *see, also*, *Mora v. New York*, *supra.* 524 F.3d at 196 n.19. In international law this principle is enshrined in Art. 28 VCLT (see above, page 6) as well as universally accepted as customary international law as the doctrine of Intertemporal Law (see above, page 6).

### 5.   *International Humanitarian Law of the Time*

Plaintiffs allege that Defendant breached international humanitarian law, the law governing armed conflict, as well as customary international law of the time. The rules of war of the time, however, were only applicable to conflicts between states and only between those states who had ratified relevant treaties. Thus, Defendant could not have been in breach of any international obligations of the rules of war versus the Ovaherero and Nama people.

Specific rules on humanitarian protection in non-international armed conflicts came to exist some 40 years later, when they were first enshrined in Article 3 common to the Geneva Conventions of 12 August 1949.

Furthermore, Germany could not have breached any of its obligations under international humanitarian law versus the Ovaherero and Nama since they had not ratified or signed any treaties of international humanitarian law, an explicit requirement for treaties at that time: "The provisions contained […] in the present Convention, do not apply except between Contracting powers and then only if all the belligerents are parties to the Convention." Art. 2 of the Hague Convention Respecting the Laws and Customs of War on Land of 1907 *(cf.* Military Manual of the United States of America, Rules of Land Warfare, 1914, para 6, p. 18).

In their discussion on customary international law, Plaintiffs omitted relevant parts of Professor Bluntschli's writings (Am. Comp. 45. -47), and cited his statements out of context. In fact he wrote that:

> Currently, even less empathetic is the current law to the tribes. International Law does not protect them, because one considers them not being part of the major families of peoples… given the fact that they do not actively participate in applying international law. I consider this still being a flaw in today's international law.

Bluntschli, J.C., Das moderne Völkerrecht der civilisirten Staten, 1878, S. 299 *et.seq,* § 535

## B.   PROPERTY NOT PRESENT IN THE UNITED STATES

In any case, the Amended Complaint fails to satisfy Element 4(a) of the FSIA expropriation exception described on page 5, *supra*, and, as such, the Court lacks subject matter jurisdiction over the Federal Republic of Germany. Element 4(a) applies solely to a sovereign state and requires that the property or property exchanged for the property is present in the United States in connection with commercial activity of the foreign state in the United States. Element 4(b) applies solely to an agency or instrumentality of a sovereign state and is therefore

not implicated in this case.

The jurisdictional pleading standard required to invoke the court's subject matter jurisdiction was recently revised in *Helmerich*, *supra*. In that case the Supreme Court rejected the bifurcated approach the District of Columbia Circuit Court of Appeals, in *Simon*, 812 F.3d 127 (D.C. Cir. 2016), had applied as the pleading standard that a plaintiff must meet when seeking to invoke the Court's subject matter jurisdiction in a case alleging jurisdiction under the FSIA expropriation exception. According to the D.C. Circuit in *Simon*, where the relief sought is a basic expropriation claim the plaintiff need only make a <u>non-frivolous</u> showing at the jurisdictional stage. Where the relief sought is for garden variety claims and violation of international law is pled only for jurisdictional purposes, the D.C. Circuit in *Simon* held that a plaintiff's allegations must be <u>plausible</u> in order to survive a motion to dismiss for lack of jurisdiction.

The Supreme Court rejected the D.C. Circuit's bifurcated approach in *Simon*.  The Supreme Court therefore necessarily held that there is only one standard and it announced what that standard is: "Where, as here, the facts are not in dispute, those facts bring the case within the scope of the expropriation exception **only if they do show (and not just arguably show)** a taking of property in violation of international law."  H*elmerich*, *supra*. 137 S. Ct.. at 1324 (emphasis added). This new pleading standard requires more than simply alleging facts which may be plausible. The D.C. Circuit, post-*Helmerich*, described this new standard in holding that, a plaintiff must "<u>prove the facts supporting the court's jurisdiction under the FSIA</u>, rather than simply to make a 'non-frivolous' claim to that effect." (emphasis added), *Owens v. Republic of Sudan*, 864 F.3d 751, 779 (D.C. Cir 2017), *citing*, *Helmerich*, *supra*. 137 S. Ct. at 1316.

