**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____x

VEKUII RUKORO, Paramount Chief of the Ovaherero
People and Representative of the Ovaherero Traditional
Authority; JOHANNES ISAACK, Chief and
Chairman of the Nama Traditional Authorities Association;          Civ. No. 17-0062
THE ASSOCIATION OF THE OVAHERERO GENOCIDE
IN THE USA INC.; and BARNABAS VERAA KATUUO,
Individually and as an Officer of The Association of the
Ovaherero  Genocide in the USA, Inc., on behalf
of themselves and all other Ovaherero and Nama indigenous
peoples,

                              Plaintiffs,

            -against-

FEDERAL REPUBLIC OF GERMANY,
                           Defendant.
_____x

## PLAINTIFFS' MEMORANDUM OF LAW

## IN OPPOSITION TO GERMANY'S MOTION TO DISMISS

Dated: New York, New York
       May 4, 2018

## TABLE OF CONTENTS

SUMMARY OF FACTS AND ARGUMENT …………………………………………………...1

ARGUMENT………………………………………………………………………………...2

   I.   THE COURT HAS SUBJECT-MATTER JURISDICTION……………………………..3

   A.   The Takings Exception of § 1605(a)(3) Applies ……………………………………...3

      1.   The Taken Rights Were Property Rights ……………………………………………4
      2.   Plaintiffs' Rights In Property Were Taken………………………………………4
      3.   Germany's Takings Constituted Violations of International Law…………………..4
        a.   The Takings and Genocides were Intertwined………..…………………………4
        b.   Germany's Actions Were Not "Inner Dealings"………..……………………….6
        c.   Germany's Takings Violated Customary International Law………...……………10
        d.   Germany's Takings Violated Positive International Law and Treaty Obligations……………………………………………………………12
      4.   New York Nexus …………………………………………………………………...13

   B.   The Commercial Activity Exception of § 1605(a)(2) Applies ………………………17

   II.   THE POLITICAL QUESTION DOCTRINE IS INAPPLICABLE ……………..……19

   III.   THERE IS NO "EXHAUSTION" REQUIREMENT UNDER THE FSIA, AND NONE SHOULD BE APPLIED HERE ……………………………………………………..……21

   IV. THE DISTRICT COURT IS NOT AN INCONVENIENT FORUM …………………..22

   V.   GERMANY CONCEDES PERSONAL JURISDICTION……………………………...25

CONCLUSION …………………………………………………………………………………26

## Amended Table of Authorities

**Cases**

*Abelesz v. Erste Grp. Bank AG*, 695 F.3d 655 (7th Cir. 2012) ........................................ 19

*Abelesz v. Magyar Allamvasutak Zrt.*, 692 F.3d 661 (7th Cir. 2015) ............................ 9

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934 (D.C. Cir. 2008) .................. 21

*Alperin v. Vatican Bank*, 365 Fed. Appx. 74 (9th Cir. 2010) ........................................ 14

*Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir. 2005) ................................................ 19

*Am. Isuzu Motors v. Ntsebeza*, 553 U.S. 1028 (2008) ................................................ 19

*APWU AFL CIO v. Potter,* 343 F.3d 619 (2nd Cir. 2003)............................................ 22

*Argentina v. NML Capital, Ltd.*, 134 S.Ct. 2250 (2014)............................................ 12

*Argentina v. Weltover*, 504 U.S. 607 (1992)............................................................ 18

*Azima v. Rak Inv. Auth.*, No. 16-cv-01948, 2018 U.S. Dist. LEXIS 53648 (D.D.C. Mar. 30, 2018) ............................................................................................ 21

*Baker v. Carr*, 369 U.S. 186 (1969)........................................................................ 19

*Blue Ridge Invs., LLC v. Argentina*, 735 F. 3d 72 (2d Cir. 2013) ............................... 2, 3

*Boosey & Hawkes Music Pub. Ltd. v. Walt Disney Comp.,* 145 F.3d 481 (2d Cir. 1998)........... 24

*Cassirer v. Spain*, 616 F.3d 1019 (9th Cir. 2010) (en banc)............................... 9, 10, 21

*Chettri v. Nepal Rastra Bank*, 834 F.3d 50 (2d Cir. 2016) ....................................... 4, 9

*Davoyan v. Turkey,* 116 F. Supp. 3d 1084 (C.D. Cal. 2013) ..................................... 20

*De Csepel v. Hungary*, 169 F. Supp. 3d 143 (D.C.C. 2016)....................................... 21

*Doe v. Exxon Mobil Corp.*, 473 F.3d 345 (D.C. Cir. 2007)....................................... 20

*El Shifa Pharm. Indus. Co. v. U.S.*, 607 F.3d 836 (D.C. Cir. 2010) (*en banc*) (Kavanagh, J., concurring). ................................................................................................. 19

*Filartiga v. Pena-Irala*, 630 F. 2d 876 (2d Cir. 1989)................................................ 9

*Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015) ..................... 9, 10, 21

*Freund v. France*, 592 F. Supp. 2d 540 (S.D.N.Y. 2008) ............................................................ 9

*Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Rep.*, 582 F.3d 393 (2d Cir. 2009)......... 24

*Garb v. Poland*, 440 F.3d 579 (2d Cir. 2006).................................................................... 6, 19, 23

German Reich's Supreme Court Reporter for Civil Matters (RGZ) Vol. 105 (1922)................... 8

*Gross v. German Found. Indus. Initiative*, 456 F.3d 363 (3d Cir. 2006). .................................... 20

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ......................................................................... 24

*Hamm v. United States*, 483 F.3d 135 (2d Cir. 2007).......................................................... 3, 12, 13

*In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009) .............................. 19, 23

*Khulumani v. Barclay Bank*, 504 F.3d 254 (2d Cir. 2007), *aff'd sub nom* .................................. 19

*Klinghoffer v. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991) ......................................................... 19

*LaLoup v. United States*, 29 F. Supp. 3d 530 (E.D. Pa. 2014) .................................................... 15

*MacDermid, Inc. v. Deiter*, 702 F.3d 725 (2d Cir. 2012) .......................................................... 13

*Medellin v. Texas* 552 U.S. 491 (2008) ...................................................................................... 19

*MMA Consultants 1, Inc. v Peru*, No. 17-1157, 2017 U.S. App. LEXIS 25540 (2d Cir. December 19, 2017) .............................................................................................................. 16, 18

*Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067 (9th Cir. 2012).................................... 20

*Multiwave Sensor Inc. v. Sunlight Instrs., LLC*, 16-cv-1361-GHW, 2017 U.S. Dist. Lexis 64404 (S.D.N.Y. Apr. 26, 2017)................................................................................... 6, 14, 16, 17

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102 (2d Cir. 2010) ................... 22

*NML Cap., Ltd. v. Argentina*, 699 F.3d 246 (2d Cir. 2012)................................................ 9, 16, 24

*Philipp v. Germany*, 248 F. Supp. 3d 59 (D.D.C. 2017)............................................................. 21

*Rep. of Austria v. Altmann*, 541 U.S. 677 (2004). ............................................................ 9, 10, 19

*Sarei v. Rio Tinto*, 550 F.3d 822 (9th Cir. 2008) ........................................................................ 20

*Simon v. Hungary*, 277 F. Supp. 3d 42 (D.D.C. 2017).................................................... 13, 14, 20

*Simon v. Hungary*, 812 F.3d 127 (D.C. Cir. 2016).................................................... 12, 19, 21, 22

iv

*Sinochem Int'l Co. v. Malay. Int'l Shipping Co.*, 549 U.S. 422 (2007) ......................................... 23

*Skanga Energy & Marine, Ltd. v. Arevanca S.A.*, 875 F. Supp.2d 264 (S.D.N.Y. 2012). ........... 24

*Smith Rocke Ltd. v. Venezuela*, No. 12-cv-7316, 2014 U.S. Dist. LEXIS 9692 (S.D.N.Y. Jan. 27, 2014)……………………………………………………………………………………4

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239 (2d Cir. 2014)........ 3, 11, 12

*The Wave Studio LLC v. General Hotel Mgmt Ltd.*, No. 17-1018, 2018 U.S. App. LEXIS 4596 (2d Cir. Feb. 26, 2018) ................................................................................................. 22, 23, 24

*Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017) ..................... 3, 4, 12

*Verlinden*, *B.V. v. Cent. Bank of Nigeria*, 461 U. S.493 (1983) .................................................. 16

*Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57 (2d Cir. 2005) ..................................... 19

**Rules**

Federal Rule of Evidence 201 ...................................................................................................... 14

Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.1(a)(3) ......................................................................................................................... 6, 16

Rule A.2.f. of *Individual Practices of Judge Laura Taylor Swain*. .............................. 6, 14, 16, 22

**Statutes**

28 U.S.C. § 1330 ......................................................................................................................... 24

28 U.S.C. § 1330(a) ...................................................................................................................... 3

28 U.S.C. § 1603 *et seq*. ............................................................................................................... 2

28 U.S.C. § 1605(a)(2) .............................................................................................................. 3, 17

28 U.S.C. § 1605(a)(3) ..................................................................................................... 4, 12, 17, 19

**Other Authorities**

Art. III German-Anglo Treaty (1890) ............................................................................................ 7

Dale A. Oeterle, *Deficiencies of the Restitutionary Right to Trace Misappropriated Property in Equity and in UCC 9-306*, 68 Corn. L. Rev. (1983)………………………………………..13

