I7VAAVEKC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   VEKUII RUKORO ET AL.,

4                Plaintiffs,

5           v.                        17 CV 62 (LTS)

6   FEDERAL RUPUBLIC OF GERMANY,

7                Defendant.

8   ------------------------------x
                                     New York, N.Y.
9                                    July 31, 2018
                                     10:00 a.m.
10
    Before:
11
                    HON. LAURA TAYLOR SWAIN,
12
                                     District Judge
13
                        APPEARANCES
14
    MCCALLION & ASSOCIATES LLP
15       Attorneys for Plaintiff Rukoro
    BY:  KENNETH F. MCCALLION
16  MICHAEL LOCKMAN
    ARTHUR BERKLE
17
    RUBIN WINSTON DIERCKS HARRIS & COOKE, LLP
18       Attorneys for Defendant Fed Republic of Germany
    BY:  JEFFREY HARRIS
19  WALTER E. DIERCKS

20  HOLMAN LAW
         Attorneys for Plaintiff Rukoro
21  BY:  THOMAS A. HOLMAN
    MEAGHAN G. GLIBOWSKI
22
    ALSO PRESENT:  Professor Richard Weisberg, Cardozo School of
23  Law

24

25

1            (Case called)

2            THE COURT:  Good morning.  Please be seated, everyone.

3            Give me just a moment please.

4            (Pause)

5            THE COURT:  Again, good morning.

6            We are here today for oral argument in the motion to

7    dismiss the complaint in the matter of Rukoro against Federal

8    Republic of Germany.

9            Counsel, would you please introduce yourselves by way

10   of stating your appearances.

11           MR. HARRIS:  Jeffrey Harris and Walter Diercks, for

12   the Federal Republic of Germany.

13           THE COURT:  Good morning, Mr. Harris.

14           And good morning, Mr. Diercks.

15           MR. MCCALLION:  Good morning, your Honor.

16           Kenneth McCallion, for the plaintiffs.  And we're

17   rejoined by Michael Lockman who was on the case originally,

18   took a federal clerkship for a year and is back with our firm.

19           THE COURT:  Good morning, Mr. McCallion and

20   Mr. Lockman.

21           MR. LOCKMAN:  Good morning.

22           MR. MCCALLION:  Tom Holman.

23           THE COURT:  Good morning, Mr. Holman.

24           MR. MCCALLION:  Megan Glibowski.

25           THE COURT:  Good morning, Ms. Glibowski.

1          MR. MCCALLION:  And Professor Richard Weisberg, of

2     Cardozo.

3          THE COURT:  Good morning, Professor Weisberg.

4          MR. MCCALLION:  And Arthur Berkle.

5          THE COURT:  Good morning, Mr. Berkle?

6          MR. BERKLE:  "Berkle".

7          THE COURT:  Good morning, Mr. Berkle.

8          And greetings as well to the distinguished

9     representatives of the Ovaherero and Nama peoples who here

10    today and all other spectators and members of the press.

11         MR. MCCALLION:  Thank you.

12         All of the named plaintiffs are here, Paramount Chief

13    Rukoro, Chief Isaack and Barnabas Veraa Katuuo.

14         THE COURT:  Good morning.

15         Thank you for coming to court today.

16         I understand that the movants, the defendants, have

17    reserved five minutes for rebuttal and so the principle remarks

18    for the defense will be allotted 15 minutes, and then the

19    plaintiffs in opposition will be allotted 20 minutes, and then

20    we will return to defense counsel for five minutes of argument.

21         We have a device up on the podium that will be set for

22    the allotted time and count down and goes red at the end.

23         Mr. Lockman will be quite familiar with those from his

24    work in the appellate court.

25         Is there anything by way of discussion that we need to

I7VAAVEKC                    Conference

1    cover before we begin the argument?

2              MR. HARRIS:  Not from us, your Honor.

3              MR. MCCALLION:  I don't believe so, your Honor.

4              THE COURT:  All right.  Then, Mr. Harris.

5              MR. HARRIS:  Good morning, your Honor.

6              THE COURT:  Good morning.

7              MR. HARRIS:  May it please the Court, we have moved to

8    dismiss this case on the basis that jurisdiction here is

9    claimed under an exception to the Foreign Sovereign Immunities

10   Act.  That exception is the so-called Expropriation Exception.

11             And with regard to a sovereign, as opposed to an

12   agency or instrumentality of a sovereign, among the

13   requirements for the exception to apply and jurisdiction to be

14   granted, there has to be a taking of violation of International

15   law.  And the portion that I would like to focus on initially

16   is the next portion which states that the property taken or

17   property exchanged for the taken property, must be present in

18   the United States in connection with commercial activity being

19   carried on by the foreign sovereign in the United States.

