UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

VEKUII RUKORO et al.,

        Plaintiffs,

    -v-                                  No.  17 CV 62-LTS

FEDERAL REPUBLIC OF GERMANY,

        Defendant.

-------------------------------------------------------x

## OPINION & ORDER

APPEARANCES:

Kenneth Foard McCallion
McCallion & Associates, LLP
100 Park Avenue, 16th Floor
New York, NY 10017

Thomas Alan Holman
Holman Law Office
One Penn Plaza, Suite 4632
New York, NY 10119

Yechezkel Rodal
Rodal Law, P.A.
3201 Griffin Rd, Suite 203
Dania Beach, FL 33312

*Attorneys for Plaintiffs*

Jeffrey Harris
Rubin Winston Diercks, Harris & Cooke, LLP
1201 Connecticut Avenue NW, Suite 200
Washington, DC 20036

*Attorneys for Defendant*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs Vekuii Rukoro, Johannes Isaack, The Association of the Ovaherero Genocide in the USA Inc., and Barnabas Veraa Katuuo bring this putative class action on behalf of members and descendants of the Ovaherero and Nama indigenous peoples against the Federal Republic of Germany ("Germany") for damages, declaratory, and other equitable relief arising from the genocide of thousands of Ovaherero and Nama people in German South West Africa, now modern day Namibia, from 1885 to 1909.  Before the Court is Defendant Germany's motion, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2), to dismiss Plaintiffs' Amended Complaint (docket entry no. 39, the "AC") for lack of subject matter and personal jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602-1611 ("FSIA").  (Docket entry no. 42.)  Germany also moves to dismiss the AC for lack of subject matter jurisdiction under the political question doctrine and, in the alternative, argues that the Court should decline to exercise both subject matter and personal jurisdiction pursuant to the doctrines of forum non conveniens and prudential exhaustion.  On October 31, 2018, Plaintiffs filed a motion for leave to file a supplemental declaration or, in the alternative, to file a Second Amended Complaint.  (Docket entry no. 61.)  The Court has considered the submissions of the parties carefully and, for the following reasons, Germany's motion to dismiss the Amended Complaint is granted and Plaintiffs' motion for leave to file a supplemental declaration or a Second Amended Complaint is denied.

## BACKGROUND

The AC recites in extensive detail the sequence of events that culminated in the brutal exploitation, enslavement, and extermination of substantial numbers of the Ovaherero and

Nama peoples.  The following abbreviated recitation of relevant facts is drawn from the AC, the well-pleaded factual content of which is taken as true for purposes of this motion practice.

Plaintiffs are U.S. and non-U.S. citizens who are members, or direct descendants of members, of the Ovaherero and Nama indigenous peoples.  (AC ¶ 316.)  From approximately 1884 to 1903, German colonial authorities arrived in what was then known as German South West Africa and began to occupy and seize Ovaherero and Nama land, livestock, personal property, and natural resources using violence and coercion.  (AC ¶¶ 5, 69-93.)  Through various decrees and ordinances, German authorities forced the relocation of the Ovaherero and Nama peoples and seized multiple tracts of ancestral land.  (AC ¶¶ 88-89, 92.)  Deprived of their homes and livelihoods, many Ovaherero and Nama people were forced into debt and slavery.  (AC ¶¶ 89, 94.)

In 1904, the German Empire began a violent campaign to exterminate the Ovaherero and Nama peoples.  (AC ¶¶ 99, 102-145.)  Under the leadership of German military commander Adrien Dietrich Lothar von Trotha, German troops captured and lynched countless Ovaherero men, women, and children.  (AC ¶¶ 105-106, 119-120.)  In one particularly gruesome incident, German troops massacred thousands of unarmed and vulnerable Ovaherero members who had gathered in the town of Waterberg for the purpose of surrendering to German forces.  (AC ¶¶ 107-112.)  Those who survived or managed to escape the German forces were driven to the Omaheke Desert to die of starvation and thirst.  (AC ¶¶ 114-115, 118.)  As one German lieutenant observed: "There's a path that leads out of Onduru towards Omuramba.  Alongside the path are human skulls, rib cages, and thousands of fallen cattle and other livestock.  This is the path on which the Ovaherero fled . . . . Everything suggests this was a march of death."  (AC ¶

124.)  German troops carried out a similar campaign against the Nama people, calling for members to surrender on pain of death.  (AC ¶¶ 143-144.)

In 1905, the German imperial government ordered all surviving Ovaherero and Nama peoples to report to shelters from which they were transported to concentration camps. (AC ¶¶ 129-130, 145.)  At these camps, Ovaherero and Nama people were treated as property, rented out as laborers and, ultimately, worked to death.  (AC ¶¶ 148, 150-152.)  Women and children in the camps were raped and sexually abused.  (AC ¶ 154.)  At a concentration camp located on Shark Island, Plaintiffs allege, hundreds of Ovaherero and Nama bodies were dissected for medical research, and hundreds more men, women, and children were brutally murdered and decapitated so that their remains could be studied by researchers who believed in the superiority of the white race.  (AC ¶¶ 167-176.)