Under the pleading standard enunciated in *Helmerich*, for this Court to have subject

matter jurisdiction over the Federal Republic of Germany under the above-stated exception (identified above as Element 4(a)), the Amended Complaint must show, and not just arguably show, that the property in question is present in the United States. In order to determine whether, in fact, the property in question is present in the United States, the Court must look to the substance of the allegations. *Robinson v. Gov't of Malay*, 269 F.3d 133, 140 (2d Cir. 2001). Here, the Amended Complaint summarily alleges that property exchanged for the appropriated property at issue is present in the United States. The Amended Complaint at ¶ 258, in substance alleges, that expropriated property was turned into cash over 100 years ago and that cash became a part of the Defendant's general revenues and that fungible cash is traceable to the Defendant's present-day property in the United States. The Amended Complaint then goes on to identify what is alleged to be commercial activities that the Federal Republic of Germany engages in in the United States. (Am. Comp. ¶¶259-270).

Proving that fungible cash is present in the United States is difficult in the best of circumstances. *Alperin v. Vatican Bank*, 365 Fed. Appx. 74, 75 (9th Cir. 2010). This is especially true in this case, given the passage of over 100 years between the alleged expropriation and the alleged current commercial activities. In addition, acceptance of such an argument would eviscerate the FSIA expropriation exception because it would grant a United States court subject matter jurisdiction over any sovereign that expropriates property, turns the property into cash, and subsequently conducts commercial activity in the United States, even after the passage of over 100 years. Such an extensive application of the expropriation exception would be inconsistent with statutory objectives and raise some of the same concerns which led to the Supreme Court's decision in *Helmerich*, as it ". . . would, in many cases, embroil the foreign sovereign in an American lawsuit for an increased period of time. It would substitute for a more

12

workable standard a standard limited only by the bounds of a lawyer`s (nonfrivolous) imagination. It would create increased complexity in respect to a jurisdictional matter where clarity is particularly important. And clarity is doubly important here where foreign nations and foreign lawyers must understand our law." *Helmerich*, *supra.* 137 S. Ct. at 1321-22 (citation omitted).

Furthermore, the argument that property is present in the United States fails because the Court can take judicial notice of the historical fact that the German colonies were in constant need of additional funding by the German government in Berlin.[5] As budget accounts for German South-West Africa from 1903 through to 1913 show, income from German South-West Africa was desperately needed to fund German South-West Africa's expenditures and therefore any benefits of the alleged takings of Ovaherero and Nama property could not and would not have been exchanged for any property which then might have been exchanged for property in the United States.[6] German South-West Africa had still not become a profit-generating endeavor for the German Reich by the time the colonial territory fell to the British dominion Union of South Africa in July 1915. Therefore, any cash received in exchange for the allegedly expropriated property in German South-West Africa would not have become part of the Defendant`s general revenue (commingled funds), as alleged by the Amended Complaint, but would have been kept in country and used to fund German South-West Africa's expenditures.

---

[5] It is estimated that additional funding required for German colonies between 1884 and 1914 amounted to a total of 646 million Mark. Gisela Graichen / Horst Gründer, *Deutsche Kolonien – Traum und Trauma*, 3. Aufl. 2005, S. 295. While from 1886 through to 1890, German colonies were subsidized on a scale of 200,000 to 300,000 Mark per year, this amount had risen to more than 31 million Mark in 1904. *Statement of the Representative to the German Reichstag* Matthias Erzberger, Reichstag, 11th term, 70th session, 19 March 1906, Reichstagsprotokolle 1905/06 vol. 3, pp. 2129-2138.