Hermann K. Hesse, *Die Schutzverträge in Südwestafrika [The South West Africa Protection Treaties]*, 6 J. Col. Pol'y., & Econ. (1905)……………………………………………..7

Henry C. Theriault, Genocide, Denial, and Domination: Armenian-Turkish Relations from Conflict-Resolution to Just Transformation, 1 J. Afr. Confl. & Pease Stud. 82 (2009)………………………………………………………………………….……..20

Nacht, Mond Und Sterne," Windhoek Kindergarten Bazaar (1909) ............................................ 9

Nick Sprenger, *et al*., *The Ovaherero/Nama Genocide: A Case for an Apology and Reparations*, 2017 Euro. Sci. J. …………………………………………………………………..10

Oskar Hintrager, Südwestafrika in der deutschen Zeit [South West Africa in the Time of Germany] 145 (1956).................................................................................................... 9

Sidney L. Harring, German Reparations to the Herero Nation: An Assertion of Herero Nationhood in the Path of Namibian Development?, 104 W. VA. L. REV. 393……………..10

Todd Grabarsky, Comity of Errors: The Overemphasis of Plaintiff Citizenship in Foreign Sovereign Immunity Act Takings Exception Jurisprudence, 33 Cardozo L. Rev. 237, (2011)……………………………………………………………………...……..9

W.A. Shabas, Origins of the Genocide Convention, 40 Case W. Res. J. Int'l L. 35 (2008)…….10

Wolfgang Werner, *Playing Soldiers: the Truppenspieler Movement among the Herero of Namibia, 1915–45*, 16 J. S. AFR. STUD. 476 (1990)…………………………………..11

**Treatises**

August Wilhelm Heffter, Das Europaische Volkerrecht Der Gengenwart [European International Law of the Present] § 125 (7th ed. 1882)........................................................................ 6

B. B. Roeben, *The Method behind Bluntschli's "Modern" International Law*, 4 J. Hist. Int'l L. 249 (2002).............................................................................................................. 10

Bluntschli § 535 (2d ed. 1874 Paris)................................................................................. 11

Franz von Lizst, Das Volkerrecht [International Law] Bk. IV § 40(III) 321 (1904)..................... 6

H.R. Rep., 7, U.S.C.C.A.N. 1976, 6605–06 ................................................................. 16

I.G. Palmer, § 2.14(c), The Law of Restitution 183 (1978)........................................... 14

Johann Caspar Bluntschli, Restatement Of Modern International Law Of Civilized States [Das Moderne Völkerrecht Der Civilisirten Staten Als Rechtsbuch Dargestellt] § 573 (Nördlingen 1868)…………………………………………………………………..………………..5, 10, 11

J.C. Bluntschli, Das Moderne Kriegsrecht Der Civilisirten Staten [The Modern Law Of War Of Civilized States] § 26  (1866)……………………………………………………….…………...11

J.H. Ferguson, 1 Manual Of Int'l Law For The Use Of Navies, Colonies And Consulates (1884)…………………………………………………………………………...……..……...7

Restatement (Third) of Foreign Relations Law of the United States, §712………………………9

Restatement Of Modern International Law Of Civilized States [Das Moderne Völkerrecht Der Civilisirten Staten Als Rechtsbuch Dargestellt] (Nördlingen 1868)[Translations:  (1) French By C. Lardy & E. Laboulaye, Le Droit International Codifié (Paris 1870), Revised In Lardy, Le Droit International Codifié (2d Ed. 1874); (2) Spanish By J.D. Covarrubias, EL Derecho Internacional Codificado (Mexico City 1871); (3) Korean By K. Hiroyuki, Chaeju Chongnij P'an (Seoul 1872), Revised In W.A.P. Martin, Chaeju Chongnij P'an (Seoul 1896); (4) Greek By K. Mousouros, Ο ΔΙΕΘΝΗΣ ΚΩΔΙΞ (Athens 1874); (5) Russian By A. Lodyzhensky, Et Al., Современное Международное Право Цивилизованных Государств, Изложенное В Виде Кодекса (Moscow 1876); (6) Turkish By İ.H. Paşa, Hukuk-I BeyneddüVel-I Kanunuf (Istanbul 1879), Revised In Paşa, Hukuk-I BeyneddüVel-I Kanunuf (2d Ed. 1886); (7) English By Martin, Bluntschli's International Law (Beijing 1880); (8) Chinese By Martin, Gong Fa Hui Tong (Beijing 1884); (9) Japanese By S. Takahashi, Heiji Kokusaihoron (Tokyo 1907)]..…………………………...…………………………………………………6, 10

U.S. Dep't of State, Foreign Affairs Manual at 5 FAH-1 H-600………………………………...16

Plaintiffs bring this action against Germany in individual and representative capacities on behalf of members and descendants of the Ovaherero and Nama peoples for violations of international law (Count I); common law (Counts II–XI); and declaratory relief (Count XII). Amended Complaint ("AC") ¶¶ 25–28, 327–82.  Plaintiffs filed an Amended Complaint on February 14, 2018, and Germany filed a Motion to Dismiss on March 13, 2018. As set forth herein and in the accompanying declarations and exhibits, the Court should deny the Motion.

## SUMMARY OF FACTS AND ARGUMENT

From 1884–1915, Germany unlawfully took land, personal property, customs, concession, and taxation rights, sovereignty rights, mining rights, labor rights, and body parts of the peoples of Hereroland and Great Namaqualand, "sovereign equals to defendant" under international law.  AC ¶ 234; ¶¶ 18, 61, 178.  Germany agreed to the terms and conditions set by the Ovaherero and Nama peoples, formed "protective" relationships, then took their property with violence and used the cover of "uprisings" to issue Extermination, Enslavement, and Expropriation Orders under color of law.  ¶¶ 5, 38, 40 & n.9, 129.  Germany killed some 100,000 people by privation, liquidation, deprivation, concentration.  ¶¶ 3, 12–14, 130–33 146–77, 328. Germany engaged and engages in the commercial activity of bone collection and research, and it took skulls from Ovaherero and Nama victims, including those Germany sent to the American Museum of Natural History in Manhattan, giving this Court supplementary subject-matter jurisdiction under the *quasi in rem* theory codified at § 1605(a)(3).  ¶¶ 13–14, 297–301. Plaintiffs seek damages and equitable and declaratory relief.  ¶¶ 20, 100, 181, 215, 288–94, 328.

The Amended Complaint amply meets any pleading standard.  It alerted Germany to its liability by alleging facts comprising takings, ¶¶ 38, 58–177, discrete rights taken, ¶¶ 178–235,

admissions of liability, ¶¶ 271–94, violations of international law, ¶¶ 40–53 & n. 7–9, New York property and activities, ¶¶ 33, 259–70, and even some details of the horrors, *id.* ¶¶ 15, 146–52, 161–62, 166–74 & n.20, 201, 240–47.  Germany tried to destroy the Ovaherero and Nama peoples, and specifically targeted the peoples *qua* peoples with lasting intergenerational, social, physical, reproductive, and economic harm.  ¶¶ 162–63, 256, 275 & n.28, 306–07.  Germany used the very word "*vernichten*," that is, "exterminate," ¶ 38(g)–(h), demonstrating genocidal "intent to destroy" the Ovaherero and Nama peoples, by, *e.g.*, (a) killing them; (b) harming them; (c) inflicting conditions calculated to destroy them; (d) sterilizing and castrating them; and (e) forcibly removing children.  ¶ 34 & n.5 (defining the crime of genocide).

Germany was driven by (1) greed to expropriate Ovaherero and Nama wealth; and (2) dreams of eternal white supremacy over the Ovaherero and Nama peoples.  Germany replaced its Extermination Orders with Enslavement and Expropriation Orders only after German Imperial Chancellor Bülow found the first illegal.  ¶¶ 162–63.  The genocides continued all the same, supplemented by enslavement in camps, ¶¶ 38(i)–(j), 146–77, sterilization, ¶ 209, and deprivation of any chance at wellbeing, in an explicit attempt at ensuring their presumptively eternal subjugation as public property held by Germany.  ¶¶ 162–63, 256, 275.  Plaintiffs show the jurisdictional nexus to New York.  ¶¶ 258–70, 297–301.  As discussed herein, Germany's arguments do not meaningfully address the Amended Complaint's jurisdictional allegations or raise a meritorious basis for dismissal, and so the Court should deny its Motion.

## ARGUMENT

The standards for a motion to dismiss for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603 *et seq*., require a movant to make a prima facie showing of sovereign status.  *Blue Ridge Invs., LLC v. Argentina*, 735 F. 3d 72, 83

(2d Cir. 2013). "The opposing party [then] has the burden of going forward with evidence showing that, under FSIA exceptions, immunity should not be granted." *Id.* (internal quotation marks omitted). The "ultimate burden of persuasion," however, "remains with the alleged foreign sovereign." *Id.* On a motion under Rule 12(b)(1), "the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (internal quotation marks omitted). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint [ ] as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir. 2014).

## I.    THE COURT HAS SUBJECT-MATTER JURISDICTION

The Court has subject-matter jurisdiction over Plaintiffs' claims under two exceptions to sovereign immunity: 28 U.S.C. § 1605(a)(3) and § 1605(a)(2).