20             And the first question that I'd like to address is,

21   what is the pleading standard that is required for a plaintiffs

22   to successfully plead that portion of the exception?  And the

23   Supreme Court last term addressed this issue in Venezuela v.

24   Helmerich, and that involved a D.C. Circuit case.  And at the

25   time that case came to the Supreme Court, the D.C. Circuit had

1    a bifurcated approach as to what you had to plead under this

2    exception.  And you either had to plea, your pleading had to be

3    either plausible or not frivolous.

4            And what the Supreme Court said in the Venezuela case

5    was that that bifurcated standard doesn't, is incorrect, that

6    there is only one pleading standard.  And in that case they

7    then went on to announce what they declared to be the standard.

8    And it is neither the frivolous nor the plausible.  What they

9    said is that the facts must show and not argue -- just arguably

10   show that you meet the standard.

11           So they basically said the old bifurcated standard

12   D.C. was using no longer applies and the new standard is that

13   the facts must show and not just arguably show that you meet

14   the standard.

15           THE COURT:  Now that case was decided in the context

16   of a controversy as to whether the plaintiffs had demonstrated

17   that there had been a taking in violation of International law.

18   I don't believe the Supreme Court spoke to any of the other

19   aspects of the Takings Exception.  So what basis should I

20   extrapolate or read the announcement of this standard to apply

21   to anything other than that core question of a claim associated

22   with a taking in violation of International law?

23           MR. HARRIS:  Well, that was the question that the

24   court was considering, the taking violation of International

25   law.  But the opinion does say, it goes on to say that to

establish jurisdiction under the FSIA and it doesn't limit it

to just that particular element.

        And subsequent to that case -- just to fast forward a

little bit -- the D.C. Circuit in a case called "Owens" had

occasion to consider that because in the district court in the

Owens case they had applied the prior standard.  And that was a

case dealing not with the Appropriation Exception but with the

Terrorism Exception to FSIA.  And when the case came to the

D.C. Circuit they said that since the district court opinion

had been issued before Venezuela v. Helmerich, that that

standard no longer applied, that that standard had been

overruled by the Supreme Court and that the standard now and to

assert FSIA jurisdiction and it didn't limit it.  Now we are in

a different exception to FSIA to the Terrorism Exception, that

you had to -- what they read the Helmerich case as saying that

you had to prove the facts of jurisdiction.  So the Owens case

did not limit it to the Appropriation Exception and certainly,

didn't further limit it to just one element of the

Appropriation Exception.

        Also, if you think about it, your Honor, the notion

that if you have to prove or you have to assert in jurisdiction

four elements and they were going to have a different pleading

standard for each of the elements, I certainly don't know of

any place in our law where you get to plead a different

standard depending on which element you are asserting of a

1    cause of action and I don't think that's what the Supreme Court

2    did.  It certainly appeared not to do it in the Helmerich case.

3            So I would assert to you that the holding in Helmerich

4    as interpreted by Owens, the D.C. Circuit makes it clear that

5    the standard to be applied to assert jurisdiction under FSIA

6    regardless of what exception you are asserting is the standard

7    that Judge Breyer set out that you must show and not just

8    arguably show the facts that support your jurisdictional claim.

9    So I believe that's the standard that you should apply in this

10   case.

11           Now, with regard to the element that you should apply

12   it to, the question about whether property, the property taken

13   or property exchange for that property is present in the United

14   States.  What the plaintiffs allege is that property was taken

15   in the 1880 to 1910 period.  It was converted into cash.

16   Although, they don't say how but they allege that.  It was put

17   into the German treasury and that today we fast forward to more

18   than a hundred years later and there are four buildings in New

19   York that are owned by the Federal Republic of Germany and

20   somehow some of that money taken in the 1880s is present in

21   those buildings.

22           So what they assert is that tracing is a proper method

23   and we agree with that.  Where we disagree with the plaintiffs

24   is that they haven't traced it.  They just simply say that.

25   They simply say that in 1880 they took our livestock.  They did

1    this.  They did that.  They took minerals.  They turned it into

2    cash.  It went into the German treasury and now we have on 51st

3    Street and First Avenue the Consulate of Germany, and some of

4    that money you should find is present in the United States in

5    some portion of that building.