In 1985, the United Nations Economic and Social Council Commission on Human Rights issued a report classifying the events described in the AC as a genocide.  (AC ¶ 271); see also Special Rapporteur to Sub-Comm'n on Prevention of Discrimination & Prot. Of Minorities, Revised and Updated Report on the Question of the Prevention and Punishment of the Crime of Genocide ¶ 24, U.N. Doc. E/CN.4/Sub.2/1985/6 (July 2, 1985) (by Benjamin Whitaker).  In recent years, Germany has begun negotiations with the government of Namibia regarding the events described in the AC.  (AC ¶ 288.)  Plaintiffs have not been invited to participate in those negotiations.  (AC ¶ 289.)

Plaintiffs seek damages for the genocide pursuant to the Alien Tort Statute, federal common law, and the law of nations (AC ¶¶ 327-332), damages for conversion of various property rights (AC ¶¶ 333-370), damages for unjust enrichment (AC ¶¶ 371-373), an accounting (AC ¶¶ 374-375), the establishment of a constructive trust (AC ¶¶ 376-377), and declaratory

relief recognizing Plaintiffs as the "legitimate successors to sovereign nations" and declaring that the exclusion of Plaintiffs from negotiations between Germany and Namibia constitutes a violation of Plaintiffs' rights under international law, including the United Nations Declaration on the Rights of Indigenous Peoples (AC ¶¶ 378-382).  Plaintiffs also seek injunctive relief prohibiting Germany from continuing to exclude Plaintiffs from its negotiations with Namibia. (AC at 91.)

In aid of their argument that jurisdiction exists pursuant to one or more of the enumerated exceptions under the FSIA, Plaintiffs allege that many of the Ovaherero and Nama skulls and body parts used for medical experiments remain in Germany's possession (AC ¶ 222), and that certain human remains have been transported to the American Museum of Natural History ("AMNH") in New York City (the "AMNH Remains") (AC ¶¶ 297-300).  Plaintiffs aver that the AMNH Remains "were originally collected by Professor Felix von Luschan, a German anthropologist and ethnologist at the Museum for Ethnology in Berlin from 1995-1910," and then remained a part of von Luschan's "private collection" until his widow sold the collection to the AMNH after von Luschan's death in 1924.  (AC ¶¶ 298-299.)  In addition to the AMNH Remains, Plaintiffs allege that one of the few surviving copies of the "Blue Book," a record of the genocide prepared in 1918, is located at the New York Public Library (AC ¶¶ 302-303), and that New York "has become one of the leading research and conference centers for the study of the Ovaherero/Nama genocide" (AC ¶¶ 304-307).

Plaintiffs also allege that land, livestock, and other personal property seized by German colonial authorities was either sold or leased to settlers or other private parties, and that all proceeds from those transactions were deposited into the German treasury.  (AC ¶¶ 179-180, 182-86.)  Plaintiffs aver that Germany further profited from these seizures by imposing and

collecting fees, customs, tariffs and taxes on exports, mining operations, railway construction, and other ventures in German South West Africa.  (AC ¶¶ 188-206.)  The AC alleges that "[u]pon realization of the benefits achieved by its takings of Ovaherero and Nama property . . . [Germany] commingled these fungible values within its general Imperial treasury and departmental treasuries of various Imperial ministries, agencies, and instrumentalities."  (AC ¶ 249; see also AC ¶¶ 250-55, 258.)  Plaintiffs contend that portions of these commingled funds were used to purchase four real estate properties in New York City: (1) a townhouse located at 119 East 65th Street, (2) a building located at 871 First Avenue, (3) a condominium located at 346 East 49th Street, and (4) a building located at 1014 Fifth Avenue (collectively, the "New York Properties").  (AC ¶ 259.)  The AC alleges that each of the New York Properties is "used in connection with [Germany's] commercial activities" including, among other things, the "performance and existence of contractual obligations related to the housing of German officials and employees," the "performance and existence of contractual obligations related to contracts for maintenance, restoration, cleaning, and other services provided by contractors located in New York City," and "cultural propagation, German-language programs, and other programs to develop American interest in the German people, language, culture, and country with the ultimate goal of commercial growth through cultural growth."  (AC ¶¶ 261, 263, 265, 269.)

## DISCUSSION

As other courts in this circuit have noted in similar circumstances, "strong moral claims are not easily converted into successful legal causes of action."  Garb v. Republic of Poland, 440 F.3d 579, 581 (2d Cir. 2006) (internal quotations omitted).