[6] Budget accounts detail a German South-West African income of its own of 6.9 million Mark in contrast to expenditures of 119 million Mark. *German Protectorates in Africa und the South Pacific* 1911/1912 – Annual Reports, published by the Reichs-Kolonialamt, Berlin 1913, p365. Although German South-West Africa`s income of its own had risen to 15.9 million Mark by 1913, expenditures were still more than twice that high amounting to a total of 32.8 million Mark. *Id.*

Germany lost World War I and with it all rights and titles over her oversea possessions.

On 28 June 1919, Germany signed the Treaty of Versailles[7] which stipulates:

> *ARTICLE 119: Germany renounces in favour of the Principal Allied and Associated Powers all her rights and titles over her oversea possessions.*
>
> *ARTICLE 120: All movable and immovable property in such territories belonging to the German Empire or to any German State shall pass to the Government exercising authority over such territories, on the terms laid down in Article 257 of Part IX (Financial Clauses) of the present Treaty. The decision of the local courts in any dispute as to the nature of such property shall be final.*
>
> *ARTICLE 257: In the case of the former German territories, including colonies, protectorates or dependencies, administered by a Mandatory under Article 22 of Part I (League of Nations) of the present Treaty, neither the territory nor the Mandatory Power shall be charged with any portion of the debt of the German Empire or States. All property and possessions belonging to the German Empire or to the German States situated in such territories shall be transferred with the territories to the Mandatory Power in its capacity as such and no payment shall be made nor any credit given to those Governments in consideration of this transfer. For the purposes of this Article the property and possessions of the German Empire and of the German States shall be deemed to include all the property of the Crown, the Empire or the States and the private property of the former German Emperor and other Royal personages.*

The Treaty of Versailles further stipulated loss of external assets and property, while at the same time recognizing that German resources, after taking into account permanent diminutions of such resources through other provisions of the Treaty of Versailles, would not be adequate to make complete reparation for all loss and damage, for Germany was financially ruined at the end of World War I[8].

Hence, the Amended Complaint does not show (and not just arguably show) that the cash from the sale of Plaintiffs' property over 100 years ago survived to be present today in the United States in connection with commercial activity conducted by the Federal Republic of Germany.

---

[7] https://www.loc.gov/law/help/us-treaties/bevans/m-ust000002-0043.pdf
[8] *Cf.* Articles 231, 232, 252 and 256 of the Treaty of Versailles

Even if the Amended Complaint would adequately show (and not just arguably shows) that property exchanged for the expropriated property is present in the United States, it must also show (and not just arguably show) that such property is used in connection with commercial activity currently being carried out by the Federal Republic of Germany. The Amended Complaint alleges that the 100-year-old fungible cash somehow can be traced to four buildings which are supposedly currently being used by the Defendant to engage in commercial activity. (Am. Comp. ¶ 259).

The first property, a townhouse located at 119 E. 65th St, was purchased by the Federal Republic of Germany in 1955 and is the private residence of the Deputy Head of Germany's mission to the United Nations. Non-commercial use is acknowledged by the United States State Department, in an April 4, 2014 letter to the New York City Department of Finance, exempting it from all taxes associated with the ownership real property. Plaintiffs allege this property is engaging in commercial activity because it enters contracts to support housing its personnel, including cleaning, maintenance, insurance, restoration and the like and "support of cultural propagation, German-language programs, and other programs to develop American interest in the German people, language, culture, and country with the ultimate goal of commercial growth through cultural growth."  (Am. Comp. ¶ 261). Incidental commercial activity to support the sovereign's mission or the residence of its official representatives is not "Commercial Activity." *See*, *Tabion v. Mufti*, 877 F. Supp. 285 (E.D. Va. 1995), *aff'd* 73 F.3d 535, 537-8 (4th Cir. 1996).

The second property, located at 871 First Avenue, as alleged houses Germany's Mission to the United Nations and was purchased by Germany in 1995. In addition to the same type of activity alleged at the E. 65th St property, the Amended Complaint alleges that the Mission houses the German Academic Exchange Service. (Am. Comp. ¶ 262), a governmental institution

established to facilitate the exchange of students and scholars. It is not commercial as that term is used in the FSIA.