**The Takings Exception of § 1605(a)(3) Applies**

The FSIA divests Germany of jurisdictional immunity, and grants this Court subject matter jurisdiction, *see* 28 U.S.C. § 1330(a) in cases like this concerning "[1] rights in property [2] taken [3] in violation of international law," and "[4] that property *or any property exchanged for such property* is present in the United States in connection" with a commercial activity carried on in the United States by the foreign state." § 1605(a)(3) (emphasis added); *Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017) ("Helmerich"). Where sovereigns carry a burden of persuasion under the takings exception, plaintiffs' allegations taken as true must show a (1) more-than-non-frivolous and (2) "legally valid claim that [a] a certain

3

kind of right is at issue (property rights) and that [b] the relevant property was taken in a certain way (in violation of international law)."  *Id.* at 1316.

### 1.  The Taken Rights Were Property Rights

To meet the first element of § 1605(a)(3), Plaintiffs must show takings of "rights in property."  Such include "intangible as well as tangible" property rights, *Smith Rocke Ltd. v. Venezuela*, No. 12-cv-7316, 2014 U.S. Dist. LEXIS 9692, at *16 (S.D.N.Y. Jan. 27, 2014).  The taken sovereignty rights may be treated as property rights here, as Germany treated its own sovereignty rights in like manner through commercial private-public enterprises.  *E.g.*, AC ¶ 68. Germany does not dispute the takings, alleged in the Amended Complaint, meet this element.

### 2.  Plaintiffs' Rights In Property Were Taken

To meet the second element of § 1605(a)(3), Plaintiffs must plead rights in property were "taken," not just affected.  *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 58 (2d Cir. 2016).  The pleading standard of *Helmerich* has not been applied to this element, as *Helmerich* concerned only the first and third elements of the pleading standard.  137 S. Ct. at 1314–17.  The Amended Complaint identifies seven types of property rights taken in violation of international law, ¶¶ 178–233, each which suffices alone, but which the Court may consider cumulatively.  Germany has not disputed that the alleged takings meet this element, so the Court should find it met.

### 3.  Germany's Takings Constituted Violations of International Law

To meet the third element of § 1605(a)(3), Plaintiffs must "show (and not just arguably show) a taking in violation of international law."  *Helmerich*, 137 S. Ct. at 1317.  Plaintiffs do.

#### a.  The Takings and Genocides were Intertwined

Germany's expropriations were a necessary and intertwined part of a genocidal program against the Ovaherero and Nama peoples.  The Amended Complaint describes Germany's duties,

AC ¶¶ 34–53, and its acts comprising takings and genocides.  ¶¶ 38, 58–60.  Plaintiffs allege it

was (1) Kaiser Wilhelm who dispatched General Lothar von Trotha ("Trotha") to solve

Germany's economic and military woes with *final* solutions by any means, even if "foul," with

"fullest confidence in [his] insight, energy, and experience," ¶¶ 69, 106; (2) Trotha who

exercised legal Imperial authority under color of law in issuing Extermination Orders by

Proclamation, ¶ 38(g)–(h); Ex. B-1–2;[1] *see also* Trotha Transcript (Oct. 4, 1904), Ex. B-3; (3)

General Alfred von Schlieffen, who considered it necessary to keep "blacks" forever "in a state

of perpetual forced labor, that is, a type of slavery," and while "Trotha's intent is acceptable," it

is at odds with the competing need to enslave the Ovaherero through "comprehensive

subjugation" as a slave race, Schlieffen Letter to Bülow (Nov. 23, 1904), Ex. B-4; and (4)

Bülow, ¶ 69, who admitted to and advised the Kaiser of the illegality of Germany's conduct,

identifying the applicable legal standard under customary international law.  Bülow Letter to

Kaiser (Nov. 24, 1904), Ex. B-5.  It was state policy.

Bülow admits the violation: "[T]he comprehensive and planned extermination of the

Herero would exceed . . . [1] the requirements of justice" and [2] limits set by "what is required

to restore German authority."  Bülow Letter, Ex. B-5.  By [1] "the requirements of justice," he

refers to Germany's humanitarian obligations under customary international law, emerging

"human rights,"[2] and the 1899 Hague Convention, in which Germany agreed "the laws of

humanity" limit permissible conduct vis-á-vis the Ovaherero and Nama peoples.  ¶¶ 42, 47.  By

---

[1] Plaintiffs' Exhibits are identified in the accompanying Declaration of Kenneth F. McCallion.
[2] *See* Johann Caspar Bluntschli, RESTATEMENT OF MODERN INTERNATIONAL LAW OF CIVILIZED STATES [DAS MODERNE VÖLKERRECHT DER CIVILISIRTEN STATEN ALS RECHTSBUCH DARGESTELLT] § 573 cmt. 1 at 323 (Nördlingen 1868) (describing the history of emerging human rights) ("*humane Rechtsbildung*"), Ex. D-1.

"what is required to restore German authority," Bülow refers to requirement of limiting wartime acts to "only those methods . . . necessary to destroy the opponent's resistance."[3]

### b. Germany's Actions Were Not "Inner Dealings"

Plaintiffs allege Hereroland and Great Namaqualand were sovereign states until the genocides and takings.  AC ¶¶ 18, 61, 71, 234–35.  Rather than "accept [Plaintiffs' claims] as true in all respects," as it must, *Garb v. Poland*, 440 F.3d 579, 581 (2d Cir. 2006), Germany states unsubstantiated, verifiably false "counterfacts": (1) the Ovaherero and Nama were German nationals, *i.e.*, "residents" or "subjects"; (2) "German South West Africa" was part of Germany; and (3) Imperial law and jurisdiction, not international law, governed Germany's relations with the Ovaherero and Nama peoples.  Def. Mem. at 8.  In other words, Germany simply rejects Plaintiffs' allegations without evidence or affidavit in violation of Local Rule 7.1(a)(3) and Rule A.2.f. of *Individual Practices of Judge Laura Taylor Swain*.  The court can and should simply ignore Germany's counterfacts,[4] or reject them as unsupported by "[e]videntiary support, in admissible form . . . filed and served with the moving . . . papers."  Rule A.2.f.

Regardless, Germany's acts were not "inner dealings," but a program of discriminatory expropriation, enslavement, and genocide in violation of international law.  Plaintiffs allege the Ovaherero and Nama peoples were subjects of their own sovereignties, not Germany's nationals, residents, or subjects.  Even after Germany finished its takings, they were still not German residents, but only its *slaves*, subject to Enslavement Orders, AC ¶ 129, by which Germany took the Ovaherero and Nama peoples as property under color of law despite having promised to

---

[3] AC ¶ 49 (citing Franz von Lizst, DAS VÖLKERRECHT [INTERNATIONAL LAW] Bk. IV § 40(III) 321 (1904), Ex. D-6; § 579 Bluntschli (1868) ("Every unnecessary killing—even if an armed enemy—is unjust."), Ex. D-1.  *Cf.* AUGUST WILHELM HEFFTER, DAS EUROPÄISCHE VÖLKERRECHT DER GEGENWART [EUROPEAN INTERNATIONAL LAW OF THE PRESENT ] § 125 (7th ed. 1882) ("Finally condemned appears to be the use of obliteration methods, whereby entire masses of enemies are felled machine-like without a need for such in the given circumstances."), Ex. D-3.

[4] *See Multiwave Sensor Inc. v. Sunlight Instrs.*, *LLC*, 16-cv-1361-GHW, 2017 U.S. Dist. Lexis 64404 at *5, n.1 (S.D.N.Y. Apr. 26, 2017).

respect their sovereignty, jurisdiction, and safety fourteen times.[5]  Ovaherero and Nama territory

did not pass to Germany under color of law until issuance of the Expropriation Orders.  ¶ 38(i)–

(j).  Germany could not claim ownership of land without expropriation, as under customary

Ovaherero property law, land was held communally by the people.  ¶ 309.  Great Namaqualand

in turn was a confederation not unlike Switzerland.  ¶¶ 4, 18, 26, 38(c), 38(h)–(j).  Germany

would have had no need for Expropriation Orders in 1905 and 1907 if Hereroland and Great

Namaqualand had already been its "territory."  Limited German authority was derived only by

contractual consent of the Nama and Ovaherero peoples through lawfully representative Chiefs

and Captains, as subjects of international law.  *See* Ex. C-1–14[6]; Goldmann Decl. at ¶¶ 44-52.

Germany had but a "sphere of influence."  Art. III German-Anglo Treaty (1890).  Nobel

Laureate Hermann K. Hesse explained: "In evaluating limits of German sovereign power, one

must distinguish its state power from its protective power.  As long as such limits exist, one can

---

[5] See Treaties, Ex. C -1-14; Decl. of Matthias Goldmann at ¶51, Ex. A-3.