6            Now, if you think about that, if that were the case

7    that a foreign government that took property from someone and

8    is now, there's now a claim against them and they owned

9    property in the United States, that somehow the fungibility

10   argument says that that is enough for you to find that that

11   element of the Expropriation Exception is satisfied.  If that

12   were the case about, FSIA would mean nothing because there

13   would be a finding that the property exchange for the taken

14   property is present in the United States.  Almost every foreign

15   country owns a piece of property in the United States.  So I

16   guess --

17           THE COURT:  You reject the proposition as a legal

18   interpretation of the concept of tracing or the effective

19   commingling as opposed to a factual question of whether it's

20   possible that any proceeds or fruits of the taken property are

21   still somehow a part of the wealth of the Federal Republic of

22   Germany?

23           MR. HARRIS:  No.  As a legal proposition I don't argue

24   with the idea of tracing.  What I'm saying is that this

25   pleading doesn't do the tracing sufficiently.  All it does is

I7VAAVEKC                    Conference

1    repeat the element that is set out in the federal statute.

2    They just say it, that the property is present in the property

3    exchange for the taken property is present in the United States

4    and here are four buildings in New York that Germany owns.  And

5    I would argue to you that that is not sufficient.

6          For example, there are two intervening world wars in

7    which Germany was absolutely bankrupt.  So, if we're claiming

8    some of the funds that were taken in 1880 still existed in the

9    coffers of Germany so that they could be invested in the

10   consulate that was built at the UN, I would say to you that

11   that is simply not true.  And where they argue tracing they

12   haven't done the tracing or alleged the tracing in sufficient

13   factual detail to allow you to find that that tracing has

14   occurred.

15         THE COURT:  And what are the burdens of production and

16   persuasion in connection with this point?  Is it sufficient for

17   the plaintiffs to come forward with a sufficient allegation?

18   And then is it Germany's job at the end of the day to persuade

19   the Court that this exception does not apply?  Or does

20   plaintiff have to prove that it applies?

21         MR. HARRIS:  And that's where we are circle back to

22   Venezuela v. Helmerich.  The burden of the plaintiff in the

23   pleading is to show facts, quote, as Judge Breyer said and not

24   just arguably show facts that support the allegation that in

25   this case money that was exchanged for the taken money is

1    present in the United States.

2            If it were enough to simply say that in 1800 Country

3    "X" took money.  They deposited it into their treasury.

4    Country "X" now has an embassy in the United States and

5    therefore under the tracing theory, that's a sufficient

6    pleading.  About the only country that I can think of that

7    would get the benefit of FSIA if that's the way we interpret it

8    would be North Korea who doesn't own any property here, I

9    think.  Because just about every country on earth owns property

10   in the United States.

11           THE COURT:  Well, in the Hungarian cases which dealt

12   with the bank and with the railroad which are a little bit

13   different but even so, the defense said well, there's been a

14   war.  The allies seized the gold train.  There were all sorts

15   of calls on the assets of these institutions and so it's

16   possible that the money is no longer there.  But the Court held

17   that at the pleading stage the allegation that the money was

18   still within the bank and within the railroad were proceeds of

19   property, was sufficient to go forward.

20           So, why is your invocation of world wars and possible

21   bankruptcy different from that scenario where the Court

22   acknowledged possibilities but said that wasn't enough to --

23           MR. HARRIS:  I think those cases were pre-Venezuela v.

24   Helmerich and I think those cases are either interpreted under

25   the nonfrivolous or plausible standard and the Court said none

1    of those apply.

2            Let me just move ahead because I don't want to run out

3    of time.  I want to talk about the Political Question Doctrine

4    for a moment.  One of the things that the Court is seeking is

5    to have you order the German government to require the clients,

6    the plaintiffs, a seat at bilateral negotiations between

7    Germany and Namibia over reparations, so to speak, or what is

8    the subject matter of this lawsuit.

9            THE COURT:  Is that even something that would be

10   within the scope of the Takings Exception?

11           MR. HARRIS:  I don't think it is.  But nevertheless,

12   that's exactly what they ask you for in paragraph.  In the

13   Prayer for Relief Sub B, they ask you to enjoin and restrain

14   the defendant from continuing to exclude the plaintiffs and

15   other lawful representatives of the Ovaherero and Nama people

16   from participation in discussions and negotiations regarding

17   the subject matter of this lawsuit.

18           I don't believe that with all due respect, that a U.S.

19   District judge ought to be ordering foreign governments as to

20   who can sit at a negotiation table having nothing to do with

21   the United States.  Furthermore, even if you, even if that was

22   something that was in the power of the Court, the problem is it

23   is the lawful Namibian government that gets to decide who sits

24   on their negotiations, not the German government.

25           So I just think that that is emblematic of the

I7VAAVEKC                    Conference

 1    problems and that you should abstain from this case under the

 2    Political Question Doctrine and let the bilateral negotiations

 3    between these two sovereigns proceed to settle this problem.