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign sovereign in the United States," Argentina v. Weltover, 504 U.S. 607, 611 (1992) (internal

quotations omitted), and thus the "the capacity of United States courts to exercise jurisdiction over [P]laintiffs' claims hinges on a legal inquiry narrowly circumscribed by statute," Garb, 440 F.3d at 581.  Under the FSIA, foreign states and their agencies and instrumentalities are presumptively immune from the jurisdiction of the courts of the United States, unless a statutory exception to immunity applies.  28 U.S.C. § 1604; Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).  "Once the defendant presents prima facie evidence that it is a foreign sovereign, the burden falls on the plaintiff to establish by a preponderance of the evidence that an exception under the FSIA permits jurisdiction over the foreign sovereign.  Where the plaintiff satisfies [its] burden that an FSIA exception applies, the foreign sovereign then bears the ultimate burden of persuasion that the FSIA exception does not apply."  Swarna v. Al-Awadi, 622 F.3d 123, 144 (2d Cir. 2010) (internal citations omitted).  If the claim does not fall within one of the FSIA's statutory exceptions, federal courts lack subject matter jurisdiction of the claim, as well as personal jurisdiction over the foreign state defendant.  Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 489 & n.14 (1983).

It is uncontested here that Germany is a foreign state and is therefore generally immune from liability under FSIA, unless a statutory exception applies.  Plaintiffs argue that their claims fall within two of the exceptions to immunity specified in the FSIA: the commercial activity exception, 28 U.S.C. § 1605(a)(2),[1] and the takings exception, 28 U.S.C. § 1605(a)(3).

---

[1]     Germany contends that Plaintiffs have waived their arguments under the commercial activity exception because the AC does not expressly assert that this exception applies. Although Plaintiffs do not specifically invoke 28 U.S.C. § 1605(a)(2) in the AC, they do plead in general terms that Germany's acts "in connection with its commercial activities elsewhere" caused a "direct, material, and deleterious effect" in the United States.  (See AC ¶¶ 33, 295-308.)  Accordingly, the Court finds no waiver and will consider Plaintiffs' arguments regarding the applicability of the commercial activity exception.

Commercial Activity Exception

The commercial activity exception provides, in pertinent part, that a foreign state shall not be immune from jurisdiction in any case in which the action is "based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2) (LexisNexis 2014).  The "threshold step" in assessing the applicability of the commercial activity exception is to "identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims."  Garb, 440 F.3d at 586 (2d Cir. 2006).   An action is "based upon" the "particular conduct that constitutes the gravamen of the suit."  OBB Personenverkehr AG v. Sachs, 136 S.Ct. 390, 395 (2015); see also MMA Consultants 1, Inc. v. Republic of Peru, 719 Fed. App'x 47, 52 (2d Cir. 2017) ("Gravamen is defined as the basis or foundation of a claim, that is, those elements that, if proven, would entitle a plaintiff to relief.  In other words, [the Court] must zero in on the core of the suit and determine a lawsuit's foundation") (internal citations, quotations, and emphasis omitted).  An effect is "direct" within the meaning of the commercial activity exception if it "follows as an immediate consequence of the defendant's . . . activity."  Weltover, 504 U.S. at 618 (internal quotations omitted).  The Second Circuit has held that "'the requisite immediacy' is lacking where the alleged effect 'depend[s] crucially on variables independent of' the conduct of the foreign state."  Guirlando v. TC Ziraat Bankasi A.S., 602 F.3d 69, 75 (2d Cir. 2010) (quoting Virtual Countries, Inc. v. South Africa, 300 F.3d 230, 238 (2d Cir. 2002)).

Plaintiffs argue that the commercial activity exception is applicable here because Germany's "bone activities" and the "construction and operation of, e.g., the railway to Grootfontein in what is now Namibia" are primarily commercial in nature.  (Docket entry no. 49,

Opp. at 18-19.)  Plaintiffs' characterization of these activities as commercial is not, however, sufficient to demonstrate that the commercial activity exception to the FSIA applies.  At their core, Plaintiffs' conversion, unjust enrichment, and restitution claims are not centered upon the collection, sale, and display of Ovaherero and Nama bones, nor does the AC predicate Germany's liability upon the construction of railways in German South West Africa.  As Plaintiffs conceded at oral argument, the gravamen of the AC is the taking of Plaintiffs' land, livestock, and personal property in connection with the Ovaherero and Nama genocide.  (See docket entry no. 58, Hr'g Tr. at 23:7-24:8.)  Thus, even if Germany's "bone activities" and railway construction are "commercial activities" within the meaning of the FSIA, the commercial activity exception is inapplicable because Plaintiffs' claims are not sufficiently "based upon" those allegations.

Separately, the AC alleges that Germany's actions caused a "direct effect" in the United States because (1) members of the class who were injured by the genocide currently reside in the United States (AC ¶¶ 295-96), (2) certain human remains collected by German anthropologist Felix von Luschan are present at the AMNH (AC ¶¶ 297-301), (3) a copy of the "Blue Book" is located in the New York Public Library (AC ¶¶ 302-303), and (4) New York has become a leading research and conference center for the study of the genocide (AC ¶¶ 304-308).  These allegations appear to assume that the acts of genocide and expropriation which form the basis of Plaintiffs' claims can themselves fairly be considered as acts "in connection with a commercial activity" of Germany, an argument that Plaintiffs do not expressly make.  However, assuming without deciding that this is the case, Plaintiffs have still failed to allege facts sufficient to support their contention that Germany's conduct caused a "direct effect" in the United States.