Establishing and maintaining consulates, promoting its economic interests through Economic and Commercial Offices and cultural relations through Academic Exchange Offices, as well as sponsoring tourism through tourist offices, is not a commercial activity. *LaLoup v. United States*, 29 F. Supp. 3d 530, 551-52 (E.D. Pa. 2014):

> These are not the type of actions a private party engages in, but are instead the activities of a sovereign, as the Vienna Convention on Consular Relations makes clear. The Vienna Convention on Consular Relations governs the establishment of consular posts and the scope of consular functions. See Vienna Convention on Consular Relations (1963), Art. 4-5. Under Article 5, consular functions include "furthering the development of commercial, economic, cultural and scientific relations between the sending State and the receiving State and otherwise promoting friendly relations between them . . . ." *Id.* The activity the plaintiffs allege simply is not commercial within the meaning of § 1603(d) and § **1605(a)(3)**.) (emphasis added).

> The claim thus does not fall within the exception to the FSIA, and we lack jurisdiction over it.

The third property, located at 346 E. 49th Street, is a part of the same building complex as the second property (871 First Avenue) that has two entrances, thus two addresses. It also was purchased in 1995. It is alleged to be engaged in the same type of activity as the E. 65th Street property. As explained above in relation to the second property (871 First Avenue) this is not commercial activity under the FSIA so as to create jurisdiction.

The fourth property (1014 Fifth Avenue), identified as the "Haunted Castle," (Am. Comp. ¶ 268) as alleged is the future home of the Germany Academy of Art. The Amended Complaint alleges that "in the future" the building will be used for commercial purposes. This is not correct. The US government has acknowledged by Verbal Note No. 17-1480 from September 26, 2017, that the building will be considered a so-called "consular annex" and thus serves

governmental functions. It enjoys protection under the Vienna Convention on Consular Relations. As explained above, the type of activity, construction contracts and the like which are in support of a governmental function do not qualify as commercial activity as that term is used in the FSIA.

In addition, the FSIA requires that the property is being **presently** used for commercial purposes and, as such, does not confer jurisdiction on the court even if all other elements are met.

Because the factual allegations in the Amended Complaint as to whether the property exchanged for the expropriated property is present in the United States and has the required nexus to current commercial activity of the Federal Republic of Germany are not supported by adequate proof, there is no subject matter jurisdiction over the Federal Republic of Germany. The Amended Complaint supplies no facts to prove that the property is in the United States; that property exchanged for the property is present in the United States; or that the property is present in the United States in connection with[9] a commercial activity. Because the factual allegations in the Complaint are deficient, there is no subject matter jurisdiction over the Federal Republic of Germany under the expropriation exception to the FSIA broad grant of immunity.

## II. The Complaint should be dismissed for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

Under the FSIA, personal jurisdiction equals subject matter jurisdiction plus valid service of process. 28 U.S.C. 1330(b); *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 746 (2d Cir. 2000); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991). As demonstrated above, Plaintiffs have failed to establish subject matter jurisdiction by establishing that one of the enumerated statutory exceptions to sovereign immunity applies.

---

[9]  "The statutory term 'in connection,' as used in the FSIA, is a term of art, and we interpret it narrowly. Accordingly, we have noted that 'acts are in connection' with commercial activity so long as there is a 'substantive connection' or a 'causal link' between them and the commercial activity." (citations omitted) *Garb v. Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006).

Hence, the Amended Complaint fails to establish subject matter jurisdiction, which is the first part of the two-part test for personal jurisdiction under the FSIA. The second prong of the test is that there be valid service which has been accomplished. The Court does not have personal jurisdiction over the Federal Republic of Germany, as it does not have subject matter jurisdiction even if service of process was sufficient.[10] The Court should dismiss the complaint pursuant to Fed R. Civ. P. 12(b)(2).

### III.     The Court Lacks Subject Matter Jurisdiction under the Political Question Doctrine.

The Amended Complaint presents this Court with a number of issues it would have to resolve and which would involve judicial interference with foreign affairs, which the Constitution reserves to the legislative and executive branches of the federal government. Those issues are subject of the ongoing talks between the German and the Namibian governments.