[6] Exhibit C is a compilation of English translations of treaties with Germany as cited in: (i)  MAX VON KOSCHITZKSY, 2 DEUTSCHE COLONIALGESCHICHTE [GERMAN COLONIAL HISTORY] (1888) (ii) HANS SCHINZ, DEUTSCH-SÜDWEST-AFRIKA: FORSCHUNGSREISEN DURCH DIE DEUTSCHEN SCHUTZGEBIETE GROSS-NAMA- UND HEREROLAND, NACH DEM KUNENE, DEM NGAMI-SEE, UND DER KALAHARI [GERMAN SOUTH WEST AFRICA: RESEARCH TRAVELS THROUGH THE GERMAN PROTECTORATES GREAT NAMAQUALAND AND HEREROLAND, TO THE KUNENE, LAKE NGAMI, AND THE KALAHARI] (1891); (iii) AUSWÄRTIGES AMT, KOLONIAL-ABTHEILUNG, DEUTSCHES KOLONIALBLATT [GERMAN COLONIAL NEWSLETTER], 6 Amtsblatt für die Schutzgebiete des Deutschen Reichs [Official Imperial Colonial Newsletter] 79 (1894); (iv) HERMANN HESSE, Die Schutzverträge in Südwestafrika [The Protection Treaties in South West Africa], 6 ZEITSCHRIFT FÜR KOLONIALPOLITIK, KOLONIALRECHT UND KOLONIALWIRTSCHAFT, [6 J. COL. POL'Y, L., & ECON.] 899 (1904); (v) HERMANN HESSE, DIE SCHUTZVERTRÄGE IN SÜDWESTAFRIKA: EIN BEITRAG ZUR RECHTSGESCHICHTLICHEN UND POLITISCHEN ENTWICKLUNG DES SCHUTZGEBIETES [THE PROTECTION TREATIES IN SOUTH WEST AFRICA: A CONTRIBUTION TO THE LEGAL HISTORICAL AND POLITICAL DEVELOPMENT OF THE PROTECTORATE] (1905)); (vi)  HERMANN HESSE, Die Schutzverträge in Südwestafrika (Fortsetzung) [The Protection Treaties in South West Africa (continued)], 7 ZEITSCHRIFT FÜR KOLONIALPOLITIK, KOLONIALRECHT UND KOLONIALWIRTSCHAFT, [7 J. COL. POL'Y, L., & ECON.] 1 (1905); (vii) DENKSCHRIFT OF THE CHANCELLOR, Reichstag Record, 11th Legis. Period, 1st Sess., App. 7, Vol. 5 (1903–05); (viii) HERMANN HESSE, DIE LANDFRAGE UND DIE FRAGE DER RECHTSGÜLTIGKEIT DER KONZESSIONEN IN SÜDWESTAFRIKA [THE QUESTION OF LAND AND THE QUESTION OF THE LEGAL VALIDITY OF THE CONCESSIONS IN SOUTH WEST AFRICA] (1906); (ix) WOLDEMAR VON ROHLAND, VÖLKERRECHTSQUELLEN [SOURCES OF INTERNATIONAL LAW] (2d ed. 1908); and, (x) SANDER, 2 GESCHICHTE DER DEUTSCHEN KOLONIAL-GESELLSCHAFT FÜR SÜDWEST-AFRIKA [2 HISTORY OF THE GERMAN SOUTH WEST AFRICA COMPANY] (1912).

speak only of Germany's *protective* power or *limited state power*, but not just *state power.*"[7]
Germany had no legal "colonies" or "possessions," but only a loose "sphere of influence" that
coalesced in correlation with the genocides. ¶¶ 189, 207–12, 234. Germany mouthed "*Kolonie*"
[Colony] *in the hope of* colonization, but exercised only a putative "*Schutzmacht*" (Protective
Power). Simply put, Germany had no "possessions." *See* Goldmann Decl. at ¶¶ 51–57, Ex. A-3.

Germany's citations are unavailing. Def. Mem. at 8. First, since the Ovaherero and
Nama strictly retained sovereignty by treaty with Germany, *see* Ex. C, Ferguson *supports*
Plaintiffs, as he derives his protectorate theory from concepts of contractual consent.[8] Second,
the case 105 RGZ [Imp. S.Ct.] 260 (1922), Ex. D-8, is nonsupportive. Germany omits the
Court's holding: "[T]he Empire is liable for previously established liabilities of protectorates
with its own assets," *id.* at 262–63, Ex. D-8; Goldmann Decl., Ex. A-3 at ¶ 54. This is because it
exercised state authority "when the Empire lawfully obtained the overseas lands later described
as protectorates by occupation or treaty." *Id.* But as Plaintiffs show, they ceded no sovereignty
by Treaty, and they prevented Germany from exercising state power in Hereroland and Great
Namaqualand until the genocides. Germany also does not explain how or why the Court should
defer to a 1922 decision, especially given Germany's own "intertemporal" defense. Third, the
citation to Art. 1 of the Protectorate Law is nonsupportive. It states only: "The German Kaiser
exercises *protective power* in the German *protectorates* in the name of the Empire." Ex. D-5
(emphasis added). The Treaties were made under application and protection of principles of
international law, § 402 *et seq.* Bluntschli, such as most-favored-nation presumptions, and

---

[7] HERMANN K. HESSE, *Die Schutzverträge in Südwestafrika* [*The South West Africa Protection Treaties*], 6
J. COL. POL'Y, L., & ECON., 899, 913 (1905) (emphasis added), Ex. D-7.
[8] J.H. FERGUSON, 1 MANUAL OF INT'L LAW FOR THE USE OF NAVIES, COLONIES AND CONSULATES 85–86
(1884) ("The condition of a protected State is different from that of a Tributary or Vassal State. The protectorate is
regarded as the result of a voluntary act of a State, placing itself under the protection of one or more States, by
special contract and for certain temporary objects."), Ex. D-4. *See also* Goldmann Decl. at ¶¶ 46–47, Ex. A-3.

implied promises of good faith and fair dealing under the law of treatymaking.  By 1904, "the natives' territory still had a broad scope of 330,000 km², *i.e.*, more than two-fifths of the entire protectorate."  Hesse, *supra* note 9, at 902; *id.* at 912–14 (discussing limited Imperial authority).  The Ovaherero and Nama peoples were subject to the jurisdiction, sovereignty, and protection of customary Ovaherero and Nama law respectively, ¶¶ 18 & n.1, 61–66, 207–33, *and* Exhibit B.1–15, and otherwise illegally subjected to Imperial law.  ¶¶ 38(g)–(j), 241–43; Goldmann Decl., Ex. A-3 at ¶¶ 56-61.  *See also Anna*, *Justine*, and *Johanna*, ¶ 241 & n.24–26.

Even if the Ovaherero and Nama *were* German "nationals," "citizens," "residents," or "subjects," they were treated differently than White Germans, and discriminated against, and the expropriation was intertwined with programmed discrimination, enslavement, and genocide.  A sovereign's taking of its own nationals' property does not *typically* violate international law, but the "general principle of immunity for these otherwise public acts should give way," Helmerich, 137 S. Ct. at 1321, where nationals' fundamental rights "vis-a-vis their own governments" are violated.  *Filartiga v. Pena-Irala*, 630 F. 2d 876, 885 (2d Cir. 1989).  Thus, the FSIA takings exception strips sovereign immunity where the expropriation is part of a scheme of genocide, torture, enslavement, human rights abuses, or violations of laws of war—or even if takings are simply "arbitrary or discriminatory in nature."[9]  *Chettri*, 834 F. 3d at 58.  Germany's takings

---

[9] *See also Abelesz v. Magyar Allamvasutak Zrt.*, 692 F.3d 661, 675 (7th Cir. 2015) ("[P]laintiffs' allegations about the relationship between genocide and expropriation in the Hungarian Holocaust take these cases outside the domestic takings rule and its foundations."), *aff'd sub nom. Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015); *Cassirer v. Spain*, 616 F.3d 1019, 1023, 1035 & n.24 (9th Cir. 2010) (en banc); *Freund v. France*, 592 F. Supp. 2d 540, 555 (S.D.N.Y. 2008); *Davoyan v. Turkey*, 116 F. Supp. 3d 1084, 1100–02 (C.D. Cal. 2013) (finding violation of international law, as taking was "integrally related" to "government-sanctioned genocidal policies"); Restatement (Third) of Foreign Relations Law of the United States §712, at 196 (under international law, a state is responsible for a "taking of the property of a *national of another state*") (emphasis added); TODD GRABARSKY, *Comity of Errors: The Overemphasis of Plaintiff Citizenship in Foreign Sovereign Immunity Act Takings Exception Jurisprudence*, 33 CARDOZO L. REV. 237, 256–66 (2011).

were discriminatory,[10] and the expropriations were part of a program to exterminate and — complementary to the extermination—enslave the Ovaherero and Nama peoples.

### c.  Germany's Takings Violated Customary International Law

Germany's "intertemporal" defense is unavailing because, even assuming that no law other than the FSIA applied retroactively,[11] Germany's takings nonetheless violated international law when they occurred. Goldmann Decl. at ¶¶ 49-53.[12]  Customary international law at the time universally prohibited the acts complained of, AC ¶¶ 45–53, as the crime of genocide was already illegal at the time of the takings,[13] albeit under the synonymous names "War of Annihilation" and "War of Extermination."[14]  The rule was clear: "Wars of extermination and annihilation against peoples and tribes that are capable of life and culture are violations of

---

[10] *Compare*, *e.g.*, ¶ 170 & n.20 (forcing Ovaherero and Nama women to strip off the faces of their fathers), *with*, *e.g.*, ¶ 201 (subsidizing nearby luxuries like the casino, ice factory, ballroom, and bowling alley for White Germans), *and* "NACHT, MOND UND STERNE," Windhoek Kindergarten Bazaar (1909), Fig. 30 *in* Oskar Hintrager, Südwestafrika in der deutschen Zeit [South West Africa in the Time of Germany] 145 (1956), Ex. E.

[11] *See Rep. of Austria v. Altmann*, 541 U.S. 677, 699–700 (2004).

[12] There is also *some* applicable 21st century law relevant to this case; for example, the federal law governing the Court's subject-matter jurisdiction, *Garb*, 440 F.3d at 580-81, and the state law governing this Court's ample palette of remedies, be they equitable, *see NML Cap., Ltd. v. Argentina*, 699 F.3d 246, 259–63 (2d Cir. 2012) (affirming discretionary *pari passu* injunctions against Argentina), or plain money judgment.