 4              THE COURT:  Thank you.

 5              MR. MCCALLION:  May it please the Court, starting with

 6    the last issue raised, I am rather puzzled.  The Political

 7    Question Doctrine, Mr. Harris seems to be asserting certain

 8    rights of Namibia.  Well, Namibia must be well aware of this

 9    particular case.  They have not chosen to intervene or

10    participate.  The U.S. Government must be well aware of this

11    case as well.  They have not sought to take a position,

12    intervene and so forth.  And there is no case that we know of

13    where the U.S. Government has not taken a position that the

14    political doctrine has been invoked to divest a plaintiff of

15    jurisdiction in a particular court.

16              Also, Mr. Harris was very careful to point out the,

17    perhaps, the last point of the relief that we're seeking, the

18    bulk of the case and the thrust of the case are damage claims,

19    and those damage claims have nothing to do with current

20    negotiations.  We believe under the indigenous UN charter

21    resolution and convention that we should participate and I

22    don't want to say that it's the tail of the dog.  It's a very

23    important issue but the thrust of our case are damage claims

24    under the FSIA.

25              THE COURT:  And what is your position as to the basis

1    for avoiding sovereign immunity with respect to that claim of

2    relief?  Is there an exception from the FSIA that would allow

3    the Court to exercise a power to order a foreign sovereign to

4    negotiate with anybody in particular?

5        MR. MCCALLION:  Yes.  It's under the equitable power

6    of the Court.  Certainly, it's a violation of International

7    law.  It's not the heart of the case which I'd like to discuss

8    but it is a violation of International law to violate the

9    rights of indigenous people and also points out that the

10   violations by Germany are really of a continuing nature and

11   come you to the present time.  These are not just historical

12   issues that we're discussing but deal with certainly the rights

13   of the plaintiffs at this present time.

14       With regard to the Court's equitable power of

15   remedies, it's very broad.  That issue wasn't specifically

16   briefed but certainly, it meets the elements of the FSIA

17   requirements and the exception, except the violation of

18   International law would be based upon the indigenous, the

19   rights of indigenous people under the UN charter as opposed to

20   the other violations of law given rise to plaintiff's damage

21   claims.

22       Now, as the Court correctly pointed out, by the way,

23   the Second Circuit has spoken to the issue, on the issue of

24   burden which your Honor discussed with Mr. Harris.  And

25   certainly, it has been held, and we briefed this, that Blue

1    Ridge Investors v. Argentina, Second Circuit in 2013, made it

2    very clear that the ultimate burden of persuasion here remains

3    with the alleged foreign sovereign.  And we would respectfully

4    the suggest that we have certainly met our burden of raising

5    certainly, nonfrivolous plausible and indeed, proving to a

6    significant extent our particular case with regard to the

7    violations of International law here such that the burden would

8    then be shifted back to the sovereign, in this case Germany,

9    which it has failed to show.

10            As your Honor knows, we've submitted extensive

11   documentation and exhibits and declarations from experts and

12   fact witness.  This matter was investigated heavily by the

13   plaintiffs.  We have put forward that evidence to the Court and

14   we believe it shows certainly sufficiently, if not conclusively

15   that there were significant violations of International law and

16   that the fruits of those violations of International law are

17   found here in New York.

18            THE COURT:  And so I hope that you will speak further

19   to your commingling doctrine argument which seems to me to be

20   extraordinarily broad and perhaps broad enough to vitiate the

21   language of the Takings Exception which speaks in terms of

22   property to a certain extent the same language as the

23   commercial activity exception and then it looks to property

24   used in connection with commercial activity, this exchange of

25   property.  But if all property of the sovereign once it has

I7VAAVEKC                    Conference

committed a violation of International law that involves the

taking of property and converting it to cash, it then all

property, of any sovereign is in some fractional measure the

proceeds of the violation of International law, why bother to

look to see whether it's used in connection with commercial

activity why trace at all?

        So, please help me to understand the principle that

you are applying here.

        MR. MCCALLION:  Yes, your Honor.

        First of all, putting the issue just in context which

I'd like to get to it, not only, it's just not an issue of

exchange property but we believe directly we have established

that the fruits of the genocide here, the violation of

International law are in New York in the form of the skulls and

human remains at the American Museum of Natural History.

        THE COURT:  In your complaint you allege that those

were sold by the survivor of an individual who maintained a

private collection.  And I think some of the documentation

that's been proffered said that it was a gift.  And so even if

one accepts that those are, that that property is here, how

have you connected it with the commercial activity of Germany

in this country?

        MR. MCCALLION:  Yes, your Honor.

        First of all, we've submitted documentation to your

Honor which we obtained from the American Museum of Natural

1    History after we filed the complaint, which frankly at the time

2    we thought that these bones and the remains came from a private

3    collection.  However, as we've submitted to the Court now and

4    if I may, for example, the exception record for those

5    products -- this is document 45-2 -- show that the documents

6    specifically came from the Museum of Ethnology in Berlin.