First, the location of some class members in the United States is insufficient to constitute a "direct effect."  See Guirlando, 602 F.3d at 78 ("[T]he mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States.").  Plaintiffs' allegations regarding the presence of a copy of the "Blue Book" at the New York Public Library and New York's role as a leading research and conference center for the study of the Ovaherero and Nama genocide similarly fall far short of the types of "direct effects" required to support jurisdiction.  Although the efforts of scholars and descendants to document and study the genocide are important and laudable, these activities bear no direct and immediate causal connection to Germany's actions in South West Africa and are thus insufficient to give rise to subject matter jurisdiction.

The presence of human remains at the American Museum of Natural History is also insufficient to constitute a "direct effect" of the Ovaherero and Nama genocide because the transfer of those remains to the AMNH was not an immediate consequence of the acts upon which Plaintiffs' claims are based.  According to the AC, the remains were part of a "private collection" belonging to a German anthropologist, and they were sold by the anthropologist's wife to the AMNH following his death in 1924, more than a decade after the events alleged in the AC.  (AC ¶¶ 298-300.)  Plaintiffs have thus failed to demonstrate that the alleged transfer of the remains was the result of any act by a foreign state, or that it flowed directly from Germany's conduct in South West Africa.[2]  On the contrary, the transfer "'depend[ed] crucially on variables

---

[2]     In connection with the instant motion practice, Plaintiffs proffer documentary evidence which they argue shows that the remains in question were transferred from the Royal Museum of Ethnology, "a German government royal museum," rather than from von Luschan's private collection.  (See docket entry no. 45-2, Katuuo Decl.)  Even if this

independent of" the conduct of the foreign state," <u>Guirlando</u>, 602 F.3d at 75.  In this sense, the transportation of remains to New York is more akin to a "subsequent commercial transaction[] involving expropriated property," which is generally insufficient to give rise to subject matter jurisdiction under the commercial activity exception.  <u>See</u> <u>Garb</u>, 440 F.3d at 587 (finding subsequent commercial treatment of expropriated property not sufficiently "in connection with" the prior expropriation to satisfy the commercial activity exception).[3]

       Because Plaintiffs' causes of action are based primarily upon the extermination of the Ovaherero and Nama people and the expropriation of their property, and because Plaintiffs have failed to allege facts sufficient to support their allegation that Germany's acts of expropriation caused a direct effect in the United States, the Court cannot exercise subject matter jurisdiction of Plaintiffs' claims pursuant to FSIA's commercial activity exception.  Accordingly, the Court proceeds to consider whether Plaintiffs' claims fall within the FSIA's takings exception.

---

were the case, the proffered evidence does not demonstrate that the AMNH's acquisition of the remains was a direct effect of the acts upon which Plaintiffs' claims are actually based—namely, Germany's acts of genocide and the expropriation of Plaintiffs' property, all of which occurred in German South West Africa.  Regardless of whether the remains were transferred by von Luschan or the Museum of Ethnology, the Court cannot conclude that a transfer of expropriated property between museums over a decade after the events described in the AC was an immediate or direct consequence of the Ovaherero and Nama genocide.  <u>See</u> <u>Westfield v. Federal Republic of Germany</u>, 633 F.3d 409, 416-17 (6th Cir. 2011) (holding that Germany's conversion of plaintiff's art in Germany did not have a direct effect in the United States).

[3]  To the extent Plaintiffs assert that the remains are themselves property taken in violation of international law, Plaintiffs cannot evade the requirements of § 1605(a)(3) by recharacterizing what are essentially takings claims as acts "in connection with a commercial activity of the foreign state."  <u>See</u> <u>Garb</u>, 440 F.3d at 588 ("Federal courts have repeatedly rejected litigants' attempts to establish subject matter jurisdiction pursuant to other FSIA exceptions when their claims are in essence based on disputed takings of property.").

Takings Exception

   The takings exception provides, in pertinent part, that a foreign state shall not be immune from jurisdiction in any case "in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3) (LexisNexis 2014).  Thus, to establish subject matter jurisdiction pursuant to the takings exception of the FSIA, a plaintiff must demonstrate: "(1) that rights in property are at issue; (2) that the property was "taken"; (3) that the taking was in violation of international law; and either (4)(a) "that property . . . is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," or (4)(b) "that property . . . is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]"  Garb, 440 F.3d at 588 (emphasis in original).

   At the pleading stage, a plaintiff must make more than a nonfrivolous argument that the jurisdictional requirements of the FSIA's takings exception are satisfied.  Venezuela v. Helmerich & Payne Intern. Drilling Co., 137 S. Ct. 1312, 1316-1318 (2017).  Germany argues that, in the wake of Helmerich, Plaintiffs must demonstrate at the pleading stage that each element of the takings exception applies.  (Docket entry no. 43, Motion at 11-12.)  In response, Plaintiffs argue that the holding in Helmerich is limited to the first three elements of the takings exception (whether (1) rights in property (2) were taken (3) in violation of international law), but does not apply to the fourth (whether the expropriated property, or property exchanged for the