In the hierarchy of doctrines that are rules of abstention and bars to suit, the most compelling is the political question doctrine. "The political question doctrine restrains courts from reviewing an exercise of foreign policy judgment by the coordinate political branch to which authority to make that judgment has been 'constitutional[ly] commit[ted].'" *Baker v. Carr,* 369 U.S. 186, 211-13, (1962); *Goldwater v. Carter*, 444 U.S. 996, 1006, (1979).

It is important to note that that not "every case or controversy which touches foreign relations lies beyond judicial cognizance" and that "not every matter touching on politics is a political question." *Baker v. Carr*, 369 U.S. at 213; *Japan Whaling Association Et Al. V. American Cetacean Society Et Al.,* 478 U.S. 221 (1986). Nonetheless, there are several categories of political question listed in *Baker v. Carr*, that determine whether an issue is

---

[10]   The Federal Republic of Germany does not concede that service of the Complaint on the Federal Republic of Germany was effective. On the contrary, as stated in the Diplomatic Note dated November 27, 2017 addressed to the Embassy of the United States in Berlin, Germany, the Federal Republic of Germany restated its position that the service of the complaint violates the soverein immunity of the Federal Republic of Germany.

justiciable:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question. "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence.

Justice Powell distilled the *Baker* test into three inquiries: "(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?" *Goldwater v. Carter*, 444 U.S. 996, (1979).

In order to establish jurisdiction under the FSIA, the Plaintiffs would have to prove that the alleged expropriation of Germany over 110 years ago violated international law and the Court would have to determine that they had so proven.  In addition, the Court would have to determine, among other things, that 1) the Plaintiffs are the sole legal heirs of two sovereign nations that communally owned the property allegedly taken by Defendant (including land, livestock, concession, taxation, and custom rights, precious gems and metals) so that the Government of Namibia has no right to such property or compensation for its loss, and 2) whether the Court should order Germany to include Plaintiffs in "discussions and negotiations regarding the subject matter of the Complaint" with Namibia, regardless of the position of the Government of Namibia with respect to any participation by the Plaintiffs.

Thus, in the Amended Complaint, Plaintiffs are asking the Court to decide a controversy

and invoke powers that are constitutionally apportioned to other branches of government, including but not limited to actively weighing in on the relationship between two foreign states (Germany and Namibia), including groups of citizens from one of those foreign states (Namibia). *Oetjen v. Central Leather Co*., 246 U. S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative [. . .]"). Any decision in favor of the Plaintiffs by the Court would meddle in foreign relations to the point of interjecting the sovereignty of the United States into a bilateral agenda between two other sovereign nations.  It is not within the domain of the Judicial branch and therefore violates the constitutional principle of the separation of powers. *Japan Whaling Association et al. v. American Cetacean Society et al.,* 478 U.S. 221 (1986) ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.").

The decision in *Davoyan v. Republic of* Turkey, 116 F. Supp. 3d 1084 (C.D. Cal. 2013), is directly on point and demonstrates that the presence of the violation of international law/genocide issue is a political question that in and of itself requires this Court to dismiss this case.  In *Davoyan*, plaintiffs filed a class action against, among other defendants, the Republic of Turkey. The *Davoyan*, plaintiffs alleged subject matter jurisdiction under the FSIA premised on an expropriation of their ancestors' property in violation of international law, the alleged violation being genocide against the Armenian people by the Republic of Turkey and its predecessor, the Ottoman Empire. The District Court held that it lacked subject matter jurisdiction to hear the case because, for the lawsuit to proceed "would involve judicial interference in foreign affairs – here establishing that 'genocide' occurred is a jurisdictional

prerequisite. In light of the political question doctrine and Ninth Circuit precedent, this Court cannot resolve such an inherently political question that our Constitution reserves for the other two coordinate branches of government." *Ibid.*, 116 F. Supp. 3d at 1104.[11]

The instant case presents many more political questions than were present in *Davoyan.*

## IV.   The Court should decline to exercise jurisdiction pursuant to the prudential exhaustion doctrine and the *forum non conveniens* doctrine.