[13] Plaintiffs allege the takings started before 1904.  *See*, *e.g.*, AC ¶¶ 77–81, 184–85.

[14] J.C. Bluntschli, DAS MODERNE KRIEGSRECHT DER CIVILISIRTEN STATEN [THE MODERN LAW OF WAR OF CIVILIZED STATES] § 26 at 6 (1866) ("*Ausrottungs- und Vernichtungskriege*"); Bluntschli, trans. C. Lardy, LE DROIT INTERNATIONAL CODIFIÉ [THE RESTATEMENT OF INTERNATIONAL LAW] § 535 at 300 (2d ed. 1874) ("*Les guerres d'extirpation et d'anéantissement*") Ex. D-2; AC ¶ 47.  Bluntschli drafted of the first RESTATEMENT OF MODERN INTERNATIONAL LAW OF CIVILIZED STATES [DAS MODERNE VÖLKERRECHT DER CIVILISIRTEN STATEN ALS RECHTSBUCH DARGESTELLT] (Nördlingen 1868), Ex. D-1.  *See generally* B.B. ROEBEN, *The Method behind Bluntschli's "Modern" International Law*, 4 J. HIST. INT'L L. 249 (2002).  The Restatement of International Law was circulated worldwide as a "Restatement" or "Codification" of international law in (1) French by C. Lardy & E. Laboulaye, LE DROIT INTERNATIONAL CODIFIÉ (Paris 1870), *revised in* Lardy, LE DROIT INTERNATIONAL CODIFIÉ (2d ed. 1874), Ex. D-2; (2) Spanish by J.D. Covarrubias, EL DERECHO INTERNACIONAL CODIFICADO (Mexico City 1871); (3) Korean by K. Hiroyuki, CHAEJU CHONGNIJ P'AN (Seoul 1872), *revised in* W.A.P. Martin, CHAEJU CHONGNIJ P'AN (Seoul 1896); (4) Greek by K. Mousouros, Ο ΔΙΕΘΝΗΣ ΚΩΔΙΞ (Athens 1874); (5) Russian by A. Lodyzhensky, *et al.*, СОВРЕМЕННОЕ МЕЖДУНАРОДНОЕ ПРАВО ЦИВИЛИЗОВАННЫХ ГОСУДАРСТВ, ИЗЛОЖЕННОЕ В ВИДЕ КОДЕКСА (Moscow 1876); (6) Turkish by İ.H. Paşa, HUKUK-I BEYNEDDÜVEL-I KANUNUF (Istanbul 1879), *revised in* Paşa, HUKUK-I BEYNEDDÜVEL-I KANUNUF (2d ed. 1886); (7) English by Martin, BLUNTSCHLI'S INTERNATIONAL LAW (Beijing 1880); (8) Chinese by Martin, GONG FA HUI TONG (Beijing 1884); (9) Japanese by S. Takahashi, HEIJI KOKUSAIHORON (Tokyo 1907); *see also Bluntschli's International Law*, 3 U.S. L. REV. 397, 403, 409 (Boston 1868) (describing Bluntschli's work as a treatise with a "purpose to state rather than debate the law," and "hailing the code of Bluntschli and the Social Science Congress as harbingers of the new era of international law."  *See* W.A. Shabas, *Origins of the Genocide Convention*, 40 CASE W. RES. J. INT'L L. 35, 37, 40–45 (2008).

international law."[15]  It cannot be seriously debated that the alleged conduct, if proven, amounts

to a violation of that rule.  *See* Exs. B-1 to B-5.  Germany's outrageous conduct in issuing the

Extermination Orders suffices for a prima facie showing of taking by extermination.

Germany argues its "inner dealings" were not genocide, because genocide "was first

defined as a legal concept" in 1948.  Def. Mem. at 9.  The position is untenable.  Courts routinely

find pre-1948 genocides to constitute violations of international law in FSIA takings cases.[16]

Germany already admitted guilt for *pre*-1948 World War II genocides, and even condemned

Turkey for its *pre*-1948 Armenian Genocide.  ¶ 278.  Scholars and historians agree: this was a

genocide, no less.[17]  Plaintiffs allege Germany already admitted liability for "genocide" many

times concerning these facts.[18]  Germany fails to address these allegations, so the Court should

accept them as true for purposes of this motion.  *Tandon*, 752 F.3d at 243.

Germany miscites Bluntschli § 535, and incorrectly alleges that Plaintiffs did not plead

material portions of that source. Def. Mem. at 10 (criticizing AC ¶¶ 45-47.)  First, Germany

mistranslates the excerpt of § 535, cmt. 2.  There Bluntschli noted merely that international law

insufficiently protects "*wild*" tribes ("*wilde Stämmen*").  *Cf.* Bluntschli § 535 (2d ed. 1874 Paris)

("*sauvages*"), Ex. D-2.  This makes sense in consideration of the substantive provision of § 535:

"Wars of extermination and annihilation against *peoples and tribes that are capable of life and*

---

[15] § 535 Bluntschli (Nördlingen 1868) ("*Ausrottungs- und Vernichtungskriege gegen lebens- und culturfähige Völker und Stämme sind völkerrechtswidrig.*"), Plaintiffs' Exhibit D-1.

[16] *E.g.*, *Altmann*, 541 U.S. 677; *Fischer.*, 777 F.3d 847; *Cassirer*, 616 F.3d 1019.

[17] *See* Goldmann Decl., at ¶¶ 62-66, Exhibit A-3. *See also, e.g.*, Nick Sprenger, *et al.*, *The Ovaherero/Nama Genocide: A Case for an Apology and Reparations*, 2017 Euro. Sci. J. 1857 – 7881; Sidney L. Harring, *German Reparations to the Herero Nation: An Assertion of Herero Nationhood in the Path of Namibian Development?*, 104 W. Va. L. Rev. 393, 396–403 ("[T]he German act of genocide against the Herero was striking and deliberate."). *See also* Wolfgang Werner, *Playing Soldiers: the Truppenspieler Movement among the Herero of Namibia, 1915–45*, 16 J. S. Afr. Stud. 476, 485–502 (1990).  *See also* Goldmann Decl. at ¶¶ 49-53.

[18] AC ¶¶ 273–87; ¶ 283 (President and Foreign Minister Frank-Walter Steinmeier acknowledging liability for "war of annihilation [that] constitute[s] a war crime and genocide"); ¶ 281–82 (German Foreign Office acknowledged liability for "the war of extermination in Namibia from 1904 to 1908, [ ] a war crime and genocide").

*culture* are violations of international law."[19]  Second, Germany's argument shows its

commitment to the same erroneous and racist legal formalism it used to justify the killings, that

is, that the Ovaherero and Nama peoples were "*wild*" or "*sauvage*[ ]," and allegedly outside the

ambit of international law.  "Wild" is defined by the context of the provision as those who "play

no active role in the activities of international law."  *Id.*  The Ovaherero and Nama played broad,

active roles in such in their sovereign capacities.[20]  They were sophisticated, cultured, and

advanced sovereign polities in Southwest Africa, AC ¶ 247, with vast wealth and ample

protections under international law, *id.* ¶¶ 61–66.  They were in fact so "capable of life and

culture," § 535, that despite Germany's best efforts, they nonetheless continue to survive.  ¶ 248.

### d.  Germany's Takings Violated Positive International Law and Treaty Obligations

Germany mistakenly argues that the Ovaherero and Nama were outside the ambit of

international law because they "had not ratified or signed any treaties of international law."  Def.

Mem. at 10.  First, Germany asserts only that the Ovaherero and Nama were nonparties to a 1907

Hague Convention, ignoring the twelve other international treaties Germany signed, AC ¶ 40 &

n.8, and under which Plaintiffs assert third-party beneficiary standing.  In any event, FSIA

jurisdiction does not turn on whether a Treaty provides *remedies* to third-party states or actors,

but only on whether Germany "violat[ed]" international law. 28 U.S.C. § 1605(a)(3).[21]

Germany also ignores its Treaties with the Ovaherero and Nama peoples.  It repeatedly

promised to respect Ovaherero and Nama law, jurisdiction, fiscal authority, and sovereignty, and

yet consistently violated these Treaties, which Plaintiffs present here with translations.  *See* Exs.

---

[19] § 535 (emphasis added).  *Compare* AC ¶ 47, *with* Def. Mem. at 10, with Exhibit D-1 at § 535.

[20] *E.g.*, AC at ¶ 40 & n.9 (treaty-making), ¶¶ 61–63, 76, 81, 140 (diplomacy with Germany, the Rehoboth Bastards, Nama, Ovaherero, English, Boers), ¶ 103 (observation of international humanitarian legal norms in giving safe passage to German women, children, handicapped, missionaries, and unarmed men).

[21] *Argentina v. NML Capital, Ltd.*, 134 S.Ct. 2250, 2256 (2014) ("[A]ny sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text.  Or it must fall.").

C-1–14.  This shows further a willful disregard of easily verifiable historical facts, and a violation of the requirement that the Amended Complaint's fact-based allegations be deemed true for purposes of its Motion.  *Tandon*, 752 F.3d at 243.  The Amended Complaint sets out Germany's obligations titled "(iii) Defendant's legal obligations as codified in its treaties," and identifies the treaties with particularity by name and date.  ¶ 40 & n.9.