7    Felix von Luschan was the director of that.  The Museum of

8    Volkerkunde in Berlin is the Museum of Ethnology, and von

9    Luschan was the director of that.

10           So the documentation that we're submitted shows really

11   overwhelmingly that the bones, the collection came directly

12   from the museum of which the director was -- and this is the

13   Imperial Museum of Ethnology owned by Germans, run by Germans

14   and with von Luschan as the director.

15           Now, if you look around the middle page you see the

16   number 41,500.

17           THE COURT:  Yes.

18           MR. MCCALLION:  That was an amount that was paid.  The

19   only way this was a gift was that Felix Warburg whose name

20   appears at the top of page was a New York philanthropist

21   associated with the museum who provided the money and then

22   gifted it to the museum.  Now, it's not necessary that this be

23   actually a commercial transaction but it is and we presented

24   evidence of that.

25           THE COURT:  So how is it a commercial transaction if

1    Warburg paid somebody for it or paid the museum for it but

2    gifted it to the Museum of Natural History?

3           MR. MCCALLION:  Well, if I may, I'd like to refer to

4    28 U.S.C. 1603 Subsection E, which we'd like to emphasize

5    actually defines commercial activity.  It defines commercial

6    activity carried on in the United States by foreign state means

7    commercial activity carried on by such state and having

8    substantial contact in the United States.

9           There is no requirement in this definition -- and this

10   is 1605(A)(3) that the commercial activity be carried on

11   specifically, by Germany in this country merely, requires

12   commercial activity carried on by the state which has a

13   substantial contact with the United States.

14          Now, as we argued in our papers, the primary

15   commercial activity that was engaged in by Germany was in the

16   business of bones and eugenics which was a very big business at

17   that particular time.  What we have --

18          THE COURT:  Business in what sense?  Was it horrible?

19   It was development of these theories upon which government

20   policies were predicated.  It was the basis of science that is

21   not respected.  But how is it business?

22          MR. MCCALLION:  Well, it was a very big business for

23   Germany through von Luschan and many other agents.  It would

24   purchase the bones.  In fact, one of the documents that we

25   submitted was actually on the skull of one of the victims of

1    genocide.  This is particularly nominal which the German's

2    derogatorily referred to as "the hottentot".  There were 20

3    reichs marks written on there and also in the related papers of

4    von Luschan was paid for the collection of it.  Von Luschan

5    then collected five thousand skulls and human remains ended up

6    in New York, but many thousand more in Berlin that were

7    actually purchased and then sold.  So there was a market in

8    bones.  It was primarily engaged in by private parties.

9        But Germany took a step out of its sovereign status

10    and engaged in this commercial activity and became the

11    preeminent really market maker and market participant in this

12    bone trade.  It's not just the sale of the bones but the

13    research relating to the Carnegie Institute, for example, in

14    New York, Cold Spring Harbor, the eugenics Institute certainly

15    made a big business of it and worked closely with the American

16    Museum of Natural History which tried to become a player and

17    did become a major player in this particular business of bone

18    display.

19        Von Luschan described this museum collection and its

20    display in Berlin as one of the major sightseeing attractions

21    in Berlin and the museum itself still remains a major

22    attraction.  So there are thousands of bones in New York,

23    thousands of bones in Berlin and the sale of them and the sale

24    of the research relating to them phrenology, eugenics largely

25    discounted at this point was a major commercial activity at

1    this time.

2              So you don't look to necessarily the purpose of the

3    transaction but the actual nature, commercial nature of the

4    transaction itself.  And for example, part of the purchase here

5    was of specific information and research by von Luschan here in

6    New York.  For example, you have Skull 2793 here.  Von Luschan

7    took very specific notes relating to these documents.  These

8    measurements were then transposed and published and became the

9    source of published materials, the fruits.  So the fruits of

10   the genocide, the fruits of this commercial activity were not

11   just in the sale of bones but also in information and

12   calculations relating to them.

13             So we'd like to emphasize that the commercial activity

14   engaged in by the foreign state was primarily in this

15   particular business and only came about because of the basic

16   violations of International law engaged in by Germany.  Germany

17   has admitted those violations of International law on a number

18   of occasions.  And actually, it's somewhat surprising that in

19   this case they deny their culpability and responsibility for

20   it.

21             So I can understand why Mr. Harris would not like to

22   discuss the violations of International law.  But as we set

23   forth in our papers, there are numerous occasions where German

24   officials have admitted that what happened to the Ovaherero and

25   Nama, the horrific treatment, the genocide which resulted in

1    the extermination of between 50 and 80 percent of the Ovaherero

2    and Nama and then the subjugation of them and the enslavement

3    and the expropriation laws, Germany has admitted this.