expropriated property, is present in the United States in connection with a commercial activity of the foreign state).  (Opp. at 13.)  In <u>Helmerich</u>, the Supreme Court rejected the lower court's application of a "wholly insubstantial" or "non-frivolous" pleading standard to the FSIA's takings exception.  137 S. Ct. at 1318.  Instead, the Court held that the takings exception "grants jurisdiction only where there is a valid claim that 'property' has been 'taken in violation of international law.'  A nonfrivolous argument to that effect is insufficient." <u>Id.</u> at 1318-1319. Nothing in <u>Helmerich</u> supports Plaintiffs' contention that a more than non-frivolous pleading standard applies to the first three elements of the takings exception, but not the fourth.  Indeed, the Court's reasoning in <u>Helmerich</u>, which is rooted in the FSIA's language, history, and structure, suggests that Plaintiffs' interpretation would "embroil the foreign sovereign in an American lawsuit for an increased period of time" and "substitute for a more workable standard . . . a standard limited only by the bounds of a lawyer's (nonfrivolous) imagination." <u>Id.</u> at 1321. Thus, a merely non-frivolous argument that property exchanged for expropriated property is present in the United States in connection with a commercial activity of the foreign state is insufficient under <u>Helmerich</u>.

Assuming <u>arguendo</u> that Plaintiffs have sufficiently alleged under <u>Helmerich</u> that rights in property were taken in violation of international law,[4] the Court nonetheless concludes

---

[4]     Other circuits have recognized that property losses arising from genocides are takings "in violation of international law" within the meaning of the FSIA's takings exception.  <u>See Simon v. Republic of Hungary</u>, 812 F.3d 127, 143-44 (D.C. Cir. 2016); <u>Abelesz v. Magyar Nemzeti Bank</u>, 692 F.3d 661, 674-75 (7th Cir. 2012); <u>Fischer v. Magyar Allamvasutak Zrt.</u>, 777 F.3d 847 (7th Cir. 2015); <u>Davoyan v. Republic of Turkey</u>, 116 F. Supp. 3d 1084, 1103 (C.D. Cal. 2013).  The Court notes, however, that not all of Plaintiffs' allegedly expropriated rights appear to involve "rights in property."  For example, Plaintiffs provide no authority to support their contention that "sovereignty rights" or "labor and tort rights" are legally cognizable property rights.  Plaintiffs' claims for the conversion of these rights appear to seek compensation for rape, forced slave

that it lacks subject matter jurisdiction of Plaintiffs' claims.  As explained below, even though Plaintiffs allege sufficiently that the expropriated property, or property exchanged for the expropriated property, is present in the United States, the AC fails to allege that the expropriated property is present "in connection with a commercial activity" carried on by Germany.  28 U.S.C. § 1605(a)(3) (LexisNexis 2014).

(1) Plaintiffs Have Alleged Sufficiently That "Property Exchanged For Such Property Is Present In The United States"

Plaintiffs allege that a "portion of [Germany's] enormous wealth . . . can be traced from the property it took from the Ovaherero and Nama peoples in violation of international law," and that "[Germany's] investments in New York City constitute property exchanged for the property taken in violation of international law and which were derived from a portion of [Germany's] commingled funds."  (AC ¶ 258.)  Specifically, Plaintiffs contend that the New York Properties constitute "property exchanged for [expropriated] property" that is present in the United States.[5]  (AC ¶ 259.)  In support of their position, Plaintiffs proffer the declaration of

---

labor, wrongful death and other torts, as well as recognition as sovereign equals to governmental units under international law and at the United Nations. (See AC ¶¶ 207-212, 213-218.)  However, it is well recognized that the takings exception does not apply to claims for personal injury or death. Simon, 812 F.3d at 141 ("The [takings] exception therefore affords no avenue by which to 'bring claims for personal injury or death'"); Abelesz, 692 F.3d at 697.  Plaintiffs' claims for declaratory relief related to participation in ongoing negotiations similarly are not claims where "rights in property" are at issue, and the Court accordingly lacks subject matter jurisdiction of those claims under the FSIA.

[5] Separately, Plaintiffs assert claims for the conversion of actual physical human remains. (AC ¶¶ 219-227.)  The AC alleges that some of these remains are present in the United States at the AMNH (AC ¶¶ 297-301), but also alleges that "[n]umerous skulls and body parts of the Ovaherero and Nama peoples remain in [Germany's] possession" (AC ¶ 222). To the extent that Plaintiffs' takings claims seek the return of remains in Germany's possession, the Court lacks subject matter jurisdiction of those claims because Plaintiffs have not demonstrated that the taken property is "present in the United States."  As discussed below, to the extent that Plaintiffs seek the return of the AMNH Remains, they

economist Stan V. Smith, who opines that revenues derived from Germany's activities in South West Africa "may be reasonably presumed to have gone into the general coffers of the German official banking system, and since money is fungible, [that] German government monies were later used to purchase various properties in New York."  (Docket entry no. 45-5, Smith Decl. ¶ 12.)  Without proffering any evidence to the contrary,[6] Germany contends that Plaintiffs cannot, as a matter of law, prove that property taken from the Ovaherero and Nama peoples is traceable to Germany's present-day investments in the New York Properties.  (Motion at 12-13.)