Even if the Court were to find that it has subject matter jurisdiction over the cause of action and personal jurisdiction over the Defendant, it should decline to do so until and unless the Plaintiff exhausts it remedies in the Federal Republic of Germany.  Additionally, the Court should decline to exercise jurisdiction as Germany is a more convenient forum to resolve the matters raised in the Amended Complaint.

### A.  EXHAUSTION OF REMEDIES IN GERMANY

The prudential exhaustion of remedies doctrine in FSIA expropriation cases is grounded in the idea that comity among nations and "international law favors giving a state accused of taking property in violation of international law an opportunity to 'redress it by its own means, within the framework of its own legal system' before the same alleged taking may be aired in foreign courts." *Fischer v. Magyar Államvasutak Zrt.* 777 F.3d 847, 855 (7th Cir. 2015) (*quoting Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012)), except where requiring exhaustion would be futile or imaginary. *Ibid.* 777 F. 3d at 858. In a recent federal district court case where the alleged violation of international law was genocide, the D.C. Circuit Court of Appeals invited the district court "to consider on remand, should the defendants assert it, the third form of exhaustion argument: whether, as a matter of international comity, the court should

---

[11] The district court's analysis in *Davoyan* of the expropriation exception in the FSIA was based on the "non-frivolous" pleading standard, which has since been rejected by the Supreme Court in *Helmerich*.  Hence, that part of the *Davoyan* decision concerning the FSIA is irrelevant to the instant case.

decline to exercise jurisdiction unless and until the plaintiffs exhaust available Hungarian remedies." *Simon*, *supra*. 812 F.3d at 149.  On remand the district court dismissed, based on both prudential exhaustion and *forum non conveniens*. *Simon v. Republic of Hung.*, 2017 U.S. Dist. LEXIS 161506 (D.D.C. September 30, 2017).

The lack of an exhaustion requirement in the FSIA is not a bar to application of the prudential exhaustion requirement because of its similarity to the *forum non conveniens* doctrine which "remains fully applicable in FSIA cases," despite lacking a statutory basis. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 100, 352 (D.C. Cir. 2002). The district court in *Simon* set out three factors that need to be considered: (1) whether the (in this case) Germany's courts provide "congruent" remedies; (2) the existence of procedural roadblocks; and (3) the adequacy of German courts.  *Simon, supra.* 2017 U.S. Dist. LEXIS 161506 at *22. The plaintiff bears the burden of demonstrating that attempting to exhaust any of their claims would be futile. *Fischer v. Magyar Államvasutak Zrt*, *supra.* 777 F.3d at 867.

The Amended Complaint in the instant case does not address the exhaustion requirement or allege that to do so would be futile. The German judicial system has been found to be an adequate forum by United States courts. *Golden Tree Asset Mgmt. LP v. BNP Paribas S.A*., 64 F. Supp. 3d 1179, 1190 (N.D. Ill. 2014) "Germany is among the 13 nations whose courts have been consistently deemed to be adequate alternative fora." *See Windt v. Qwest Commc'ns Int'l, Inc*., 544 F. Supp. 2d 409, 418 (D.N.J. 2008) (*citing* Tom McNamara, *International Forum Selection and Forum Non Conveniens*, 34 Int'l Law 558, 560-61 (2000)), *aff'd*, 529 F.3d 183 (3d Cir. 2008); *Deirmenjian v. Deutsche Bank, A.G.*, 2006 U.S. Dist. LEXIS 96772 (C.D. Cal Sept. 26, 2006).

The instant case involves century old historical events of political significance for

Germany. "The dignity of a foreign state is not enhanced if other nations bypass its courts without right or good cause." *Philippines v. Pimentel*, 553 U.S. 851, 866 (2008).