### 4.  New York Nexus

To meet the fourth element of § 1605(a)(3), Plaintiffs need only show the nexus by a "preponderance of the evidence."  *Hamm*, 483 F.3d at 137.  Contrary to Germany's contention, *Helmerich* did not consider the pleading standard for *nexus* allegations, as that was not on appeal.  137 S. Ct. at 1313–17.  The Court's analysis rested on the fact that the third element—a violation of international law—is the pivotal element of the analysis.  *Id.*; *see also Simon v. Hungary*, 812 F.3d 127, 147 (D.C. Cir. 2016).  A strict pleading standard is sensible for the third element as (1) the facts comprising the violation of international law and the applicable standards are presumably as accessible to plaintiffs as to defendants; and (2) there *is* a legitimate concern about dragging an *innocent* foreign sovereign into protracted federal litigation.  But like here, where the expropriated property and economic benefits of slave labor were exchanged for fungible assets,[22] the *Helmerich* pleading standard cannot reasonably be grafted onto the normal nexus pleading standards of the Second Circuit, under which a plaintiff need only prove by a "preponderance of the evidence" that jurisdiction exists.  *Hamm*, 483 F.3d at 137.

Germany disputes the jurisdictional allegations.  Normally where a defendant presents conflicting affidavits, "factual disputes are resolved in the plaintiff's favor."  *Id.*; *MacDermid*,

---

[22] *See* Smith Decl., Ex A-5 at ¶¶ 13-16; *see also Simon*, 812 F. 3d at 147 (sufficient to raise plausible inference that the defendants retain the property or proceeds thereof, absent a sufficiently convincing indication to the contrary where plaintiffs alleged defendants liquidated the stolen property, mixed the resulting funds with their general revenue, and devoted the proceeds to funding various governmental and commercial operations).

*Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) ("[A]llegations in the complaint must be taken as true *to the extent they are uncontroverted by the defendant's affidavits*.") (emphasis added). But Germany has not offered so much as a conflicting affidavit; it has given Plaintiffs and the Court *nothing*. Plaintiffs' showing exceeds the "non-frivolous" standard rejected in *Helmerich*. Given Germany's broad admissions of liability, AC ¶¶ 271–87, the equitable relief sought here, *id.* ¶¶ 371–82, and Germany's reliance on *equitable* defenses exhaustion and *forum non conveniens*, this Court should consider Plaintiffs' *equitable* responses including application of the equitable doctrine of tracing,[23] which is embedded in the word "exchange[]" in the FSIA. Under that doctrine, fungible rights in property, taken in violation of international law and exchanged and invested in properties owned and commercially used by Germany on First and Fifth Avenues, are directly traceable to that taken by Germany in violation of international law. *See* Smith Decl., Ex. A-5 at ¶¶ 12-17; Lockman Decl., Ex. A-6 at ¶¶ 4-8; Declaration of Arthur Burkle, Ex. A-7 at ¶¶ 7-12. Tracing as an equitable remedy may be modified as justice requires. *See* Oesterle, *supra* note 23 (citing I.G. PALMER, § 2.14(c) THE LAW OF RESTITUTION 183 (1978) ("[I]nterests [ ] created by equity [can] be adapted so as to achieve equity.").

Germany speculates that "[p]roving that fungible cash is present in the United States is difficult in the best of circumstances." Def. Mem. at 12. But such "speculation fails to demonstrate the implausibility of the plaintiffs' claims." *Simon*, 812 F.3d at 147. What's more, Germany relies only on an unpublished and distinquishable disposition by the Ninth Circuit, *Alperin v. Vatican Bank*, 365 Fed. Appx. 74, 75 (9th Cir. 2010) ("While we recognize that it could be difficult to prove that fungible articles, such as the gold alleged to have been taken in

---

[23] DALE A. OESTERLE, *Deficiencies of the Restitutionary Right to Trace Misappropriated Property in Equity and in UCC 9-306*, 68 Corn. L. Rev. (1983).

this case, are currently present in the United States, Alperin does not even make such an allegation in the pleadings").

Germany also seeks "judicial notice."  Def. Mem. at 13.  But such request must fail under Federal Rule of Evidence 201 as Germany does not give the Court the means to *notice* anything at all.  The paragraph beginning "Furthermore" contains conclusory, unsupported factual assertions that the Court should ignore along with the entirety of footnotes 5 and 6.  *Multiwave*, 2017 U.S. Dist. Lexis 64404 at *5, n.1; *Individual Practices Rule* A.2.f.  If the Court finds these "counterfacts" permissible, Plaintiffs dispute them on the merits: Germany cannot meet the hurdle of proving an immunity defense by rattling off random numbers from a book it does not even provide to the Court.  Insofar as Germany argues that everything that was taken in Southwest Africa stayed there is absurd, and belied by the vast exports from South West Africa in the period under review.  *See* Declaration of Mutjinde Katjiua, PhD, Exhibit A-1 ¶ 10 (Germany "exploited the valuable mining rights …[it confiscated from the Ovaherero and Nama] by granting or leasing lands for valuable consideration" to various companies); see also Goldmann Decl. at ¶28 (Germany "ran a profitable import-export business [with] revenues that were extracted …from confiscations and forced labor….").

As to the First Avenue Property, Plaintiffs allege, *inter alia*, that it houses the German Academic Exchange Service ("DAAD"), and that Germany regularly performs contractual obligations relating to the Service and its affiliates, employees, and partners.  AC ¶¶ 262–63. Germany argues without a factual showing that the Service is a "governmental institution."  Def. Mem. at 15.  In fact, though, the organization is a "nongovernmental institution."  Lockman Decl., Ex. A-6 at ¶ 6.  Germany's citation to *LaLoup v. United States*, 29 F. Supp. 3d 530, 551–52 (E.D. Pa. 2014) is also unavailing.  Although the Service and other entities renting space from

Germany may be involved in the promotion of "cultural relations," the Service's connection to the Ovaherero and Nama skulls in New York is unavoidable. The Service was "founded in 1925 . . . with the purpose of propagating Germanic superiority across the globe . . ."). While DAAD was engaging in racist propaganda as a private entity with material assistance from Germany, the Kaiser Wilhelm Institute, which Luschan formerly directed, had taken Plaintiffs' precedessors' skulls and remains, and sent these to New York. *See* Katuuo Decl. at ¶¶ 5–8 & Ex. 1–2; Burkle Decl. at ¶10; *see also* Accession Records, Ex. F-1–2. And Germany's *rental* of housing in its First Avenue Property to DAAD and its "partner organization" the German Center for Research and Innovation ("GCRI") (see Burkle Decl. at ¶ 10-12) is obvious commercial activity.[24]

As for the Fifth Avenue Property ("the Haunted Castle"), Plaintiffs allege it was built in 1905, and owned and operated by Germany since the early 1950s. AC ¶¶ 266–69. After using it for commercial activities for seventy years, *see* ¶ 269(f), as alleged and confirmed, *see* Lockman Decl., Ex. A-6, Germany now says, nine months after the Complaint was filed, that "[t]he US Government has acknowledged by Verbal Note. No. 17-1480 from September 26, 2017, that the building will be considered a so-called 'consular annex' and thus serves governmental functions." Def. Mem. at 16. This flagrantly violates Rule 7.1(a)(3) and *Individual Practices Rule* A.2.f, because Germany *knows* or *should know* that the source is unavailable to the Court and plaintiffs.[25] Given that Germany conceded personal jurisdiction, *infra* Part V, Germany uses the Verbal Note for one purpose: to challenge this Court's authority to hear these claims, not through *argument* or *persuasion*, but by a plausibly bad faith attempt at *manufacturing* immunity. One goal of the FSIA was to remove the State Department from immunity decisions

---

[24] Indeed, GCRI not only rents space from Germany, but engages in a wide range of funding for commercial, research, and other development projects from its Manhattan location. See Burkle Decl., Ex. A-7.

[25] *Notes Verbáles* are nonpublic, informal, unsigned state-to-state communiques. *See* U.S. Dep't of State, Foreign Affairs Manual at 5 FAH-1 H-600, *available at* https://fam.state.gov/fam/05fah01/05fah010610.html.

altogether, implement, *inter alia*, the most-favored-nation principle of international law, and end

the practice of State Department favoritism that plagued sovereign litigation in 1950s and 60s.

The mechanism was simple: take immunity decisions out of the hands of the Executive and hand

those decisions to the Judiciary.[26]  Germany improperly seeks to employ these obsolete and

rejected tactics.[27]  Germany has had constructive notice of this lawsuit since January 2017, and

this Court should not be distracted by an "immunity" concocted after this suit commenced.  The

Court is "within its rights to examine evidence beyond the pleadings . . . to determine if a valid

FSIA defense exist[s]."[28]  But Germany provides no exhibits, experts, or translations to allow the

Court to reach a reasoned determination.  This is why Local Rule 7.1(a)(3) is a "require[ment],"

not a recommendation.  *Multiwave*, 2017 U.S. Dist. Lexis 64404 at *5, n.1.  The only proper

remedy is for the Court to simply "disregard all [unsupported] facts submitted" in this motion.

*Id.*

Finally, the skulls and bones in the Museum, AC ¶ 297–301 provide this Court with

subject-matter jurisdiction under § 1605(a)(3),[29] as they constitute property taken in violation of

international law in connection with Germany's bone research, display, and provenance, which

constitute commercial activities as discussed below. See also, generally, Katuuo Decl., Ex. A-2.