4         Mr. Harris in Germany in this case obviously, is

5    trying to walk that back.  They're denying that there's been an

6    admission but we have established again and again starting on

7    August 16, 2004, on the 100th anniversary of the genocide

8    Germany's minister for economic development at the time

9    specifically admitted that we Germans accept our historical and

10   moral responsibility and guilt incurred by the Germans at this

11   time.  The atrocities committed at that time would be termed

12   "genocide".  Later on the Foreign Office admitted it.

13        The German government was then asked by the press, is

14   this true what the German foreign Office is saying, admitting

15   that this was a genocide?  And they say, yes, this reflects the

16   official position of the federal government.  Even the current

17   president of Germany, Frank-Walter Steinmeier, acknowledges

18   Germany's responsibilities for its actions which amounted to a

19   war of annihilation and constitutes a war crime and genocide.

20        We would like to specifically suggest to the Court

21   that the Supreme Court in Venezuela v. Helmerich certainly

22   focused exclusively on the International law violation because

23   that is the crux of the Foreign Sovereign Immunities Act, which

24   adopted the restricted view of sovereign immunity, namely, that

25   once you look at whether the sovereign engaged in an

1    International law violation or not, if they have, they have

2    taken themselves, really stripped themselves of their right to

3    assert that sovereign immunity defense.

4            So that is the heart of this particular exception and

5    that's why the Court focused on it.

6            THE COURT:  Well, that was also what was in

7    controversy in the cases that came to that Court.  But why

8    should there be any different standard for the other statutory

9    elements of this exception from the general rule of sovereign

10   immunity?

11           MR. MCCALLION:  Well, certainly, I believe we meet

12   either standard.  So it's somewhat academic.  But certainly,

13   once you established a horrific clear violation that's admitted

14   by the sovereign we would respectfully suggest that after that

15   we have put forth sufficient evidence that the Court would give

16   some latitude if there's some question as to the extent to

17   which this violation of International law had a direct effect

18   on the United States.

19           We have certainly alleged, they've submitted no

20   declarations of experts.  We've submitted declarations of, for

21   example, Stand v. Smith, an economist, expert economist who has

22   set forth an economic opinion and said that it's accepted

23   economic theory regarding the fungibility of assets that while

24   you can trace dollar for dollar, certainly, to the extent that

25   there was a forfeiture of property here, an expropriation not

I7VAAVEKC                    Conference

1    only of land, cattle, other assets, the use of the proceeds of

2    slave labor, the renting and leasing out of human beings for

3    slave labor which benefited Germany, that once those proceeds

4    went to Germany and certainly, there are substantial savings

5    since they had slave labors working on infrastructure projects,

6    railway projects as well, that that substantial benefit

7    certainly, not only gave the German treasury money but

8    certainly saved them millions upon millions of dollars that

9    once you have that although, you can't trace it Deutsche mark

10   or dollar for dollar that that benefit certainly can be traced

11   to an economic theory, as well as in a legal theory to the use

12   of proceeds by the German treasury and the purchase of

13   buildings here in New York.

14        THE COURT:  Now, you are over your allotted time.  So

15   would you mind summing up briefly.

16        MR. MCCALLION:  Sure.  I would like to mention the

17   other exception which we allege and we believe we allege it had

18   clearly in our jurisdictional section, paragraph 33, which is

19   the commercial activity section.  And this is the other prong

20   which we are relying upon jurisdiction.  And here it's even

21   clearer that when the action is based upon an act outside the

22   territory which would be the International law of violation and

23   commercial activity in the trade of bones.  The United States

24   in connection with a commercial activity of the foreign state

25   elsewhere don't need the commercial activity here.  And the act

I7VAAVEKC                    Conference

1    causes a direct effect in the United States.  So it's a

2    different analysis than that under the 83 prong or the Takings

3    Exception which we believe we meet.  But certainly, the direct

4    effect on the United States, the sale of bones, the sale of

5    human remains in New York, the activities of the German service

6    which owns property on First Avenue --

7        THE COURT:  Are you saying that the damage claim is

8    based on the fact of bone sales?  Or isn't the damage claim

9    arising from the murders and the taking of skeletons in the

10   first place and so the case law with respect to direct effects

11   looks at the place of contract breach, the place of a tort, the

12   place of the killing and the, essentially, the accrual of a

13   claim in connection with that sort of activity as the direct

14   effect and other effects as more tangential or derivative.  And

15   so what is the -- are you saying that the trade in bones is

16   itself a violation of International law or is somehow an

17   independent basis of this action?  Or I thought the genocide

18   was basis of the action.