The Court finds that the uncontroverted allegations in the AC, combined with the Smith Declaration, are sufficient to show under <u>Helmerich</u> that property exchanged for the allegedly expropriated property is present in the United States.  Because Germany does not dispute any of the facts in the AC, the Court "assume[s] the truth of [Plaintiffs'] allegations, make[s] all reasonable inferences in [their] favor" and, because Germany asserts it is immune under the FSIA, "properly place[s] the ultimate burden of proof with the Defendant[]."  <u>Schubarth v. Federal Republic of Germany</u>, 891 F.3d 392, 401 (D.C. Cir. 2018).  Under this

---

[6]     have not sufficiently alleged that those remains are present in the United States in connection with a German commercial activity.

Germany asks the Court to "take judicial notice of the historical fact that the German colonies were in constant need of additional funding by the German government in Berlin," thus ensuring that "any cash received in exchange for the allegedly expropriated property . . . would not have become part of [Germany's] general revenues," but provides no evidentiary materials to support its assertions.  (Motion at 13.)  Because the financial arrangements between German colonies and the German government in Berlin are not facts that are "generally known within the trial court's territorial jurisdiction," nor can they be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," the Court declines to take judicial notice of Germany's proffered "historical fact."  <u>See</u> Fed. R. Evid. 201.  In addition, Germany argues that it was "financially ruined at the end of World War I" and cites to the Treaty of Versailles, which provides that all property in Germany's overseas territories "shall pass to the Government exercising authority over such territories."  (<u>Id.</u> at 14.)  The treaty provisions cited by Germany, however, do not relate to funds in the German treasury or monies held locally by Germany, which are the subject of Plaintiffs' commingling claims.

standard, the Court concludes that Plaintiffs have alleged facts sufficient to support their theory

that property expropriated by Germany in the early twentieth century was either sold or leased,

and that the proceeds of those transactions were commingled into the German treasury and used

to purchase the New York Properties.  As other courts have noted when evaluating similar

commingling theories, "further factual development may reveal these allegations to be false or

unsupportable, but for now they must be presumed to be true and construed liberally."  Id.; see

also Simon, 812 F.3d at 147 (finding allegations that the foreign state "liquidated the stolen

property, mixed the resulting funds with their general revenues, and devoted the proceeds to

funding various governmental and commercial operations" sufficient to "raise a plausible

inference that the defendants retain the property or proceeds thereof, absent a sufficiently

convincing indication to the contrary"); Abelesz, 692 F.3d at 697 (finding commingling

allegations plausible where "defendants have offered no case or fact that demonstrates

conclusively that the value of the expropriated property is not traceable to their present day cash

and other holdings.").

       To the extent that Germany argues that it is impossible, as a matter of law, to trace

funds expropriated over a century ago, Germany presents no legal authority to support its

position.  The only case cited by Germany in support of its argument, Alperin v. Vatican Bank,

365 Fed. App'x 74, 75 (9th Cir. 2010), is unpersuasive because the plaintiff in that case failed to

make any allegation in the pleadings that the expropriated property, or property exchanged for

such property, was currently in the United States.

(2) <u>Plaintiffs Have Failed To Allege That Property In The United States Is Present "In Connection With" A German Commercial Activity</u>

Germany next argues that, even if the New York Properties are property exchanged for expropriated property within the meaning of the takings exception, Plaintiffs have failed to show, as a matter of law, that these properties are present in the United States in connection with a commercial activity carried on in the United States by Germany.  (Motion at 15-17.)  The FSIA defines a "commercial activity carried on in the United States by a foreign state" as a "commercial activity carried on by such state and having substantial contact with the United States."  28 U.S.C. § 1603(e) (LexisNexis 2014).  A "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d) (LexisNexis 2014).  The statute notes that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  <u>Id.</u>  Courts have found that a state engages in "commercial activity" where it acts "in the manner of a private player within the market."  <u>Nelson</u>, 507 U.S. at 358-59.

Plaintiffs contend that the New York Properties are present in the United States in connection primarily with two types of commercial activities.  First, Plaintiffs argue that the "performance and existence of contractual obligations" related to housing, maintenance, and insurance at each of the four properties is sufficient to demonstrate that the properties are present "in connection with" commercial activities.  (<u>See</u> AC ¶¶ 261, 263, 265, 269.)  This argument, however, ignores the primary function of each property, and focuses instead on activities that are incidental to the property's operations.  Although contracts for construction, maintenance, insurance, and repair are concomitant commercial aspects of property ownership, they bear no "substantive connection" or "causal link" to the primary purposes for which these properties are

held and operated.  <u>Garb</u>, 440 F.3d at 587 ("The statutory term 'in connection,' as used in the

FSIA, is a term of art, and we interpret it narrowly.").  As the parties acknowledge, the New

York Properties are used principally as a private residence for Germany's diplomats or to house

Germany's mission to the United Nations, its consulate general, or other entities engaged in the

propagation of German culture such as the German Academic Exchange Service, the Goethe