## B. FORUM NON CONVENIENS

"The doctrine of *forum non conveniens* permits a court to 'resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute,' *Gulf Oil Corp. v. Gilbert*, 330 U.S. at 507, if dismissal would 'best serve the convenience of the parties and the ends of justice.' *Koster v. (American) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527, 91 L. Ed. 1067, 67 S. Ct. 828 (1947)." *Murray v. BBC*, 81 F.3d 287, 290 (2d Cir. 1996). This doctrine is available in cases brought under the FSIA. *Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094 ,1119 (S.D.N.Y. 1982) ("[T]he Court sees no reason whatsoever to conclude that the enactment of the FSIA evidences a congressional intention that a foreign state brought before a United States court should have a lesser right to a *forum non conveniens* dismissal than a like-situated private person."); *Bahgat v. Arab Republic of Egypt*, 2015 BL 97418, 11 (S.D.N.Y. Mar. 31, 2015) ("Accordingly, even if the Court had subject matter jurisdiction, dismissal on the basis of *forum non conveniens* would be required.")

The Court therefore should dismiss this action because an adequate forum exists in Germany and balancing the public and private interest factors favors dismissal. *Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008). ("whether an adequate alternative forum for the dispute is available and, if so, whether a balancing of private and public interest factors strongly favors dismissal."). The private interests to be considered include,

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; …and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability (sic) of a judgment if one is obtained.

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

Here, all the relevant documents and records are in Germany and, possibly, in Namibia and are in the German language. Many, if not all, custodians of records are in Germany. Process to obtain documents and/or witnesses is more readily available in Germany, as is service of that process.

The public factors include "the administrative difficulties flowing from court congestion; the local interest in having controversies decided at home; the interest in having the trial in a forum that is familiar with the law governing the action; the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft*, 454 U.S. at 241 n.6 (*citing Gilbert*, *supra.* 330 U.S. at 509).

The instant lawsuit has no connection to the United States, except for the fact that a plaintiff claims to be a resident of New York. As the Court in *Murray* said, "We are, quite frankly, at a loss to see how this lawsuit has any but the most attenuated American connection." *Murray v. BBC*, *supra.* 81 F.3d at 293. Next, United States courts are surely less familiar with the applicable German laws that would govern this action, as well as deciding conflict of law issues between German and Namibian law. While plaintiffs are not entitled to a jury trial in a case where the defendant is a foreign sovereign, such a case would nevertheless add to the already clogged calendar of the Court and impose expenses on United States taxpayers related to the use of judicial resources to hear this matter.  The private and the public interest factors weigh in favor of a dismissal based on the doctrine of *forum non conveniens***.**

## CONCLUSION

The Federal Republic of Germany is immune under the FSIA, as the expropriation

exception does not apply. In addition, this Court lacks subject matter jurisdiction to hear the case because it presents several political questions which the Constitution reserves to the legislative and executive branches and which would require the Court to interfere with foreign affairs, including the bilateral relations between Germany and Namibia. Even if Defendant is not immune under the FSIA, the Court should decline to exercise jurisdiction and require the Plaintiffs to exhaust their remedies in Germany. Lastly, Germany is a more convenient forum and the factors that apply should permit the Court to dismiss the case on that basis.

Dated: March 13, 2018     <u>s/ Jeffrey Harris</u>

           Jeffrey Harris, Esq. JH2121
           Max Riederer von Paar, Esq.
           Walter E. Diercks, Esq.
           RUBIN, WINSTON, DIERCKS, HARRIS
             & COOKE, LLP
           1201 Connecticut Avenue, N.W., Ste 200
           Washington, D.C. 20036
           jharris@rwdhc.com
           Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

<u>s/ Jeffrey Harris</u>
Jeffrey Harris

Service List:
Kenneth F. McCallion, Esq.
McCALLION & ASSOCIATES LLP
100 Park Avenue – 16th   floor
New York, New York 10017

Thomas Holman, Esq.
Holman Law, P.C.
99 Park Avenue - Suite 2600
New York, New York 10016-1601