### A.  The Commercial Activity Exception of § 1605(a)(2) Applies

Subject-matter jurisdiction also exists over this action, as it is on Germany's acts "outside

the territory of the United States in connection with a commercial activity of the foreign state

elsewhere and that act causes a direct effect in the United States."  § 1605(a)(2).

---

[26] *NML*, 134 S.Ct. at 2255–56; H.R. Rep., 7, U.S.C.C.A.N. 1976, 6605–06.
[27] *See Verlinden, B.V. v. Cent. Bank of Nigeria*, 461 U. S.493 (1983) (the Act "comprehensively regulat[es]" jurisdiction).
[28] *MMA Consultants 1, Inc. v. Peru*, 2017 U.S. App. LEXIS 25540, at *3-*4 (2d Cir. Dec. 19, 2017).
[29] The skulls and bones also provide subject-matter jurisdiction in the alternative under § 1605(a)(2), *infra*.

First, Plaintiffs argue *in the alternative* that Germany's bone activities, AC ¶ 15, 169–72, 297–301, 314, 328, were primarily commercial rather than "sovereign" activities, as participants in the international bone market were mostly nongovernment entities and individuals, and the collection of at least eight identified Ovaherero and Nama skulls and other human remains by Luschan and other German agents were sold and sent to the Museum in New York as part of commercial and pseudo-scientific transactions. *See* Katuuo Decl., Ex. A-2; Burkle Decl., Ex A-7 at ¶3-6. These transactions concerning the collection, sale, and display of Ovaherero and Nama skulls and bones, among others, involved Germany's Royal Ethnological Museum (*Königlichen Museum für Völkerkunde*). *Id.* Moreover, Germany's construction and operation of, *e.g.*, the railway to Grootfontein in what is now Namibia, had the direct effect of increased productivity and increased tonnage shipment by freighter to the U.S. *See* Katjiua Decl., Ex. A-1 at ¶ 10-11; Goldmann Decl., Ex A-3 at ¶ 28-29; Burkle Decl., Ex. A-7 at ¶ 5-6.

As in *Argentina v. Weltover*, 504 U.S. 607 (1992), the acts complained of here occurred substantially outside the United States on Ovaherero and Nama lands and territories, and the taking of Ovaherero and Nama skulls, bones, mineral rights and the financial benefits of the slave labor, had a direct effect in the United States in that, *inter alia*, those skulls and human were sent directly from Berlin to New York for commercial purposes and in connection with Germany's commercial activity. A sovereign engages in "commercial" activity when, instead of regulating a market, it acts "in the manner of a private player within it." *MMA Consultants 1, Inc. v Peru*, No. 17-1157, 2017 U.S. App. LEXIS 25540 (2d Cir. December 19, 2017). But the direct effect need not be "substantial" or even "foreseeable." *Weltover*, 504 U.S. at 618. Rather, the effect need be more than "purely trivial effects" in the United States, and need only "follow as an immediate consequence" of a defendant's activity. *Id.* Given that New York was the place

of payment under Argentina's bonds, the effect was sufficiently direct.  Here, the "direct effect"
is even stronger than in *Weltover*, as the skulls and remains in New York would not be here but
for Germany's commercial sales and illegal and commercial takings of those human remains by
Luschan and other German agents on traditional Ovaherero and Nama lands.  Plaintiffs' injuries
are the immediate and direct result of defendant's illegal commercial takings of skulls, bones,
and remains, and its illegal sale to the Museum, and Germany's clearly intended to cause the
injuries Plaintiffs suffer: Germany intended to profit from this research with the goal of
subjugating Plaintiffs based on race and physical attribute.  The sale to the Museum was
Germany's ultimate goal, as Germany sought the most comprehensive venue possible for the
greatest success in bone collection, display, and provenance as part of the international
commercial eugenics and bone business.

## II.        THE POLITICAL QUESTION DOCTRINE IS INAPPLICABLE

The political question doctrine, *Baker v. Carr*, 369 U.S. 186, 211 (1969), has no bearing
here.  The Second Circuit has distilled the inquiry into a three-factor test in the foreign sovereign
context, with a threshold question: whether there exists an "expressed . . . statement of foreign
policy interests" by the United States Executive, "urg[ing] dismissal of claims against a foreign
sovereign."  *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 59-60 (2d Cir. 2005).
Here, the United States has not expressed any interest in this case, and certainly not an interest in
resolving this case under executive purview.  Rather, Germany argues without support that a
decision in Plaintiffs' favor would "meddle in foreign relations to the point of interjecting the
sovereignty of the United States into a bilateral agenda between two other sovereign nations."
Def. Mem. at 20.  Germany provides no affidavit or evidentiary support for its claims, and

simply references "talks" with the Namibian government, while failing to note that the United

States has no position on those "talks." *See Whiteman*, 431 F.3d at 69–72. "[S]trong feelings"

are irrelevant. *Klinghoffer v. Achille Lauro*, 937 F.2d 44, 46 (2d Cir. 1991). Under Germany's

rule, the mere "presence of the violation of international law/genocide issue . . . [,]*in and of

itself*[,]" would create a new broad shield of nonjusticiability for claims that *touch* the area of

"foreign relations." Besides gutting § 1605(a)(3), Germany's argument runs contrary to decades

of well-established case law, in which courts afford redress to claimants alleging violations of

international law and genocide.[30] It also conflicts with the fundamental goal of human rights

litigation to *enforce*, not *degrade* international norms. By Germany's rule, the *more* horrific a

genocide is, the *less* justiciable it becomes, creating untenable perverse incentives.

Germany's reliance on *Davoyan v. Turkey,* 116 F. Supp. 3d 1084 (C.D. Cal. 2013) is

misplaced. There, in dismissing claims against Turkey as nonjusticiable under the political

question doctrine, the district court relied on the Executive's foreign policy statements regarding

the Armenian Genocide, which the Ninth Circuit had earlier found preemptive of a California

statute on the same. 116 F. Supp. 3d at 1103 (citing *Movsesian v. Victoria Versicherung AG*,

670 F.3d 1067, 1076–77 (9th Cir. 2012)). In light of *Movsesian*, the *Davoyan* court found that

because this express policy was sufficiently extensive to preempt the state statute, it also met the

political-question inquiry by showing the issue was expressly reserved for executive decision.

*Id.* at 1102–03. Here, unlike Turkey, which fiercely disputes that its acts constituted genocide,[31]

---

[30] *Alperin v. Vatican Bank*, 410 F.3d 532, 546–58 (9th Cir. 2005) (reversing application of political question doctrine); *see also, e.g.*, *Medellin v. Texas* 552 U.S. 491 (2008); *Altmann*, 541 U.S. at 701–02; *Garb*, 440 F.3d 579; *Khulumani v. Barclay Bank*, 504 F.3d 254, 262–64 (2d Cir. 2007), *aff'd sub nom.*, *Am. Isuzu Motors v. Ntsebeza*, 553 U.S. 1028 (2008); *Simon*, 812 F.3d at 149–51; *Abelesz v. Erste Grp. Bank AG*, 695 F.3d 655 (7th Cir. 2012); *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 283–85 (S.D.N.Y. 2009); *see also El Shifa Pharm. Indus. Co. v. U.S.*, 607 F.3d 836, 856 & n.3 (D.C. Cir. 2010) (*en banc*) (Kavanagh, J., *concurring*).

[31] *See* HENRY C. THERIAULT, *Genocide, Denial, and Domination: Armenian-Turkish Relations from Conflict-Resolution to Just Transformation*, 1 J. AFR. CONFL. & PEACE STUD. 82, 82, 87–89 (2009).

Germany has finally admitted its liability for the Ovaherero and Nama genocides after a century

of denial.  The absence of a statement in this litigation from the United States warrants an

inference that the Executive does not care.[32]  Moreover, some courts do not dismiss even when

there *is* such a statement.[33]  The Court should not apply the political question doctrine here.

### III.    THERE IS NO "EXHAUSTION" REQUIREMENT UNDER THE FSIA, AND NONE SHOULD BE APPLIED HERE

Germany invokes a "prudential exhaustion of remedies doctrine in FSIA expropriation

cases."  Def. Memo at 10.  Germany overstates its case, as the FSIA does not require "exhaustion

of local remedies."  *Simon v. Hungary*, 277 F. Supp. 3d 42, 55–56 (D.D.C. 2017); *see also*

*Simon*, 812 F.3d at 148 ("[The] FSIA itself imposes no exhaustion requirement.").  The Seventh

Circuit also recently reaffirmed that the FSIA contains no such requirement:

> We rejected the statutory exhaustion argument, finding that nothing in the language of the
> FSIA expropriation exception suggests that plaintiffs must exhaust domestic remedies
> before resorting to [federal] courts.  In so doing, we joined the Ninth and D.C. Circuits.

*Fischer*, 777 F.3d at 854 (citing *Cassirer*, 616 F.3d at 1034–37; *Agudas Chasidei Chabad of U.S.*

*v. Russian Fed'n*, 528 F.3d 934, 948–49 (D.C. Cir. 2008). Germany omits mention of the 2017

decision in its ongoing *Philipp* litigation, *Philipp v. Germany*, 248 F. Supp. 3d 59 (D.D.C. 2017),

which addressed the very question: whether a plaintiff in a genocide case against Germany

should first be required to exhaust local German remedies.  The district court found no such

requirement either in the FSIA or under principles of "comity."  *Id.*  Instead, the court noted that

though prudential exhaustion may be appropriate where both plaintiff and defendant are foreign

sovereigns, the same does not apply where individual claims are brought against a foreign state,

as "there is no apparent reason for systematically preferring the courts of the defendant state."