19       MR. MCCALLION:  Well, the genocide is the act outside

20   of the territory.  However --

21       THE COURT:  So you have to show a direct effect of

22   that genocide in the United States.

23       MR. MCCALLION:  Yes.  The bones and the von Luschan

24   collection would not be in New York but for the fact that the

25   skulls of victims were then cleaned and boiled, went to Berlin

I7VAAVEKC                  Conference

1   and then ended up in New York.  This was a major acquisition by

2   the museum.  And also the German service which was formed in

3   1923 to support eugenics is housed at the First Avenue property

4   owned by Germany.  So that was a direct effect.  In other

5   words, this, the genocide and the fruits of that directly the

6   human bodies and remains -- what more direct impact could be

7   connected to the genocides than that -- found their way to New

8   York and as part of that commercial activity.

9              THE COURT:  Thank you.

10             MR. MCCALLION:  Thank you very much.  On behalf of the

11  plaintiffs respectfully request that the Court deny Germany's

12  motion to dismiss.  And we also touched upon it but we would

13  believe that there is a basis for further jurisdictional

14  research or discovery which could take place.  We've only had

15  limited access to the von Luschan collection at the museum.  We

16  have not had access, for example, to his focus and study

17  materials which were part of it.

18             THE COURT:  Thank you, Mr. McCallion.

19             MR. MCCALLION:  And we would respectfully request an

20  opportunity to further discovery on that issue.

21             Thank you, your Honor.

22             THE COURT:  Thank you, Mr. McCallion.

23             Good morning again, Mr. Harris.

24             MR. HARRIS:  Good morning, your Honor, once again.

25             I would submit, if you look at the amended complaint

1    that this paragraph 33, it certainly does not allege in the

2    commercial activity exception, the first sentence of it, that

3    is a belated interpretation that really isn't in the complaint.

4    Paragraph 33 says the Court has subject matter jurisdiction

5    under 28 U.S.C. 1330(A) and personal jurisdiction over the

6    defendant under 1330(B), in that the defendant is a foreign

7    state and the Takings Exception to jurisdictional immunity

8    applies.  That's what that paragraph alleges.

9          This belated commercial activity section argument

10   which appears for the first time in their opposition to our

11   motion to dismiss, I would say to you, is not a fair reading of

12   the pleading.  So I would call that to the Court's attention.

13         THE COURT:  There is, it's at best say an inartful

14   pleading but the final line of that paragraph does say that

15   there's jurisdiction because the action is in part based on

16   acts in Germany in connection with commercial activities

17   elsewhere that has caused a direct effect in the United States

18   picking up some of language of the A2 exemption.  But I do

19   understand your procedural argument and you have a response to

20   the argument, the substance of the argument that that exception

21   applies.

22         MR. HARRIS:  And if you go to the rest of the 96 pages

23   you will never see it referred to again.  There is no further

24   pleadings with regard to that.

25         As to the pleadings that are actually in the

1   complaint, I would call the Court's attention to paragraph 258

2   which is the portion of the complaint that deals with this

3   so-called tracing.  And it reads:

4            A portion of the defendant's enormous wealth is

5   attributable to, in exchange for and can be traced from the

6   property it took from the Ovaherero and Nama people in

7   violation of International law.  Defendant has invested its

8   wealth worldwide and particularly, large investments in the

9   city and state of New York.  Defendants investments in New York

10  constitute property exchanged for property taken in violation

11  of International law in which were derived from a portion of

12  the defendant's commingled funds.

13           And I would suggest to you that that is the extent of

14  the pleading with regard to this, quote, tracing argument and

15  that really, what that is if you look at the statute and look

16  at this language, is just a paraphrase of the statute.  So I do

17  not think that that satisfied it.

18           I'd like to now move on to the skulls.  No where in

19  the complaint did it alleged that the skulls are the property

20  that's in the United States.  It is this paragraph 258 which is

21  the exclusive place which you will find the allegations

22  regarding property in the United States.

23           And with regard to the skulls, as your Honor points

24  out, the skulls were a gift from a private citizen in 1924.

25  And the question of -- so I don't even think we have we reached

1    the question of whether the skulls would satisfy the property

2    present in the United States.  It was a gift from a private

3    citizen and it is not pled in the complaint.  And when we move

4    to dismiss and write our briefs we are guided by what's in the

5    complaint.  And to the extent that we hear new kinds of

6    argument at oral argument, we're really at a loss to be able to

7    legally defend our position.  We go by the Bible.  The Bible is

8    the complaint.  That's what we are responding to.