Institute, and the German Academy of Art.  (<u>See</u> Motion at 15-16; AC ¶¶ 262, 267-68.)  To

conclude that contracts for restoration work or boiler repairs render these properties present "in

connection with" a commercial activity of a foreign state would expand the scope of the FSIA

takings exception well beyond the boundaries of the "restrictive" theory of sovereign immunity

embodied in the statute.  <u>See</u> <u>Helmerich</u>, 137 S. Ct. at 1320 ("The [FSIA] . . . by and large

continues to reflect basic principles of international law, in particular those principles embodied

in what jurists refer to as the 'restrictive' theory of sovereign immunity"); Restatement (Third) of

Foreign Relations Law of the United States § 451 cmt. a (1986) ("Under the restrictive theory, a

state is immune from any exercise of judicial jurisdiction by another state in respect of claims

arising out of governmental activities.").  Under Plaintiffs' interpretation, a foreign state would

be amenable to suit under to the takings exception simply because its personnel have to be

housed, fed, or transported while in the United States.  Plaintiffs' reading of the commercial

nexus requirement conflates commerce in connection with property and property held in

connection with commerce, and it swallows the general rule that foreign states are presumptively

immune from the jurisdiction of the courts of the United States.  Accordingly, the Court finds, as

a matter of law, that Plaintiffs' allegations are insufficient to establish subject matter jurisdiction under the takings exception.[7]

Second, Plaintiffs argue that each of the New York Properties is present in connection with a "commercial" activity because they are involved in "cultural propagation, German-language programs, and other programs to develop American interest in the German people, language, culture, and country with the ultimate goal of commercial growth through cultural growth."  (AC ¶¶ 261, 263, 265, 269.)  In support of their allegations, Plaintiffs proffer the declaration of attorney Michael Lockman, who claims to have visited each of the New York Properties and states, among other things, that he "saw no indication of official state use" at any

---

[7]    For similar reasons, the Court also concludes that the AMNH Remains are not present in the United States in connection with a German commercial activity.  Plaintiffs argue that the remains were sold by the Museum of Ethnology to the AMNH "as part of a commercial transaction," and that von Luschan, the Museum's director, employed the assistance of "German soldiers and agents to locate and/or transfer human remains from Ovaherero and Nama territory and lands to Germany."  (Katuuo Decl. ¶¶ 6-7.)  Plaintiffs argue generally that Germany was a "market maker," "market participant," and "major player" in the "bone trade" and the "business of bone display."  (Hr'g Tr. at 17-19.)  Even accepting that the "bone trade" is a commercial activity, and that Germany acted in the manner of a private participant in the bone trade, Plaintiffs present no facts from which the Court can infer that the AMNH Remains are currently present at the AMNH in connection with the bone trade, or that Germany continues to participate in the bone trade.  See Schubarth v. Federal Republic of Germany, 220 F. Supp. 3d 111, 115 (D.D.C. 2016) ("Courts assessing the FSIA's commercial activity requirement, however, have looked for evidence of recent or ongoing transactions"), aff'd in part, rev'd in part, 891 F.3d 392 (D.C. Cir. 2018) (noting that "[t]his interpretation is supported by the FSIA's plain text, which employs the present tense").  Moreover, Plaintiffs present no facts from which the Court can infer that Germany's engagement in the bone trade in the early twentieth century was "in the United States" or had any substantial contact with the United States.  To the extent that Plaintiffs argue that the AMNH transfer itself was a substantial contact with the United States, the Court finds that a single commercial transaction is not substantial enough to constitute a "commercial activity carried on in the United States by a foreign state" as that term is defined by 28 U.S.C. § 1603(e), particularly where Plaintiffs' simple conclusory assertion that the Museum is a "German government royal museum" is insufficient to demonstrate that the Museum of Ethnology's actions in connection with the sale can fairly be considered activities of  the German state.

of the four properties.  (Docket entry no. 45-6, Lockman Decl. ¶¶ 5, 6-8.)  Plaintiffs' arguments

and evidence seek to stretch the definition of "commercial" to encompass activities that are

ordinarily considered governmental.  The use of the New York Properties to support cultural

exchange or arts programs is not fundamentally concerned with "the buying and selling of

goods," nor are these activities goods "[m]anufactured for the markets" or "put up for trade," or

related to "the ability of a product or business to make a profit."  Black's Law Dictionary (10th

ed. 2014); see also Restatement (Third) of Foreign Relations Law of the United States § 453 cmt.

b (1986) ("An activity is deemed commercial . . . if it is concerned with production, sale, or

purchase of goods; hiring or leasing of property; borrowing or lending of money; performance of

or contracting for the performance of services; and similar activities of the kind . . . .").  Plaintiffs

proffer no evidence of a commercial relationship between, for instance, Germany and the

German Academic Exchange Service, and unlike the sale of railway tickets or the issuance of

bonds—activities which other courts have determined to be sufficiently "commercial" in

nature—the programs and activities described in the AC and referenced in the Lockman

Declaration appear to be sovereign and diplomatic undertakings aimed at promoting interest in

German culture and are thus not the "type of actions by which a private party engages in trade

and traffic or commerce."  Weltover, 504 U.S. at 614; see also LaLoup v. United States, 29 F.