---

[32] *See Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 379 (3d Cir. 2006).
[33] *E.g., Sarei v. Rio Tinto*, 550 F.3d 822 (9th Cir. 2008); *Exxon Mobil*, 473 F.3d 345 (D.C. Cir. 2007).

*Id*. at 82 (quoting *Agudas Chabad*, 528 F.3d at 949).[34]  What's more, an exhaustion requirement would wholly undercuts Congress' clear intent in enacting the FSIA.  *See*, *e.g.*, Curran Decl. ¶ 4, Ex. A-4.[35]  *Id.* ¶ 19 (noting no exhaustion requirement under international law); *see also id.* ¶¶ 20–24 (noting that Congress designed the FSIA as a comprehensive jurisdictional test with a goal of uniformity, which is inconsistent with a spotty application of exhaustion).

In those cases where courts have asked plaintiffs to exhaust domestic remedies, they are instructed to first pursue remedies in courts of their country of citizenship and where the illegal takings occurred.  *E.g*., *Simon*, 812 F. 3d 127.  But here, Plaintiffs were not German citizens or "nationals," and the Ovaherero and Nama sovereignties were recognized by Germany by treaty.  So as none of the plaintiffs or predecessors were German nationals, and the property was not taken in Germany, there is no basis to require plaintiffs to prosecute this case in Germany.

## IV.    THE DISTRICT COURT IS NOT AN INCONVENIENT FORUM

Germany argues that the doctrine of *forum non conveniens* requires a dismissal of this action.  The argument is based entirely on conclusory factual assertions in three sentences:

> Here, all the relevant documents and records are in Germany and, possibly, in Namibia and are in the German language. Many, if not all, custodians of records are in Germany. Process to obtain documents and/or witnesses is more readily available in Germany, as is service of that process.

Def. Memo at 24.  Apart from the fact that these unsupported allegations violate Rule A.2.f. and thus ought be ignored, they either untrue or irrelevant.  While *hard copies* of records may be Germany and Namibia, and while they are mostly in German, this is of no event, because all

---

[34] S*ee also De Csepel v. Hungary*, 169 F. Supp. 3d 143, 169 (D.C.C. 2016) ("[B]oth international and domestic courts (including the D.C. Circuit) have reasonably construed the prudential theory of exhaustion to be inapplicable to causes of action brought by individuals and not states."); *Azima v. Rak Inv. Auth.*, No. 16-cv-01948, 2018 U.S. Dist. LEXIS 53648 at *53 (D.D.C. Mar. 30, 2018) (rejecting exhaustion requirements).

[35] Curran was an active member of the ALT Group that worked on the Restatement (Fourth) of the United States Law of Foreign Relations, "which informs a number of the issues of this case." See Ex. A-4 at ¶ 3.

pertinent documents are accessible online through the German Federal Archive's *invenio* database, and Plaintiffs' have ample translation resources to prosecute this case.

Germany has not carried its burden of "making out a strong case for transfer" with support in affidavits or materials beyond the pleadings. *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (internal quotation marks omitted). Because Germany has not provided *any* evidentiary support, and so there is no "strong case for transfer" as required. *Id.*; *see also APWU*, 343 F.3d at 627 (burden of persuasion remains with foreign sovereign). Because Germany presents no evidence, the Court need not engage in this Circuit's three-step *forum non conveniens* inquiry. *The Wave Studio LLC v. General Hotel Mgmt Ltd.*, No. 17-1018, 2018 U.S. App. LEXIS 4596 *89 (2d Cir. Feb. 26, 2018).

In any event, the three-step inquiry is not met. Step one considers "the level of deference due to the plaintiff's choice of forum." *Id*. Plaintiffs filed in the Southern District, because New York is home to German wealth, home to the largest population of class members in the United States, and home to the Association of the Ovaherero Genocide in the USA and Barnabas Veraa Katuuo, AC ¶¶ 28, 295. This alone creates a "presum[ption]" of "convenien[ce]." *Id.* at 89–90; *Sinochem Int'l Co. v. Malay. Int'l Shipping Co.*, 549 U.S. 422, 430 (2007) (noting defendants carry a "heavy burden" in invoking the equitable defense). In fact the forum is so convenient, that Plaintiffs Paramount Chief Vekuii Rukoro and Johannes Isaack and their delegations attend all conferences, as the Court is aware. Evidence is here, such a the "Blue Book" depicting Germany's wrongdoing, which nearly did not survive destruction efforts by revisionists, ¶¶ 302–03; New York is a center for Ovaherero and Nama genocide research, ¶¶ 304–08; and the Southern District has special expertise in handling cases involving genocide and crimes against

humanity.[36]  New York is the current resting grounds of bodies taken in violation of international

law, a component of this Court's subject-matter jurisdiction.  ¶¶ 297–301.  What's more, very

few of the plaintiff class speak or read German, and thus they would effectively be excluded

from German proceedings due to the language barrier.  Katuuo Decl., Ex. A-2 at ¶ 24.

At step two, "the court must establish that an adequate forum exists."  *Wave Studio*, 2018

U.S. App. LEXIS at *89.  Germany has not given the Court a means by which it can so establish

the existence of an alternate forum, let alone an "adequate" one.  *Id.*  The only way to do so is by

showing specific remedies available there to address the individual and class claims.  Germany

has not – and cannot -- do so, because, upon information and belief, relief there would be futile.

If the first two steps are met, as a third step, the Court "balance[s] the public and private factors

articulated by the Supreme Court in *Gulf Oil v. Gilbert*."  *Id.* (citing 330 U.S. 501, 508–09

(1947)).  It is a context-dependent balancing test, requiring one to "weigh relevant advantages

and obstacles to a fair trial," such as "ease of access to sources of proof," and consider whether

plaintiffs vex, harass, or oppress a defendant.  *Gulf Oil*, 330 U.S. at 508–09; *id.* at 508 ("But

unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should

rarely be disturbed.").  Germany has provided no credible evidence to rebut the public and

private interests involved or to show that Plaintiff's claims should more properly be heard in

Germany or Namibia.  As such, the Court should conclude that Germany has failed to

demonstrate that any private and public interest considerations "strongly support dismissal."[37]

Plaintiffs' choice of forum is entitled to considerable deference, and Germany has not made a

---

[36] *E.g.*, *see infra* note 30 (citing, *e.g.*, *Garb*, 440 F.3d 579; *S. African Apartheid Litig*, 617 F. Supp.2d 22)).
[37] See *Boosey & Hawkes Music Pub. Ltd. v. Walt Disney Comp.*, 145 F.3d 481, 491 (2d Cir. 1998).

showing with evidentiary support "that private and public interest factors render either [Germany or Namibia] the more convenient forum to gain *forum non conveniens* dismissal."[38]

## V.     GERMANY CONCEDES PERSONAL JURISDICTION

Germany concedes it has no personal jurisdiction defense.[39]  Germany must so concede, because it is not a "person" under the Due Process Clause.[40]  As such, the "minimum contacts" inquiry is inapplicable.  The only question is if Congress gave this Court the *statutory* power to hear this case.  28 U.S.C. § 1330.  Germany has been served.  Any immunity defense "must stand on the Act's text."  *NML*, 134 S.Ct. at 2256.  Here it does not.  And so it "must fall."  *Id.*

---

[38] *Skanga Energy & Marine, Ltd. v. Arevanca S.A.*, 875 F. Supp.2d 264, 274 (S.D.N.Y. 2012).
[39] Def.'s Mot. To Dismiss at 17 ("[P]ersonal jurisdiction equals subject matter jurisdiction plus valid service of process").
[40] *Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Rep.*, 582 F.3d 393, 398–99 (2d Cir. 2009).

## CONCLUSION

The Court should deny Germany's Motion to Dismiss, and in the alternative grant leave to amend to cure any deficiencies the Court may identify.

Dated:  New York, New York
         May 4, 2018

McCALLION & ASSOCIATES LLP

_____/s/_____
Kenneth F. McCallion (Bar # KFM-1591)
Professor Richard H. Weisberg
Arthur A. Burkle, Esq.
100 Park Ave, 16th floor
New York, NY 10017-5538
(646) 366-0884

Thomas A. Holman
Meaghan G. Glibowski
HOLMAN LAW, P.C.
99 Park Avenue, Suite 2600
New York, New York 10016
(212) 481-1336

Yechezkel Rodal
RODAL LAW, P.A.
3201 Griffin Road, Suite 203
Dania Beach, FL 33312
954) 367-5308

Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2018, I electronically filed this document with the Clerk of the Court using CM/ECF.  I also certify that this document is being served today on counsel of record identified below on the Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

Dated:  New York, New York
        May 4, 2018

                                McCALLION & ASSOCIATES LLP

                            _____/s/_____
                            Kenneth F. McCallion (Bar # KFM-1591)
                            100 Park Ave, 16th floor
                            New York, NY 10017-5538
                            (646) 366-0884

Service List:

Jeffrey Harris, Esq. JH2121
Max Riederer von Paar, Esq.
Walter E. Diercks, Esq.
RUBIN, WINSTON, DIERCKS, HARRIS, & COOKE, LLP
1201 Connecticut Ave., N.W., Ste. 200
Washington, D.C. 20036
jharris@rwdhc.com

Attorneys for Defendant