9            THE COURT:  Well, to the extent a motion is directed

10   to the merits of the complaint, certainly, one looks at the

11   four corners of the complaint and matters that are integral to

12   the complaint.  Your motion is brought as a motion to dismiss

13   for lack of subject matter jurisdiction.  And at the end of the

14   day, if there are factual disputes, then we go outside the

15   complaint and there are supplemental materials that have been

16   proffered and I will grant you that the skull and bone matter

17   arguments have been further developed here during oral argument

18   than they were in the papers but they certainly were developed

19   in the papers as well and the Court is not limited to the four

20   corners of the complaint in determining whether it has subject

21   matter jurisdiction.

22           So is there any further that you want to proffer on

23   this question of the skulls and bones as a basis for the

24   exercise of subject matter jurisdiction?

25           MR. HARRIS:  Just simply that they were a gift to a

I7VAAVEKC                    Conference

1    museum by a private German citizen in 1924 and there is no

2    activity being carried on, commercial activity being carried on

3    with regard to those skulls in a museum by the Federal Republic

4    of Germany.

5         THE COURT:  I think that the theory that I heard here

6    in oral argument was that Germany made a commercial sale of the

7    bones, whether it was to Mr. Warburger directly to the museum.

8    And so the bones and skulls came to be here in the United

9    States by virtue of a German commercial transaction and they

10    remain in the United States.

11         Why isn't that enough?  Why does it have to be a

12    current commercial --

13         MR. HARRIS:  Because the commercial transaction first

14    has to be a commercial transaction by the foreign sovereign in

15    the United States, by commercial activity of the foreign

16    sovereign in the United States.

17         So to the extent that the German, assuming those

18    facts, the German government made a sale of some skulls to a

19    citizen, to Mr. Warburg or whoever and it was subsequently

20    brought by Mr. Warburg to the United States, that commercial

21    activity by Germany was not in the United States.

22         THE COURT:  Is there a factual question?  Could they

23    have shipped them to him in the United States?  Do we need

24    discovery on that?

25         MR. HARRIS:  I would say to you, your Honor, on this

I7VAAVEKC                    Conference

1    discovery situation, first of all, I don't think that the

2    skulls, I don't think it's fairly pled that the skulls are the

3    kind of property that give rise to the exception.  They are not

4    property present in the United States in connection with

5    commercial activity being carried on by Germany.  And let's

6    assume that there was commercial activity in Germany in 1924.

7    I don't believe that satisfies the statute.  I think if you

8    look at the statute you will find that a fair reading of it is

9    the commercial activity being referred to is current commercial

10   activity, not historical commercial activity.

11            THE COURT:  Thank you.

12            And we're going a bit over your time but I also let

13   Mr. McCallion go over his time.  So, we'll call it another

14   three minutes that you can go but if you want to hit the high

15   points you should --

16            MR. HARRIS:  I'll do it less than three minutes, your

17   Honor.

18            I just want to point out one other thing that Justice

19   Breyer says in the opinion of the court in Venezuela v.

20   Helmerich, is that as we've previously stated the Court should

21   decide foreign sovereign immune defenses at the threshold of

22   the action.  So I would urge you not to consider jurisdictional

23   discovery.  Germany should not be put in this court to any more

24   expense an participation than is absolutely necessary.  And I

25   think that the Supreme Court clearly said that.

1          Lastly, I want to double back to where we started.

2   And you asked me do I think that the Venezuela case is limited

3   to that one element.  And I told you I didn't think so.  But

4   there's a sentence in the opinion that I think further supports

5   my position.  That's where Justice Breyer -- and it's right

6   above the conclusion and it says talking about courts --

7   sometimes they should not simply look to the existence of a non

8   frivolous argument when they decide whether the requirements of

9   the Expropriation Exception are satisfied.  So he's talking

10  about the Expropriation Exception as a unified exception, not

11  element by element.

12          And I think if you -- I have to say this.  I've been

13  reading Supreme Court opinions for a long time.  And Justice

14  Breyer's opinion sometimes require reading several times to get

15  the full import.  And I think a fair reading of Venezuela v.

16  Helmerich is that they announce a new pleading standard that

17  applies to exceptions under FSIA, not with particularly limited

18  Expropriation Exception and certainly not limited to one

19  element within the Expropriation Exception.

20          Thank you for your time, your Honor.

21          THE COURT:  Thank you, Mr. Harris.

22          And thank you, Mr. McCallion, and all counsel.

23          This has been very helpful to me and I will think

24  carefully on these arguments, as well as the submissions which

25  I've already read thoroughly.  I am retaining this matter under

I7VAAVEKC                        Conference

1    advisement.  I would ask that the parties split the cost of

2    ordering an overnight copy of this transcript for my chambers

3    and I will look forward to receiving that.  And the ECF system

4    will notify the parties when I have rendered a decision.

5            Thank you all very much.  Keep well and safe travels

6    to those who travel.

7            We are adjourned.

8            (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25