Supp. 3d 530, 551-552 (E.D. Pa. 2014) (finding allegations that a foreign sovereign maintained

consulates, promoted business interests, and sponsored tourism insufficient to constitute

commercial activity under the FSIA).  Accordingly, the Court finds that the AC does not allege

plausibly that the New York Properties are present in the United States "in connection with

a commercial activity" carried on by Germany, and the Court lacks subject matter jurisdiction

under the FSIA's takings exception.

In light of the Court's conclusion that it lacks subject matter jurisdiction pursuant to the FSIA commercial activity and takings exceptions, the Court declines to address Germany's remaining arguments in favor of dismissal.

Motion for Leave to File a Supplemental Declaration or a Second Amended Complaint

On October 31, 2018, Plaintiffs filed a motion seeking leave to file a supplemental declaration in support of their motion to dismiss or, in the alternative, to file a Second Amended Complaint.  The proposed supplemental declaration proffers additional facts related to, among other things, the history and provenance of the AMNH Remains (docket entry no. 61-2, Supp. Decl. ¶¶ 5-7), von Luschan's relationship with the Museum of Ethnology in Berlin (id. ¶¶ 4, 31-36), the Museum of Ethnology's acquisition and study of human remains from other institutions within and outside of the United States (id. ¶¶ 8-14, 24-26), von Luschan's acquisition of other remains from the United States (id. ¶¶ 24, 27-30), the collection of other human remains by other individuals and institutions in Germany (id.  ¶¶ 17-23), the repatriation of certain Ovaherero and Nama remains to Namibia (id. ¶¶ 38-39), and the repatriation of certain human remains from Germany to the United States (id. ¶¶ 40-41). Plaintiffs' proposed Second Amended Complaint primarily adds factual allegations substantially similar to those presented in their proposed supplemental declaration.  (See generally docket entry no. 61-3.)

Federal Rule of Civil Procedure 15(a) provides that leave to amend the pleadings "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Leave to amend may, however, be denied if the amendment (1) has been delayed unduly, (2) is sought for dilatory purposes or is made in bad faith, (3) the opposing party would be prejudiced, or (4) would be

futile.  Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018).  Other than a general reference to delays and difficulties in gaining access to research documents, Plaintiffs offer no explanation as to why the facts alleged in the proposed supplemental declaration and Second Amended Complaint—which are primarily derived from historical and scholarly documents, the contents of which have presumably been available to Plaintiffs for decades since the events described in the AC—were not included in earlier iterations of their complaint.  The initial complaint in this action was filed over two years ago, on January 5, 2017, and Plaintiffs have already availed themselves of an opportunity to amend their complaint.  The instant motion to dismiss has been fully briefed twice and oral argument was held on the motion on July 31, 2018.  The Court finds that Plaintiffs' undue delay in supplementing their motion and seeking leave to file an amended pleading is prejudicial to Germany at this late stage.

Furthermore, even if the Court were to consider the additional factual material proffered in the supplemental declaration and Second Amended Complaint, leave to amend must be denied as futile.  As discussed above, the presence of Ovaherero and Nama remains at the AMNH is insufficient to give rise to subject matter jurisdiction under either the commercial activity or the takings exception to the FSIA.  The additional factual allegations regarding the history and provenance of the AMNH Remains that Plaintiffs have proffered do not alter the Court's conclusion that the transfer of these remains ten years after the events described in the AC is not a direct effect of the acts of genocide upon which Plaintiffs' claims are based.  The same is true with respect to the Court's conclusion regarding the applicability of the takings exception.  While the facts proffered in Plaintiffs' supplemental declaration and proposed Second Amended Complaint now suggest that Germany's "bone trade" activities bore some relationship to the United States in the early twentieth century, they do not sufficiently

demonstrate that Germany's ongoing "bone trade" activities in the form of repatriation efforts entail substantial, commercial contact with the United States or share a substantive or causal connection to the AMNH Remains, nor do they provide any basis from which the Court can conclude that the activities of the German entities engaged in these repatriation efforts can all fairly be considered activities of the German state.  In this context, the Court finds that allegations regarding the recent repatriation of certain Hawaiian and Alaskan remains from Germany are insufficient to demonstrate that the AMNH Remains are "present in the United States in connection with" a German commercial activity having substantial contact with the United States.  Accordingly, Plaintiffs' motion for leave to file a supplemental declaration or, in the alternative, to file a Second Amended Complaint is denied.

CONCLUSION

For the foregoing reasons, Germany's motion to dismiss the Amended Complaint is granted and Plaintiffs' motion for leave to file a supplemental declaration or a Second Amended Complaint is denied.  The Clerk of Court is requested to enter judgment dismissing the Amended Complaint for lack of subject matter jurisdiction and to close this case.  This Opinion and Order resolves docket entry nos. 42 and 61.

SO ORDERED.

Dated: New York, New York
       March 6, 2019

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge